**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| RHODE ISLAND STATE COUNCIL OF CHURCHES, | |
| NATIONAL COUNCIL OF NONPROFITS, | |
| SERVICE EMPLOYEES INTERNATIONAL UNION, | |
| MAIN STREET ALLIANCE, | |
| CITY OF CENTRAL FALLS, | |
| CITY OF PAWTUCKET, | |
| CITY OF PROVIDENCE, | Case No. _____ |
| CITY OF ALBUQUERQUE, | |
| CITY OF BALTIMORE, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| CITY OF COLUMBUS, | |
| CITY OF DURHAM, | |
| CITY OF NEW HAVEN, | |
| AMOS HOUSE, | |
| DR. MARTIN LUTHER KING, JR. COMMUNITY CENTER, | |
| EAST BAY COMMUNITY ACTION PROGRAM, | |
| FEDERAL HILL HOUSE ASSOCIATION, | |
| THE MILAGROS PROJECT, | |
| UNITED WAY OF RHODE ISLAND, | |
| NEW YORK LEGAL ASSISTANCE GROUP, | |

BLACK SHEEP MARKET,

        *Plaintiffs*,

v.

BROOKE ROLLINS, in her official capacity
as Secretary of the United States Department
of Agriculture,

UNITED STATES DEPARTMENT OF
AGRICULTURE,

RUSSELL VOUGHT, in his official capacity
as Director of the United States Office of
Management and Budget,

OFFICE OF MANAGEMENT AND
BUDGET,

SCOTT BESSENT, in his official capacity as
Secretary of the United States Department of
the Treasury,

UNITED STATES DEPARTMENT OF
TREASURY,

and

UNITED STATES OF AMERICA,

        *Defendants.*

## INTRODUCTION

1.      Millions of Americans rely on the Supplemental Nutrition Assistance Program (SNAP) for food assistance. Those beneficiaries include more than 14 million children, nearly 8 million elderly people, and 1.2 million veterans who live in households that receive SNAP benefits. Beyond the many people (including Plaintiff SEIU's members) who rely on SNAP for food, SNAP is crucial for business for thousands of grocery stores and retailers, including many in rural areas. It is estimated that hundreds of thousands of jobs depend on food-related spending enabled by SNAP.

2.      Defendants have needlessly plunged SNAP into crisis. This month, the U.S. Department of Agriculture (USDA) abruptly suspended SNAP benefits, effective November 1, 2025, even though there are appropriated funds available that could—and must—be used for those benefits.

3.      USDA also prematurely terminated waivers of certain SNAP work requirements in states and areas with insufficient jobs, acting without any statutory authorization or consideration of the effects on people trying to keep up with those requirements.

4.      USDA's suspension of SNAP benefits is contrary to law and arbitrary and capricious, and its failure to fund SNAP constitutes agency action unlawfully withheld, all in violation of the Administrative Procedure Act (APA).

5.      USDA's premature termination of waivers for certain work requirements exceeds the agency's statutory authority and is arbitrary and capricious, in violation of the APA.

6.      Plaintiffs in this action include a national union whose membership includes SNAP recipients who risk losing their benefits; cities that will divert critical resources to support their residents who depend on SNAP to feed themselves and their families; churches, faith-based

organizations, and nonprofits that provide emergency food assistance, legal services, and other critical resources, whose missions are impaired by the impending crisis; and food retailers that rely on SNAP-powered purchases to keep their doors open. These Plaintiffs will suffer irreparable harm as a result of USDA's suspension of SNAP benefits and termination of waivers.

7.    This Court should immediately grant temporary relief to ensure that millions of Americans can continue to receive essential SNAP benefits.

## PARTIES

8.    Plaintiff Rhode Island State Council of Churches (RISCC) is a nonprofit membership organization of churches, located in Providence, Rhode Island, and serves as an advocate for those who have no voice and resource for individuals, congregations, denominations, and civil organizations, operating as a coalition of individuals and faith communities. RISCC brings this case on behalf of its members. Food assistance is a critical component of services provided by RISCC member churches, as many member churches operate food pantries that provide produce, meat, dairy and non-perishables to individuals and families in Rhode Island.

9.    Plaintiff National Council of Nonprofits (NCN) is the largest network of nonprofit organizations in North America, with more than 30,000 organizational members nationwide, including organizations that provide direct emergency food assistance to food-insecure individuals or help them obtain benefits. NCN supports nonprofits in advancing their missions by identifying emerging trends, sharing proven practices, and promoting solutions that benefit charitable nonprofits and the communities they serve. NCN brings this case on behalf of its members.

10.    Plaintiff Service Employees International Union AFL-CIO ("SEIU") is a labor organization of approximately two million working people united by the belief in the dignity and

worth of workers and the services they provide. SEIU strives for a just society in which all workers, families, and communities can thrive. SNAP is a crucial program in supporting that mission, and it serves more than 1 in 5 workers in the United States. SEIU brings this case on behalf of its members, who work in healthcare, the public sector, and property services. SEIU has over 150 affiliates across the United States, Canada, and Puerto Rico, and is headquartered at 1800 Massachusetts Ave., N.W., Washington, D.C. 20036. The nonfunding of SNAP and the early termination of existing waivers of federal work requirements for SNAP recipients who are classified as Able-Bodied Adults Without Dependents ("ABAWD") will hurt SEIU members who are SNAP recipients and SEIU members who are state and local government workers who help administer SNAP benefits to eligible recipients across the country.

11.    Plaintiff Main Street Alliance (MSA) is a national network of small businesses, which represents approximately 30,000 small businesses across the United States including grocery retailers that accept SNAP benefits. MSA seeks to amplify the voices of its small business membership by sharing their experiences with the aim of creating an economy where all small business owners have an equal opportunity to succeed. MSA brings this case on behalf of its members.

12.    Plaintiff the City of Central Falls, Rhode Island, is a municipal corporation organized under the laws of the State of Rhode Island. *See* R.I. Gen. Laws § 45-15-1. Central Falls is the smallest and most densely populated city in Rhode Island, with approximately 22,500 residents, of which nearly one-fourth receive SNAP benefits. Central Falls has provided funding to help mitigate hunger in the wake of the disruption of SNAP, and it provides a range of services on behalf of its residents, including public safety, public health, education, recreation,

and various social services designed to help individuals and families achieve stability and self-sufficiency, including food security. Central Falls is also one of the nine Rhode Island municipalities covered by the able-bodied adults without dependents ("ABAWD") waiver that USDA approved effective March 1, 2025, through February 28, 2026.

13.    Plaintiff the City of Pawtucket, Rhode Island, is a municipal corporation organized under the laws of the State of Rhode Island. *See* R.I. Gen. Laws § 45-15-1. Pawtucket has a population of approximately 75,600 residents, of which 15,900, or one-fifth of the City's population, receive SNAP benefits. Pawtucket has provided funding to help mitigate hunger in the wake of the disruption of SNAP, and it provides essential services and programs to help residents achieve stability and self-sufficiency. Pawtucket is also one of the nine Rhode Island municipalities covered by the able-bodied adults without dependents ("ABAWD") waiver that USDA approved effective March 1, 2025, through February 28, 2026.

14.    Plaintiff the City of Providence, Rhode Island, is a municipal corporation organized under the laws of the State of Rhode Island. *See* R.I. Gen. Laws § 45-15-1. Providence is the capital city and has a population of approximately 194,000 residents, with approximately 25,000 residents, including 16,000 children, receiving SNAP benefits. Providence has provided funding to help mitigate hunger in the wake of the disruption of SNAP, and it provides essential services and programs to support its residents, including child nutrition and community meals, homeless shelter operations, mobile outreach, and much more. Providence is also one of the nine Rhode Island municipalities covered by the able-bodied adults without dependents ("ABAWD") waiver that USDA approved effective March 1, 2025, through February 28, 2026.

15.     Plaintiff the City of Albuquerque is a municipal corporation organized under the laws of the State of New Mexico. *See* N.M. Const. article X. Albuquerque is the largest municipality in the State of New Mexico, serving more than 560,000 residents, and makes up the majority of Bernalillo County. Albuquerque provides a range of services and programs to its residents, including social and health services, youth programs, senior services, public safety, education, recreation, homelessness services, and resources for those in need of emergency, mental, or behavioral health support. These services are critical for supporting individuals and families in the community to reach stability and independence. As of September 2025, the unduplicated customer count in Bernalillo County receiving SNAP benefits totaled 119,164, or 17.62 percent of the Bernalillo County population; a large percentage of these recipients are located in Albuquerque. The nonfunding of SNAP will leave thousands of Albuquerque residents without adequate means of securing food, placing additional pressure on Albuquerque's resources and support systems. Albuquerque anticipates additional food will be required for the food assistance programs at its Health and Social Services Centers and Senior Centers, which will necessitate an increase in food costs, workforce, and infrastructure. The internal programs in place designed to provide advice, referrals or, and resources to the community, as well as volunteer opportunities, are being diverted to address this crisis. This, together with other measures Albuquerque expects to undertake in response to the nonfunding, will necessitate diverting resources and staff time away from other critical City services.

16.     Plaintiff Mayor and City Council of Baltimore, Maryland ("Baltimore"), is a municipal corporation, organized pursuant to Articles XI and XI-A of the Maryland Constitution, entrusted with all the powers of local self-government and home rule afforded by those articles. Baltimore is the largest city in Maryland and the thirtieth largest city in the United States, with

just under 570,000 residents, 25 percent of whom receive SNAP benefits. Baltimore provides a range of services and programs to its residents, including public safety, public health, education, recreation, homelessness services, services for children and family, violence reduction, and other social services designed to help individuals and families achieve stability and self-sufficiency. The nonfunding of SNAP will leave nearly 145,000 Baltimore residents without adequate means of securing food, a burden that Baltimore will have to help shoulder. The nonfunding has already caused Baltimore to allocate $1.7 million of funding to help get food to workers and residents who would otherwise go hungry. This requires it to divert limited resources from other important city services. Meanwhile, City personnel must also divert time and resources from their normal duties to help affected households and to develop plans for addressing the crisis.

17.     Plaintiff the City of Columbus, Ohio, is a municipal corporation organized under Ohio law. *See* Ohio Const. art. XVIII. Columbus has all the powers of local self-government and home rule under the constitution and laws of the state of Ohio, which are exercised in the manner prescribed by the Charter of the City of Columbus. Columbus, located in Franklin County, is the capital of Ohio. It is the largest city in the state and the fifteenth largest city in the United States, with a population of around 905,748, according to the 2020 Census. Columbus has provided funding to help mitigate hunger in the wake of the disruption of SNAP, and it provides a wide range of services on behalf of its residents, including operating municipal utilities, public health services, public assistance, community and recreation centers, and emergency medical care.

18.     Plaintiff the City of Durham, North Carolina, is a municipal corporation organized under North Carolina law. *See* N.C. Gen. Stat. § 160A-1 *et seq*. Durham is the fourth-most populous city in North Carolina, with a population of 283,506 people, approximately 32,529 of whom receive SNAP benefits. The City of Durham is the only municipal corporation

in Durham County, and nearly 87 percent of Durham County residents are in the City limits. The City promotes the well-being of its residents through a broad range of programs, services, and partnerships that address housing, public safety, health, economic opportunity, and community engagement. As a municipal corporation, the City provides essential public services—including police and fire protection, water and sewer utilities, solid waste collection, and infrastructure maintenance—that ensure safe and healthy living conditions. The City also supports public transportation, parks, recreation centers, greenways, and cultural initiatives that foster physical health, social connection, and quality of life. Through its Housing and Neighborhood Services and Community Safety Departments, the City invests federal and local funds in affordable housing, homelessness prevention, neighborhood revitalization, and programs that combat food insecurity and poverty. Additionally, Durham collaborates with Durham County, local nonprofits, and educational and healthcare institutions to address social determinants of health— such as housing stability, food access, and economic mobility—through coordinated initiatives and grant partnerships. Should SNAP be discontinued or reduced, the City will surely face increased fiscal and service burdens as more residents turn to local food programs and emergency aid. In that event, the City will need to expand its grant-making and direct support to nonprofit food providers, reallocate limited general fund and HUD resources toward emergency food access, and work with Durham County and community partners to fill critical gaps left by the loss of federal assistance.

19.     Plaintiff the City of New Haven, Connecticut, is a municipal corporation organized under Connecticut law and has the capacity to bring a suit in its own name. *See* C.G.S. § 52-73. New Haven is the second-most populous city in Connecticut, with a population of about 135,000 residents. About 42,930 residents receive SNAP benefits, or about 31 percent of the

population. New Haven has provided funding to mitigate hunger in the wake of the disruption of SNAP, and it provides essential services such as public health initiatives, community and senior centers, services for people suffering from homelessness, and partnerships with local food pantries to help individuals and families achieve stability and self-sufficiency.

20.     Plaintiff Amos House is a private, non-profit, 501(c)(3) community-based organization located in Providence, Rhode Island. Amos House provides food, shelter, housing and basic needs to unhoused, unemployed and underemployed Rhode Islanders. Amos House serves over 213,000 meals in its soup kitchen and over 200,000 meals through its shelter programs. As individuals served by Amos House lose their SNAP benefits, Amos House will have to provide additional meals for both residents in their shelter programs and at their soup kitchen at increased costs of staffing, food and supports, which will cost in the thousands of dollars.

21.     Plaintiff Dr. Martin Luther King, Jr. Community Center (MLKCC) is a private, non-profit, 501(c)(3) community-based organization located in Newport, Rhode Island. MLKCC operates with a mission to nourish, educate, and support Newport County residents to improve their economic, social and physical well-being through programs in three areas: Hunger Prevention and Nutrition, Children's Education, and Community Support and Wellness. MLKCC's staff has already seen a surge in hunger relief programming, including hundreds of visits from SNAP recipients seeking information or emergency food assistance. This disruption has impaired MLKCC's ability to carry out other essential services and strains its already limited administrative and financial resources.

22.     Plaintiff East Bay Community Action Program (EBCAP) is a private, non-profit, 501(c)(3) health and human services agency, serving low-income individuals and families

residing in 10 cities and towns in Rhode Island's East Bay. EBCAP is both a community action agency and a federally qualified health center and directly addresses food insecurity through operation of three food pantries, and various other programs. EBCAP has already had to divert employees and volunteers from other programs, such as housing and community health worker programs, in order to manage the increased demand and influx of calls from SNAP recipients seeking information or emergency food assistance.

23.     Plaintiff Federal Hill House (FHH) is a private, non-profit, 501(c)(3) community-based service organization located in Providence, Rhode Island. Each year, FHH serves more than 7,500 households in Providence and the surrounding communities with emergency food assistance, early childhood education, after school programs, parent education, youth workforce development, senior programs, tax preparation and various support services. FHH operates one of the busiest food pantries in the state. Since news came out that SNAP benefits would not be released for November 1, FHH experienced a dramatic increase in demand at the food pantry, causing it to divert employees and volunteers from other programs to manage the influx, which impaired FHH's ability to carry out other essential services and strained its limited administrative and financial resources.

24.     Plaintiff The Milagros Project (TMP) is a private, non-profit, 501(c)(3) community-based organization located in Woonsocket, Rhode Island. TMP provides food to the most at-risk residents in Woonsocket and the surrounding area, which includes individuals and families who receive SNAP benefits but still need supplemental food assistance to survive. The increased demand due to the nonfunding of SNAP will place extraordinary strain on TMP's staff and volunteers to work longer hours and manage greater numbers of clients than its operations were designed to handle. If SNAP benefits are suspended, TMP will be forced to end its

nonviolence program for youth and coordinated city events, including backpack giveaways to school children, in order to meet the increased need for food assistance.

25.     Plaintiff United Way of Rhode Island (UWRI) is a private, non-profit, 501(c)(3) multi-service, community-based organization located in Providence, Rhode Island. Each year, UWRI connects hundreds of thousands of Rhode Islanders to critical resources that support every aspect of their well-being. UWRI helps households understand their SNAP eligibility and helps households complete or renew applications for SNAP, concrete steps toward reducing food insecurity. UWRI also serves as a lead convener of the Rhode Island Food Access Coalition, a cross-sector partnership coalition focusing on aligning food access, programs, strengthening data sharing, and identifying systemic barriers that prevent Rhode Islanders from obtaining healthy, affordable food. The announcement of the nonfunding of SNAP and new work requirements has already led to a dramatic increase in food requests, surpassing rent and utility assistance, creating significant strain on UWRI's outreach teams and causing UWRI to divert exorbitant additional staff hours across multiple departments.

26.     Plaintiff New York Legal Assistance Group (NYLAG) is a civil legal services organization combating economic, racial, and social injustice. NYLAG addresses legal needs with free civil legal services, impact litigation, policy advocacy, and community education. NYLAG's Public Benefits Unit serves clients who are experiencing barriers to accessing and maintaining public benefits, including SNAP. If SNAP benefits are suspended and/or ABAWD waivers are prematurely terminated, NYLAG expects that its intake lines and referral channels from community-based partner organizations will be swamped with clients seeking advice and counsel. This will consume substantial staff time and expertise and will require NYLAG to

divert its resources from other clients who need assistance and other areas of essential legal support.

27.    Plaintiff Black Sheep Market is an independently owned small business meat market with two locations in Greenville, South Carolina, and Laurens, South Carolina. Black Sheep Market prides itself on providing quality, affordable meat and produce, and its stores serve a predominantly low-income customer base. It accepts SNAP benefits at its Greenville location and has applied to accept SNAP benefits at its Laurens location, which just opened in August 2025. About 40 percent of Black Sheep Market's weekly 50 to 60 thousand dollars in sales is paid for with SNAP benefits, and it stands to lose all of that revenue if SNAP funding is suspended. That loss will harm Black Sheep Market's ability to maintain partnerships with its suppliers and plan effectively for its day-to-day operations. It will also cause Black Sheep Market to cut back its employees' hours, which will in turn make it more difficult for their employees to make ends meet.

28.    Defendant Brooke Rollins is the Secretary of the U.S. Department of Agriculture (USDA), the agency responsible for administering the SNAP program. She is sued in her official capacity.

29.    Defendant the United States Department of Agriculture is an executive department of the United States federal government headquartered in Washington, D.C. 7 U.S.C. § 2202. USDA is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

30.    Defendant the Office of Management and Budget (OMB) is an administrative agency within the Office of the President of the United States. Defendant OMB apportions congressionally appropriated funding to USDA to be issued to states for SNAP benefits.

31.    Defendant Russell Vought is the Director of OMB. He is sued in his official capacity.

32.    Defendant the United States Department of Treasury is a federal agency headquartered in Washington, D.C., with responsibility for managing federal finances.

33.    Defendant Scott Bessent is the Secretary of United States Department of the Treasury. He is sued in his official capacity.

34.    Defendant the United States of America is sued in its governmental capacity as a proper party defendant for actions seeking relief under the Administrative Procedure Act (APA), 5 U.S.C. § 702.

## JURISDICTION AND VENUE

35.    The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the claims arise under federal law, namely, the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*

36.    The Court has authority to enter a declaratory judgment and to provide temporary, preliminary, and permanent injunctive relief pursuant to Federal Rules of Civil Procedure 57 and 65, 28 U.S.C. §§ 2201–2202, the All Writs Act, and the Court's inherent equitable powers.

37.    Venue is proper in the District of Rhode Island under 28 U.S.C. § 1391(e)(1) because this action seeks relief against an agency of the United States and an officer of that agency acting in his official capacity and Plaintiffs Rhode Island State Council of Churches, City of Central Falls, City of Pawtucket, City of Providence, Amos House, Dr. Martin Luther King, Jr. Community Center, East Bay Community Action Program, Federal Hill House, The Milagros Project, and United Way of Rhode Island reside in this district.

# BACKGROUND

## A. The SNAP Program

38.    SNAP is the nation's largest domestic food assistance program. Gene Falk, et al., Cong. Rsch. Serv., R48531, Work Requirements: Existing Policies in Medicaid, SNAP, Housing Assistance, and TANF (2025), https://perma.cc/MXL2-D9SJ. In fiscal year 2024, the program served an average of 41.7 million people per month—12.3 percent of U.S. residents.

39.    While federally funded food assistance dates back to the Great Depression, Congress created the most recent iteration, known as the Supplemental Nutrition Assistance Program, in the Food and Nutrition Act of 2008. Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, §§ 4001-4002, 122 Stat. 1853 (2008); *see also* U.S. Dep't of Agric., *A Short History of Snap*, (Aug. 29, 2025), https://perma.cc/5AK3-HTFC. With the SNAP program, Congress aimed to "alleviate … hunger and malnutrition" among low-income households by enabling them to "obtain a more nutritious diet through normal channels of trade." 7 U.S.C. § 2011. In particular, the SNAP program provides eligible individuals an allotment that they can use to buy food at approved retailers. 7 U.S.C. § 2013(a)(1). Congress created SNAP as an entitlement: The statute provides that "[a]ssistance under this program shall be furnished to all eligible households who make application for such participation." 7 U.S.C. § 2014(a).

40.    SNAP plays a critical role in helping American families afford food when they cannot otherwise make ends meet. Over one-third of SNAP participants are children. U.S. Dep't of Agric., *Characteristics of SNAP Households: Fiscal Year 2023*, (May 2, 2025), https://perma.cc/RN8A-YD8R. And the vast majority—88 percent in fiscal year 2023—are households with either a child, an elderly individual, or a person with a disability. *Id.* SNAP provides Americans approximately $8 billion in food assistance monthly. U.S. Dep't of Agric.,

*The Food and Nutrition Assistance Landscape: Fiscal Year 2024 Annual Report* at 9 (July 2025), https://perma.cc/BV5D-ZM98.

41.    In addition to serving as the first line of defense against hunger, SNAP reduces poverty, improves health and economic outcomes, and supports people who are paid low wages. It also benefits the economy more broadly, with USDA estimating that, in a slowing economy, $1 billion of SNAP benefits generates over $1.5 billion in economic activity and creates over 13,500 new jobs. U.S. Dep't of Agric.,, *Supplemental Nutrition Assistance Program (SNAP) – Key Statistics and Research* (July 24, 2025), https://perma.cc/NST2-C9KL.

42.    SNAP benefits are capped at $298 per month for a single-person household. U.S. Dep't of Agric., *SNAP Eligibility*, (Sept. 30, 2025), https://perma.cc/6YFJ-YQUU. But most households receive less. On average, participants received $187 per month from SNAP in fiscal year 2024 to help cover food costs. *Supplemental Nutrition Assistance Program (SNAP) – Key Statistics and Research* (updated July 24, 2025), *available at* https://perma.cc/NST2-C9KL.

43.    The USDA and states jointly administer the SNAP program, with states handling most recipient functions, like determining eligibility and issuing benefits, and the USDA's Food and Nutrition Service supporting and overseeing state functions and approving retailers to accept SNAP benefits. 7 U.S.C. §§ 2018, 2020. Ten states delegate administrative responsibilities to counties such that SNAP is county-administered in those states.

### B.  Funding for SNAP

44.    Congress generally funds the SNAP program through appropriations bills.

45.    In the Consolidated Appropriations Act of 2024, Congress appropriated more than $122 billion for SNAP. Pub. L. No. 118-42, 138 Stat. 25, 93. Of that sum, Congress directed that $3 billion, "to remain available through September 30, 2026, shall be placed in reserve for use

only in such amounts and at such times as may become necessary to carry out program operations." *Id.*

46.    Congress maintained those funding levels for the SNAP program in the Full-Year Continuing Appropriations and Extensions Act of 2025, meaning that an additional $3 billion was put aside in a reserve available through September 30, 2027. Pub. L. No. 119-4, 139 Stat. 9, 13.

47.    Previous administrations issued guidance indicating that these contingency funds are available if SNAP funds lapse due to a government shutdown.

48.    During the first Trump administration, USDA advised regional partners that funding from the contingency reserve was available to provide SNAP benefits. *See, e.g.*, *Early Issuance of February 2019 SNAP Benefits – Questions & Answers #2*, https://perma.cc/9HCL-5GCU.

49.    Similarly, during the Obama administration, USDA guidance indicated that contingency funds could be used for SNAP benefits. *See* U.S. Dep't of Agric., *Q&A for SNAP Recipients in the Event of a Government Shutdown*, https://perma.cc/P5YF-ARV9.

50.    Aside from the contingency funds, USDA is authorized under 7 U.S.C. § 2257 to use a percentage of appropriated funds "interchangeably" for certain expenditures. One appropriated fund available to USDA—a fund created by section 32 of the Agricultural Adjustment Act amendments of 1935—had over $23 billion in it as of October 8, 2025. *See* OpenOMB, *State Child Nutrition Programs*, https://perma.cc/39Y3-4K9F. USDA previously used a portion of this money to fund the Women, Infants & Children (WIC) program during the shutdown. *See* OpenOMB, *Special Supplemental Nutrition Program for Women, Infants, and C*, https://perma.cc/G34G-X898; Marcia Brown, *USDA Tells Lawmakers WIC Will Be Funded*

*Through October, Politico* (Oct. 10, 2025), https://www.politico.com/live-updates/2025/10/10/congress/usda-wic-tariff-revenue-nutrition-benefits-trump-00600666.

### C. SNAP Work Requirements

51.    The Food and Nutrition Act generally requires capable individuals to work in order to be eligible for SNAP benefits.

52.    In particular, SNAP imposes two work requirements: a general one and one that applies to people classified as "able-bodied adults without dependents" (ABAWDs). 7 U.S.C. §§ 2015(d), (o).

53.    Under the general requirement, individuals aged 16-59 and "physically and mentally fit" must, with certain exceptions, register for employment, participate in an employment and training program if offered by their state, take a suitable job if offered, and not voluntarily quit (or reduce their hours below 30 per week) without good cause. 7 U.S.C. § 2015(d)(1).

54.    The ABAWD-specific rules impose additional, more stringent requirements on able-bodied adults without dependents. Under these rules, such adults are limited to receiving only three months of SNAP benefits every three years unless they meet the ABAWD work requirements or qualify for an exemption. 7 U.S.C. § 2015(o)(2).

55.    Until July 2025, the exemptions covered those exempt from the general work requirement as well as anyone younger than 18 or older than 54; anyone certified as physically or mentally unfit for employment; a parent or other member of a household that includes a minor under 18; anyone who is pregnant; unhoused individuals; veterans; and young adults under 25 who transitioned out of foster care. 7 U.S.C. § 2015(o)(3) (2024).

56.    In July 2025, Congress passed H.R. 1, also known as the "One Big Beautiful Bill Act," which eliminated or modified certain exemptions. Under that law, the exemptions no

longer cover individuals ages 55-65, parents or other caretakers of kids 14 years old or older, veterans, unhoused individuals, or former foster youths. 7 U.S.C. § 2015(o)(3).

57.     SNAP recipients who are classified as ABAWDs and not exempt must either work 20 hours per week (averaged monthly), participate in a state employment and training program for the same amount of time, or participate in a state's workfare program. 7 U.S.C. § 2015(o)(2); 7 C.F.R. § 273.24(a). States are not required to offer people classified as ABAWDs a slot in an employment and training program or a workfare program.

58.     SNAP recipients subject to the ABAWD work requirements who fail to comply with them for three months (whether consecutive or not)—referred to as accruing "countable months"—face a steep penalty. *See* 7 C.F.R. § 273.24(b). They lose eligibility for SNAP benefits for any month thereafter in which they fail to meet the ABAWD work requirements for the balance of the three-year period. 7 U.S.C. § 2015(o)(2), (5). Each state determines how to measure and track the three-year period, known as a "clock." 7 C.F.R. § 273.24(b)(3).

59.     A SNAP recipient who loses eligibility after not meeting the ABAWD work requirements for three months may regain eligibility by complying with the ABAWD work requirements in a subsequent month. 7 U.S.C. § 2015(o)(5). However, if the recipient then fails to meet the work requirement for three months again, their benefits will be terminated, and they will be ineligible to receive SNAP benefits for the remainder of the three-year period during any time when they are not meeting the minimum work requirement. 7 U.S.C. § 2015(o)(5)(C). Thus, accruing "countable months" has lasting legal and practical consequences for recipients throughout the pending three-year period.

60.     To mitigate the harsh effects of these requirements on individuals who live in areas with limited employment opportunities, the statute permits states to request a waiver from the ABAWD three-month time limit in certain circumstances.

61.     Before passage of H.R. 1 in July 2025, the Food and Nutrition Act allowed states to obtain a waiver of the ABAWD time limit for areas with "an unemployment rate over 10 percent" or that lack "a sufficient number of jobs to provide employment" for recipients in that area. 7 U.S.C. § 2015(o)(4)(A) (2024). Regulations detail the type of evidence that could establish that an area lacks sufficient jobs. 7 C.F.R. § 273.24.

62.     Pursuant to that provision, many states requested, and USDA granted, waivers. U.S. Dep't of Agric., *ABAWD Waivers* (Aug. 29, 2025), https://perma.cc/3WQS-HSTT. States planned their operations and budgets around those waivers.

63.     In H.R. 1, Congress amended the waiver provision such that, now, states may only obtain a waiver for areas with "an unemployment rate over 10 percent." 7 U.S.C. § 2015(o)(4)(A). USDA can no longer grant waivers on the ground that an area does not have "a sufficient number of jobs." *See id.*

64.     H.R. 1 does not purport to have retroactive effect with respect to existing waivers, nor does it grant USDA new authority to terminate existing waivers.

65.     At the time H.R. 1 was enacted, approximately twenty states had active ABAWD waivers. Those waivers had differing end dates, with the latest ones expiring in June 2026. Seventeen states, including Rhode Island, had waivers expiring on or after November 30, 2025.

**D.  USDA announces it will not fund November SNAP benefits**

66.     Congress has not yet passed an appropriations bill funding SNAP benefits for the current fiscal year.

67.     On October 10, 2025, the acting associate administrator for SNAP sent a memo to regional SNAP directors and SNAP state agency directors, stating: "if the current lapse in appropriations continues, there will be insufficient funds to pay full November SNAP benefits for approximately 42 million individuals across the Nation." U.S. Dep't of Agric., *Supplemental Nutrition Assistance Program (SNAP) Benefit and Administrative Expense Update for November 2025*, https://perma.cc/LDG4-DQMC.

68.     The memo further noted that "several States would normally begin sending November benefit issuance files to their electronic benefit transfer (EBT) vendors soon." *Id.*

69.     It continued: "Considering the operational issues and constraints that exist in automated systems, and in the interest of preserving maximum flexibility, we are forced to direct States to hold their November issuance files and delay transmission to State EBT vendors until further notice." *Id.*

70.     USDA sent a follow-up memo to regional SNAP directors and SNAP state agency directors on October 24. U.S. Dep't of Agric., *Supplemental Nutrition Assistance Program (SNAP) Benefit and Administrative Expense Update for November 2025*, https://perma.cc/4VPF-4ANN.

71.     The memo stated that the agency was "suspending all November 2025 benefit allotments until such time as sufficient federal funding is provided, or until [Food and Nutrition Service] directs State agencies otherwise." *Id.*

72.     The memo directed recipients to "take immediate action to implement this suspension." *Id.*

73.     In a separate memo also issued on October 24, 2025, USDA stated that "approximately 42 million individuals will not receive their SNAP benefits come November

1st." U.S. Dep't of Agric., *Impact of the Government Lapse on November Supplemental Nutrition Assistance Program (SNAP) Household Benefits*, https://perma.cc/L343-L7YA.

74.     In that memo, the agency asserted, without any citation or legal support, that SNAP contingency funds were "not available to support FY 2026 regular benefits, because the appropriation for regular benefits no longer exists." *Id.*

75.     A banner displayed on USDA's website inaccurately claims "the well has run dry" to fund the SNAP program and blames "Senate Democrats" for not voting to "reopen the government so mothers, babies, and the most vulnerable among us can receive critical nutrition assistance," and states that "there will be no benefits issued November 01." U.S. Dep't of Agric., https://perma.cc/BL88-8QU6.

**E.  USDA prematurely terminates waivers of ABAWD rules in states and areas with insufficient jobs**

76.     On October 3, over two months after H.R. 1's passage, USDA announced for the first time that it would terminate existing ABAWD waivers early. U.S. Dep't of Agric., *Supplemental Nutrition Assistance Program Provisions of the One Big Beautiful Bill Act of 2025 – ABAWD Waivers - Implementation Memorandum* (Oct. 3, 2025), https://perma.cc/LZ8D-RBCM.

77.     In an "Implementation Memorandum" entitled "Supplemental Nutrition Assistance Program Provisions of the One Big Beautiful Bill Act of 2025 — ABAWD Waivers" (ABAWD Termination Memo), USDA stated that it would "review all future waiver requests" under H.R. 1's new standards.

78.     However, it also went beyond that—and beyond what H.R. 1 requires or authorizes—and announced that it would terminate existing ABAWD waivers approved under

20

the "lack of sufficient jobs" criteria. That termination would be effective 30 days later, *i.e.*, on November 2, but USDA also encouraged states to terminate their own waivers even earlier.

79.     The ABAWD Termination Memo advised states that they "must prepare to enforce the time limit" in areas that will no longer be covered by a waiver, and specified that, "[a]t a minimum," this would "include updating eligibility systems, notifying SNAP households of the time limit, and training eligibility workers." The Memo also advised states to screen work registrants to determine whether to refer them to a SNAP employment and training program.

80.     Thus, USDA directed states to begin enforcing ABAWD time limits and assessing countable months for failure to meet the ABAWD work requirements, while at the same time acknowledging that state agencies are expected to update systems, provide notice to thousands of recipients, train or retrain their workers, and screen participants for potential referral to an employment and training program.

81.     Pursuant to the Termination Memo, SNAP recipients classified as ABAWD who do not immediately comply with ABAWD work requirements will begin to incur "countable months" beginning in December 2025, even if they did not previously have to comply with those requirements due to insufficient jobs in their geographic area. Affected recipients who begin accruing countable months in December can lose their SNAP benefits as early as March 2026. For those who manage to come into compliance with ABAWD work requirements after exhausting some or all of their three-month time limit, the countable months already accrued will limit their entitlement to benefits in future months where they cannot comply.

### F.  The nonfunding of SNAP benefits causes Plaintiffs irreparable harm

82.     USDA's suspension of funds for SNAP benefits beginning November 1, 2025, will cause serious and irreparable harm to all Plaintiffs named in this lawsuit, their members and constituents, and many others.

83.     Most urgently, 42 million Americans will lose access to SNAP benefits, which constitute the primary or sole means by which they can purchase food. Among these SNAP recipients are individual members of Plaintiff SEIU, who rely on SNAP benefits to feed themselves and their families—even though they work part-time or full-time jobs. Not having benefits means that Plaintiff SEIU's members who receive SNAP will immediately have to survive on a very reduced diet, which will have critical consequences to their health and ability to work and care for their children. They will not be able to get adequate sustenance from food pantries and other emergency food assistance because of their work schedules and the limited availability of food supplies to meet unmet need during a system-wide shutdown of SNAP.

84.     Likewise, many of the nonprofit Plaintiffs—including Federal Hill House, East Bay Community Action Program, Dr. Martin Luther King, Jr. Community Center, The Milagros Project, Amos House, members of Plaintiff Rhode Island State Council of Churches, and members of Plaintiff National Council of Nonprofits—offer direct food assistance to low-income clients, many of whom rely on both SNAP benefits and Plaintiffs' food pantry services to meet their basic nutritional needs. These nonprofits provide emergency food assistance as a core function of their individual missions, and they will face direct and serious harm if SNAP benefits are suspended on November 1.

85.     For example, Plaintiff Federal Hill House, which operates one of the busiest food pantries in Rhode Island, has already had to divert staff and volunteers to support food pantry operations, and from its administrative and development team to attempt to secure food and financial resources to meet the demand. As of October 28, its family support team, which is designed to offer resources and support across programs, is now instead stationed primarily in its food pantry. The harm to FHH will worsen each day that SNAP benefits are suspended. Despite

the diversions of staff time and financial resources to address the food crisis, FHH will be unable to keep up with the pace of demand and expects that it will ultimately have to turn hungry families away if the SNAP funding suspension continues. This would frustrate FHH's core mission and harm its relationships and partnerships with the community.

86.    Plaintiff RISCC member St. Peter and St. Andrew Episcopal Church is diverting funds to its food program to meet the acute needs of its community for groceries. With SNAP benefits about to be suspended on November 1, obtaining sufficient food to feed people who would otherwise receive food through SNAP diverts resources away from the church's social worker internship program, ministry to women who have recently come out of prison, and also drains energy that is needed for pastoral care for the parish, the volunteers, and guests.

87.    If the SNAP suspension happens on November 1, Plaintiff The Milagros Project (TMP) will be forced to turn away hungry families who have nowhere else to turn for food, representing a fundamental frustration of TMP's core mission and will prevent TMP from offering programs, services and resources that would help its communities thrive. For example, in order to try to meet the increased demand for food assistance, TMP would be forced to end its nonviolence program which works with youth in the city who are justice-impacted and provides them with re-entry services, as well as nonviolence training.

88.    As of October 28, 2025, East Bay Community Action Program has had to designate approximately $85,000 in unrestricted funds on emergency food purchases in response to the exponential increase in need. This represents a diversion of resources from its other critical programs, including workforce development, health and youth education. Additionally, if SNAP benefits are suspended, EBCAP will be forced to reassign staff from other programs, including its workforce development program, to help manage food pantry operations.

89.      Likewise, the SNAP suspension threatens Plaintiff NCN's members that provide food assistance to their communities. NCN member Jewish Family and Career Services (JFCS) in Louisville, Kentucky, will have to divert resources from its older adult programming, career counseling, and clinical services in order to meet the growing demand for food assistance. Even still, JFCS's operations were not designed to handle the expected influx, and it will likely have to turn families away, which would undermine its core mission. NCN member Johnston Partnerships (JP), a food pantry in Iowa, faces similar threats. JP has already spent more than eight thousand dollars of unbudgeted funds on emergency food purchases in anticipation of the suspension, and is cutting back on mentoring programs, holiday support programs, and local school district food assistance in order to do so. Because of the SNAP suspension, JP cannot effectively pursue its mission of mobilizing partnerships, resources, and services to respond to essential community needs. Plaintiff NYLAG serves clients who are experiencing barriers to accessing and maintaining public benefits, including SNAP, and expects to be inundated with requests as soon as SNAP benefits are suspended. NYLAG's clients rely on the delivery of SNAP each month to meet their basic subsistence needs. When clients do not receive their benefits for November and do not understand why, they will reach out to NYLAG in unprecedented numbers. NYLAG has already received many frantic calls from current clients and community members who are desperately worried about how they will feed themselves and their families if November SNAP benefits are not issued. NYLAG will need to provide individual advice and develop materials that can be shared widely, both of which will consume substantial staff time and expertise. NYLAG will therefore have to divert resources from other clients who need assistance and from other essential areas of legal support.

90.    City Plaintiffs, too, will be irreparably harmed by the imminent suspension of SNAP benefits for their most vulnerable residents. For example, nearly one-fourth of the City of Central Falls' population receives SNAP benefits, and many residents live paycheck to paycheck and depend on the timely and predictable issuance of their SNAP benefits to feed themselves and their families. Central Falls expects to experience a dramatic increase in demand for City services and programs as a result of the SNAP suspension, as residents who suddenly lose their primary means of purchasing food will turn to City resources, and the City will be forced to expend significant financial resources, including overtime for public safety staff, staffing from multiple city departments at emergency food distribution centers, increased funding for emergency food assistance programs, purchasing of gift cards for families to purchase food, and expanded hours at city facilities serving as emergency response centers. This Saturday, November 1, 2025, because SNAP will be suspended, Central Falls is hosting a city-wide food drive, designed to provide food for up to 800 families and which will require the City to expend resources, including thousands of dollars to purchase grocery store gift cards and staffing from the police department, the department of public works, and the office of constituent services— resources that would have otherwise been spent on the delivery of city services and public safety.

91.    The City of Columbus, Ohio has already allocated emergency funding for the area's largest food collective, and it is working on an emergency response plan, which includes coordinating with other local governmental units, local non-profits, and for-profit corporations to further address issues of food insecurity and providing additional funding in support of individuals who have had their SNAP benefits cancelled. As a result, it will be forgoing other investments central to maintaining core city services.

92.     Finally, the suspension of benefits will have devastating impacts on the local economy and small businesses like Plaintiff Black Sheep Market and Plaintiff Main Street Alliance's food retail members. As just one example, Plaintiff Black Sheep Market stands to lose the 40 percent of its revenue that is currently fulfilled by SNAP transactions. It will not be able to recoup that money and, in the meantime, also risks damaging its relationships with food suppliers and community partners, as well as its ability to offer full work schedules to its twelve employees. Plaintiff Black Sheep Market exists to meet the needs of low-income individuals in its community, but without SNAP benefits being available to those individuals, Plaintiff Black Sheep Market will not be able to fulfill that mission.

93.     These stories are just a few examples of a much broader picture of the instability and irreparable harm created by Defendants' actions.

94.     The harms to each and every Plaintiff described above would be irreparable if SNAP benefits are suspended. Each day that SNAP benefits remain suspended, more Americans like SEIU's SNAP recipient members will go hungry, more resources will be diverted from nonprofit and city Plaintiffs' other critical programs, more unrecoverable revenue will be lost for small business Plaintiffs, and more damage will be done to each Plaintiff's ability to fulfill their missions of supporting their communities. Furthermore, the uncertainty and disruption created by the SNAP suspension harm Plaintiffs' ability to plan—whether SEIU's members' ability to budget for groceries, food pantries' abilities to fill their shelves, legal service organizations' abilities to meet client demand, or cities' abilities to care for their residents. The longer the SNAP suspension continues, the more difficult it will be for Plaintiffs to resume their normal activities.

### G. The early termination of ABAWD waivers causes Waiver Plaintiffs irreparable harm

95.    USDA's early and sudden termination of states' previously approved ABAWD waivers on November 2, 2025, will also cause serious and irreparable harm to Plaintiffs Rhode Island State Council of Churches, United Way of Rhode Island, Federal Hill House, The Milagros Project, City of Central Falls, City of Providence, City of Pawtucket, City of New Haven, NYLAG, and NCN (the "Waiver Plaintiffs"), their members and constituents, and many others.

96.    Even if the immediate SNAP payment suspension is resolved, SNAP recipients who are subject to ABAWD requirements in many jurisdictions—including parts of Rhode Island, Connecticut, New Jersey, New York, and Kentucky—will face potential loss of benefits soon, up to eight months earlier than they expected under their state's waiver. And they will immediately face having to meet—and having to figure out how to meet—new work requirements that until now had been waived due to the lack of sufficient jobs in their communities. They will be doing so in jurisdictions that have administered SNAP with a waiver in place, but now must adapt and create new protocols and processes, on an exceptionally compressed timeframe, to assess SNAP eligibility under new requirements. The difficulty of this unexpectedly shortened adaptation period will compound the difficulties described below.

97.    Waiver Plaintiffs that help with SNAP benefit applications—like United Way of Rhode Island, NYLAG, and NCN member Brothers Building A Better Nation (BBABN)—anticipate that their staff will be inundated with requests for assistance navigating new ABAWD requirements. USDA's sudden termination of the waivers requires them to expend time and resources educating themselves about these changes, training staff members to assist clients with these changes, developing operational infrastructure, including technology, to support changing

reporting requirements, and educating clients that their support will be available. Plaintiffs are already stretched thin and will have to divert resources from their other programs to meet this need. Under the waivers' established durations, Waiver Plaintiffs should have had longer to make these changes and to train staff; the abrupt termination of the waivers accelerates the timeline, makes it more difficult to make the necessary changes, and forces Waiver Plaintiffs to divert resources toward making the changes in a now-rushed timeframe.

98.     For example, Plaintiff United Way of Rhode Island operates the state's only 211 Contact Center and Aging and Disability Resource Center (ADRC), which is a central access point for residents seeking help with benefits, employment and community resources. The removal of the ABAWD waiver would lead to a significant increase in the number of individuals contacting UWRI for factual information, referrals and direct support, as well as a rise in in-person visits and outreach requests. UWRI staff would face an influx of calls and cases requiring complex explanations of new rules, employment requirements and reinstatement procedures, that would not only strain its contact center capacity, but also extend to UWRI's outreach, community impact and partnership networks, as more residents seek urgent help and UWRI will be forced to divert resources from other programs to meet those needs. The heightened demand would stretch UWRI's human and financial resources beyond sustainable limits, as overtime costs would rise, staff fatigue and burnout would increase, and its ability to maintain timely responses across all 211 and ADRC call categories would decline. In effect, a single policy shift could disrupt the entire ecosystem of assistance that United Way provides to tens of thousands of Rhode Islanders every year.

99.     Likewise, NYLAG will need to help clients understand the newly applicable work requirements. NYLAG will have to assess each client's eligibility for an exemption from work

requirements and assist clients in gathering and submitting documentation. And NYLAG will have to advise clients about how to comply with relevant appointments for ABAWD-qualifying work activities. These tasks will place a significant burden on NYLAG's Public Benefits Unit staff. Given that the Public Benefits Unit has limited staff and is already operating at or beyond capacity, directing time and effort to addressing this anticipated surge in clients will divert NYLAG's resources from other clients who need assistance and from other areas of essential legal support.

100.    NCN member BBABN serves a population that is significantly impacted by the early termination of New Jersey's waiver, as more than 90 percent of its community members are both eligible for SNAP benefits and subject to ABAWD requirements. BBABN provides support with SNAP applications and job placement, and it expects to be inundated with requests for help in light of the sudden changes to its constituents' eligibility and work requirements. BBABN expects to spend considerable staff time educating itself and its constituents about the new requirements; hire advocates to represent its constituents at their SNAP hearings; and put time into helping its constituents track their work hours. BBABN will have to divert resources from its other critical programs to meet this need, as it is already stretched thin.

101.    Finally, the termination of the ABAWD waiver will result in an entire category of individuals that cannot meet the new requirements losing SNAP benefits months earlier than expected and turning to Waiver Plaintiffs for emergency assistance. For the same reasons that a suspension of SNAP benefits during the shutdown will frustrate the missions of Plaintiffs Rhode Island State Council of Churches and its members, National Council of Nonprofits and its members, United Way of Rhode Island, Federal Hill House, The Milagros Project, City of Central Falls, City of Providence, City of Pawtucket, and City of New Haven and force them to

divert resources in response, the early waiver termination will also increase demand on their already-strained resources and prevent them from effectively serving their communities.

102.    For example, the termination of the ABAWD waiver will result in an entire category of residents in the Plaintiff Cities of Providence, Central Falls, and Pawtucket potentially losing SNAP benefits four months earlier than expected and turning to Plaintiff's City services and local food pantries—which are funded in part by Plaintiff Cities—for emergency assistance. The residents in Providence, Central Falls, and Pawtucket who are subject to ABAWD requirements already face significant barriers to employment, including limited English proficiency, lack of transportation, criminal records, or health issues that do not meet the threshold for disability. When these residents of Plaintiff Cities lose their SNAP benefits after three months of noncompliance, they will turn to City agencies for assistance with food, housing and emergency needs.

103.    Even though Waiver Plaintiffs would have had to make adjustments for the eventual termination of their states' waivers in the coming months, the extra months of emergency support that they will need to provide will be a substantial drain on their resources, and their other programs and missions will suffer as a result. In addition, the rush to implement work requirements earlier than expected will deprive the agencies that administer SNAP of adequate time to update their systems, procedures, and guidance, leading to administrative chaos that will, in turn, place additional burdens on the Waiver Plaintiffs.

104.    The early waiver terminations threaten to overwhelm Plaintiffs' capacity from multiple directions and will cause ongoing, irreparable harm.

## CLAIMS FOR RELIEF

### Count 1
### Suspension of SNAP Benefits - Violation of Administrative Procedure Act - Arbitrary and Capricious - 5 U.S.C. § 706(2)(A)
### (Against All Defendants)

105.    The paragraphs above are incorporated and reasserted as if fully set forth here.

106.    The APA directs courts to hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

107.    An agency action is reviewable under the APA if it is a final agency action. 5 U.S.C. § 704. An agency action is final if it "mark[s] the consummation of the agency's decisionmaking process" and is an action by which "rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up).

108.    USDA's suspension of SNAP benefits is final agency action. 5 U.S.C. § 704. The agency's decision not to fund SNAP represents "the 'consummation' of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 177 (1997) (citation omitted). And "legal consequences will flow" directly from that decision, as states will not be able to provide SNAP benefits to eligible participants in the program. *Id.* (citation omitted).

109.    USDA's suspension of SNAP benefits is arbitrary and capricious.

110.    USDA failed to provide a reasoned explanation for its decision not to fund the SNAP program with available appropriations. The agency did not account for the enormous harms that will result to SNAP beneficiaries and their communities, including small grocery businesses and other retailers whose revenue comes from SNAP benefits and who supply food in otherwise food-poor areas and organizations whose missions center on providing food assistance

and other support and who will be forced to divert resources from those missions due to the agency's action. USDA thus failed to consider "important aspects of the problem" or to articulate a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

111.    USDA also failed to consider reliance interests when it suspended SNAP benefits—including the reliance interests of beneficiaries who rely on SNAP for adequate nutrition for themselves and their families, retailers who rely on SNAP to keep their stores (including stores in food deserts) operational, cities and other jurisdictions that rely on SNAP as the primary way to address food insecurity for their low-income residents, and organizations that rely on continued access to SNAP for the communities they serve.

112.    USDA also failed to acknowledge that its decision not to use contingency funding reflects a change in policy or to reasonably explain the reasons for that change. Previous administrations, including the first Trump administration, issued guidance explaining that contingency funds appropriated by Congress would be available to fund SNAP in the event of a government shutdown. USDA then abruptly deviated from that position without any justification.

113.    Defendants' withholding of funds is also arbitrary and capricious because its premise that no funds are available is incorrect; in fact, funds are available both from the FY 2024 and FY 2025 contingency appropriations and in the funds available under 7 U.S.C. § 2257.

114.    The nonfunding of SNAP benefits must be declared unlawful and set aside as arbitrary and capricious. 5 U.S.C. § 706(2)(A).

**Count 2**
**Suspension of SNAP Benefits - Violation of Administrative Procedure Act - Contrary to Law - 5 U.S.C. § 706(2)(A)**
**(Against All Defendants)**

115.    The paragraphs above are incorporated and reasserted as if fully set forth here.

116.    The APA directs courts to hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

117.    USDA's suspension of SNAP benefits is final agency action. 5 U.S.C. § 704.

118.    USDA's suspension of SNAP benefits is contrary to law. In creating the SNAP program, Congress provided that, subject to available appropriations, "eligible households within the State shall be provided an opportunity to obtain a more nutritious diet through the issuance to them of an allotment." 7 U.S.C. § 2013(a)(1). And Congress provided that assistance under the SNAP program "shall be furnished to all eligible households who make application for such participation." 7 U.S.C. § 2014(a). Congress also appropriated specific funds to be "placed in reserve for use only in such amounts and at such times as may become necessary to carry out program operations." In light of the shutdown, those contingency funds and other available funds are now necessary to carry out the SNAP program—as USDA previously recognized. The agency's decision not to use that money to fund November SNAP benefits is contrary to law.

**Count 3**
**Suspension of SNAP Benefits – Agency Action Unlawfully Withheld – 5 U.S.C. § 706(1)**
**(Against All Defendants)**

119.    The paragraphs above are incorporated and reasserted as if fully set forth here.

120.    The APA provides that a reviewing court "shall" "compel agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. § 706(1).

121.    The statute provides that "[a]ssistance under this program shall be furnished to all eligible households who make application for such participation." 7 U.S.C. § 2014(a).

122.    Defendants have a non-discretionary duty to furnish assistance to eligible households who apply by providing funding for that assistance, at least insofar as funding is available.

123.    Funding is available both in the contingency funds Congress appropriated in FY 2024 and FY 2025 and in the funds available to USDA under its authority under 7 U.S.C. § 2257.

124.    The Department of the Treasury has a non-discretionary duty to disburse the funds in its charge upon receipt of a properly executed voucher. 31 U.S.C. § 3325.

125.    Defendants have not complied with their non-discretionary duty to provide funding for food assistance to eligible households.

126.    The Court should thus compel Defendants to release available funds as necessary to pay SNAP benefits to eligible participants.

### Count 4
### Early Termination of Waivers – Exceeds Statutory Authority – 5 U.S.C. § 706(2)(C)
### (Against Defendants Rollins, USDA, and USA)

127.    The paragraphs above are incorporated and reasserted as if fully set forth here.

128.    The Administrative Procedure Act (APA) provides that a court "shall" "hold unlawful and set aside agency action" found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

129.    The early termination of the ABAWD waivers announced in the Termination Memo is final agency action. Defendants have made a final decision to terminate states' existing ABAWD waivers before their expiration dates. The decision determines rights and obligations and produces legal consequences by changing the eligibility requirements for SNAP benefits and

by requiring recipients to meet—and state administrators to enforce—work requirements that were waived under the prematurely terminated waivers.

130.    No statute authorizes Defendants to terminate existing ABAWD waivers before their expiration date.

131.    The early termination of the ABAWD waivers must be declared unlawful and set aside as "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

**Count 5**
**Early Termination of Waivers – Arbitrary and Capricious – 5 U.S.C. § 706(2)(A)**
**(Against Defendants Rollins, USDA, and USA)**

132.    The paragraphs above are incorporated and reasserted as if fully set forth here.

133.    The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

134.    In prematurely terminating the ABAWD waivers, Defendants failed to consider important aspects of the problem.

135.    Defendants failed to consider the effects of USDA's abrupt action on states' and counties' ability to come into compliance with new rules that, under the existing waivers, should not have applied until later. Defendants did not consider how states and counties would be able to update their systems, train staff, revise their policies and procedures, provide sufficient notice to recipients regarding the now un-waived requirements, or provide work activities and referrals to enable ABAWD recipients to comply with the requirements.

136.    Defendants also failed to consider the effects on ABAWD SNAP recipients, who will be expected to find employment or alternative work activities within a compressed timeframe, or else begin accruing "countable months" toward the three-month SNAP time limit.

137.    Defendants also failed to consider the reliance interests of state and county SNAP administrators, beneficiaries, and the municipalities and nonprofit organizations that help people obtain SNAP benefits or secure food some other way.

138.    Defendants also considered factors Congress did not permit them to consider by apparently terminating existing waivers in light of the standard for approving or disapproving *new* waivers.

139.    Defendants further failed to provide a reasoned explanation for the early termination, setting forth no reason why terminating the waivers early would promote the goals of the SNAP program and no explanation of how administrators in areas covered by waivers could be expected to immediately implement new ABAWD procedures without harming indigent SNAP recipients.

140.    The early termination of the ABAWD waivers must be declared unlawful and set aside as arbitrary and capricious. 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

A.  Declare unlawful, vacate, and set aside the suspension of SNAP benefits and the early termination of the ABAWD waivers;

B.  Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with Defendants from enforcing, implementing, giving effect to, maintaining, or reinstating under a different name the directives in the October 10 or October 24 memos;

C.  Preliminarily and permanently enjoin and compel Defendants to release the withheld funding for SNAP benefits insofar as funds are available under the contingency funds

from the FY 2024 and FY 2025 appropriations or under USDA's authority under 7 U.S.C. § 2257;

D. Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with Defendants from terminating any ABAWD waiver before the waiver's expiration date on the ground that the waiver was approved due to lack of sufficient jobs in the relevant geographic area;

E. Stay the directives to suspend SNAP benefits pursuant to 5 U.S.C. § 705 while funds are available under the contingency funds from the FY 2024 and FY 2025 appropriations or under USDA's authority under 7 U.S.C. § 2257;

F. Stay the early termination of the ABAWD waivers pursuant to 5 U.S.C. § 705 and issue all other necessary and appropriate process to preserve status or rights pending conclusion of the review proceedings;

G. Award Plaintiffs reasonable costs and attorneys' fees; and

H. Grant any other relief that the Court deems fit and proper.


Date: October 30, 2025                    Respectfully submitted,


                                          */s/ Amy R. Romero*
                                          Amy R. Romero (RI Bar # 8262)
                                          Kevin Love Hubbard (MA Bar #704772)^
                                          DeLuca, Weizenbaum, Barry & Revens, Ltd.
                                          199 North Main Street
                                          Providence, RI 02903
                                          (401) 453-1500
                                          Amy@dwbrlaw.com
                                          Kevin@dwbrlaw.com
                                          Cooperating counsel, Lawyers' Committee for RI

                                          */s/ Kristin Bateman*
                                          Kristin Bateman (D.C. Bar No. 90037068)^
                                          Jyoti Jasrasaria (D.C. Bar No. 1671527)^
                                          Michael J. Torcello (D.C. Bar No. 90014480)^

Andrew Bookbinder (D.C. Bar No. 90028967)^
Adnan Perwez (D.C. Bar No. 90027532)^
Robin F. Thurston (D.C. Bar No. 1531399)^
Skye L. Perryman (D.C. Bar No. 984573)^
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
kbateman@democracyforward.org
jjasrasaria@democracyforward.org
mtorcello@democracyforward.org
abookbinder@democracyforward.org
aperwez@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org

*Counsel for Plaintiffs*

^ *Pro hac vice* motion forthcoming