# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

RHODE ISLAND STATE COUNCIL OF
CHURCHES, *et al.*,

               *Plaintiffs*,

      v.

BROOKE ROLLINS, *et al.*,

               *Defendants*.

Case No. 25-569

**EMERGENCY RELIEF
REQUESTED**

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY STAY UNDER 5 U.S.C. § 705

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................2

    A.    The SNAP program provides critical support to food-insecure individuals and families ........................................................................................................................2

    B.    USDA improperly withholds funding for SNAP benefits ...........................................4

    C.    USDA prematurely terminates waivers of ABAWD work requirements in states and areas with insufficient jobs ...................................................................................6

    D.    The nonfunding of SNAP benefits causes Plaintiffs irreparable harm .....................10

    E.    The early termination of ABAWD waivers causes impacted Plaintiffs irreparable harm ..........................................................................................................................16

LEGAL STANDARD ...........................................................................................................20

ARGUMENT ........................................................................................................................21

I.    Plaintiffs Are Likely to Succeed on the Merits ................................................................22

    A.    Plaintiffs have standing ..............................................................................................22

        1.    Plaintiffs have standing to challenge the withholding of funding for SNAP ...........22

        2.    Waiver Plaintiffs have standing to challenge the early termination of the ABAWD waivers .....................................................................................................................23

    B.    Defendants' Actions Violate the APA .......................................................................24

        1.    APA standard of review .............................................................................................24

        2.    The suspension of SNAP benefits violates the APA ..................................................25

            a.    The suspension is reviewable final agency action ................................................25

            b.    The suspension is contrary to law .......................................................................26

            c.    The suspension is arbitrary and capricious ..........................................................28

            d.    Defendants have unlawfully withheld agency action by refusing to release SNAP funding ..................................................................................................................29

3.    The early termination of ABAWD waivers violates the APA ................................30

a.    The early termination is reviewable final agency action .......................................30

b.    The early termination exceeds Defendants' statutory authority ...........................30

c.    The early termination is arbitrary and capricious ..................................................31

II.    Plaintiffs Will Suffer Irreparable Injury Absent Emergency Relief..................................33

A.    Plaintiffs face irreparable harm from the withholding of funding for SNAP benefits ..........................................................................................................................33

B.    Plaintiffs face irreparable harm from the early termination of ABAWD waivers .....35

III.    The Balance of Equities and Public Interest Favor Immediate Temporary Relief ........36

CONCLUSION ...................................................................................................................39

**INTRODUCTION**

More than forty million people—approximately one in eight Americans—depend on the Supplemental Nutrition Assistance Program (SNAP) to meet their basic nutritional needs. This includes more than 14 million children, nearly 8 million elderly people, and 1.2 million veterans who live in households that receive SNAP benefits. Beyond the many people (including Plaintiff SEIU's members) who rely on SNAP for food, SNAP is crucial for business for thousands of grocery stores and retailers, including many in rural areas. It is estimated that hundreds of thousands of jobs depend on food-related spending enabled by SNAP.

Defendants have needlessly plunged SNAP into crisis. Just this month, the U.S. Department of Agriculture (USDA) abruptly suspended SNAP benefits, effective November 1, 2025. The agency claims it cannot fund the program due to the government shutdown—even though previously appropriated funds are available, including contingency funds that Congress expressly designated for use when "necessary to carry out program operations." And USDA did not explain its about face from the agency's longstanding position that SNAP benefits continue even when the government is shut down. USDA also needlessly and prematurely terminated waivers of certain SNAP work requirements in states and areas with insufficient jobs. The agency threw the process of phasing out these waivers into chaos, acting without statutory authorization or consideration of the effects on people and communities scrambling to keep up with newly restricted SNAP eligibility. These actions, which will leave millions without adequate food and imperil local communities, violate the Administrative Procedure Act.

Plaintiffs in this case include a national union whose membership includes SNAP recipients who risk losing their benefits; cities that will divert critical resources to support their residents who depend on SNAP to feed themselves and their families; churches, faith-based organizations, and nonprofits that provide emergency food assistance, legal services, and other

critical resources, whose missions are impaired by the impending crisis; and food retailers that rely on SNAP-powered purchases to keep their doors open. Their declarations highlight just a fraction of the staggering harms that Defendants' actions will cause: Americans will not be able to feed their families, food pantries will be overwhelmed, organizations will be forced to divert resources from core programs to accommodate those in need of assistance, and small businesses will lose substantial revenue that is critical to maintaining their labor force and supplier relationships. In light of these enormous harms, and in the absence of any countervailing interest of Defendants in not funding SNAP, the equities and public interest strongly support emergency relief.

This Court should immediately grant temporary relief to ensure that millions of Americans continue to receive critical food benefits through SNAP.

## BACKGROUND

### A. The SNAP program provides critical support to food-insecure individuals and families

While federally funded food assistance dates back to the Great Depression, Congress created the most recent iteration, known as the Supplemental Nutrition Assistance Program, in the Food and Nutrition Act of 2008. Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, §§ 4001–4002, 122 Stat. 1853 (2008); *see also* U.S. Dep't of Agric. Food and Nutrition Serv., *A Short History of SNAP* (Aug. 29, 2025), https://perma.cc/BU2Q-3MYA. With the SNAP program, Congress aimed to "alleviate . . . hunger and malnutrition" among low-income households by enabling them to "obtain a more nutritious diet through normal channels of trade." 7 U.S.C. § 2011. It does that by providing eligible individuals an allotment that they can use to buy food at approved retailers. *Id.* § 2013(a)(1). USDA administers the program. *Id.* Congress created SNAP as an entitlement: The statute provides that "[a]ssistance under this program shall

be furnished to all eligible households who make application for such participation." *Id.* § 2014(a).

Today, SNAP is the nation's largest domestic food assistance program, and it provides critical support to food-insecure individuals and families across the country. Ausenberg, et al., Cong. Rsch. Serv., R48531, *Work Requirements: Existing Policies in Medicaid, SNAP, Housing Assistance, and TANF* 1 (June 25, 2025), https://perma.cc/L94B-B75F. In fiscal year 2024, the program served an average of 41.7 million people per month—12.3 percent of U.S. residents. Over one-third of SNAP participants are children. U.S. Dep't of Agric. Food and Nutrition Serv., *Characteristics of SNAP Households: Fiscal Year 2023* (May 2, 2025), https://perma.cc/X4EY-B8W7. And the vast majority—88 percent in fiscal year 2023—are in households with either a child, an elderly individual, or a person with a disability. *Id.* SNAP provides Americans approximately $8 billion in food assistance monthly. USDA, *The Food and Nutrition Assistance Landscape: Fiscal Year 2024 Annual Report* at 9 (July 2025), https://perma.cc/BV5D-ZM98.

In addition to serving as the first line of defense against hunger, SNAP reduces poverty, improves health and economic outcomes, and supports working people who are paid low wages. It also benefits the economy more broadly, with USDA estimating that, in a slowing economy, $1 billion of SNAP benefits generates over $1.5 billion in economic activity and creates over 13,500 new jobs. U.S. Dep't of Agric. Econ. Rsch. Serv., *Supplemental Nutrition Assistance Program (SNAP) – Key Statistics and Research* (July 24, 2025), https://perma.cc/NST2-C9KL. SNAP benefits are capped at $298 per month for a single-person household. USDA Food & Nutrition Serv., *SNAP Eligibility* (Sept. 30, 2025), https://perma.cc/MEY4-SBXJ. But most households receive less. On average, participants received $187 per month from SNAP in fiscal year 2024 to help cover food costs. U.S. Dep't of Agric. Econ. Rsch. Serv., *Supplemental*

*Nutrition Assistance Program (SNAP) – Key Statistics and Research* (July 24, 2025), https://perma.cc/NST2-C9KL.

The USDA and states jointly administer the SNAP program, with states handling most recipient functions, like determining eligibility and issuing benefits, and the USDA's Food and Nutrition Service supporting and overseeing state functions and approving retailers to accept SNAP benefits. 7 U.S.C. §§ 2018, 2020. Ten states delegate administrative responsibilities to counties such that SNAP is county-administered in those states. Nat'l Assoc. of Counties, *H.R. 1 and the Supplemental Nutrition Assistance Program (SNAP): What Counties Should Know* (Aug. 13, 2025), https://perma.cc/V924-F28L. The federal government funds all SNAP benefits, 7 U.S.C. § 2013(a), and the federal government and states share administrative costs, *id.* § 2025(a).

### B.  USDA improperly withholds funding for SNAP benefits

Congress generally funds the SNAP program through appropriations bills. In a 2024 appropriations act, for example, Congress appropriated more than $122 billion for SNAP and directed that $3 billion, "to remain available through September 30, 2026, shall be placed in reserve for use only in such amounts and at such times as may become necessary to carry out program operations." Pub. L. No. 118-42, 138 Stat. 25, 93. Those funding levels were extended in a 2025 appropriations act. Pub. L. No. 119-4, 139 Stat. 9, 13. Together, these two appropriations therefore provide for a total of $6 billion in contingency reserves for the SNAP program.

Aside from the contingency funds, USDA is authorized under 7 U.S.C. § 2257 to use a percentage of appropriated funds "interchangeably" for certain expenditures. One appropriated fund available to USDA—a fund created by section 32 of the Agricultural Adjustment Act amendments of 1935—had over $23 billion in it as of October 8, 2025. *See* OpenOMB, *State Child Nutrition Programs*, https://perma.cc/39Y3-4K9F. USDA previously used a portion of this

money to fund the Women, Infants & Children (WIC) program during the shutdown. *See* OpenOMB, *Special Supplemental Nutrition Program for Women, Infants, and C*, https://perma.cc/G34G-X898; Marcia Brown, *USDA Tells Lawmakers WIC Will Be Funded Through October*, Politico (Oct. 10, 2025), https://perma.cc/74PN-7R2F.

For the current fiscal year, Congress has not yet passed an appropriations act funding SNAP benefits. Ordinarily, because of the congressionally appropriated contingency funds totaling $6 billion as well as funding available to tap under USDA's § 2257 authority, this would not immediately jeopardize SNAP's operations. After all, Congress appropriated funds to be used when "necessary to carry out program operations." And previous administrations, including the first Trump administration, recognized that those contingency funds were available to fund SNAP. *See* Letter from Jessica Shahin to FNS Regions, *Early Issuance of February 2019 SNAP Benefits – Questions & Answers #2* (Jan. 14, 2019), https://perma.cc/9HCL-5GCU; U.S. Dep't of Agric., *Q&A for SNAP Recipients in the Event of a Government Shutdown*, https://perma.cc/P5YF-ARV9.

But on October 10, 2025, the agency did an about face. USDA issued guidance informing state officials that "if the current lapse in appropriations continues, there will be insufficient funds to pay full November SNAP benefits for approximately 42 million individuals across the Nation." Dep't of Agric., *Supplemental Nutrition Assistance Program (SNAP) Benefit and Administrative Expense Update for November 2025* (Oct. 10, 2025), https://perma.cc/LDG4-DQMC. The memo acknowledged that "several States would normally begin sending November benefit issuance files to their electronic benefit transfer (EBT) vendors soon," but it directed

states "to hold their November issuance files and delay transmission to State EBT vendors until further notice." *Id.*

USDA followed up with another memo on October 24. Dep't of Agric., *Supplemental Nutrition Assistance Program (SNAP) Benefit and Administrative Expense Update for November 2025* (Oct. 24, 2025), https://perma.cc/4VPF-4ANN. This time, USDA stated that it was "suspending all November 2025 benefit allotments until such time as sufficient federal funding is provided, or until [Food and Nutrition Service] directs State agencies otherwise." *Id.* The memo directed states to "take immediate action to implement this suspension." *Id.* And in a separate memo issued on the same day, USDA asserted, without any citation or legal support, that SNAP contingency funds were "not available to support FY 2026 regular benefits, because the appropriation for regular benefits no longer exists." Dep't of Agric., *Impact of the Government Lapse on November Supplemental Nutrition Assistance Program (SNAP) Household Benefits*, https://perma.cc/L343-L7YA.

Meanwhile, a banner displayed on USDA's website inaccurately claims "the well has run dry" to fund the SNAP program, blames "Senate Democrats" for not voting to "reopen the government so mothers, babies, and the most vulnerable among us can receive critical nutrition assistance," and states that "there will be no benefits issued November 01." U.S. Dep't of Agric., https://perma.cc/BL88-8QU6.

### C. USDA prematurely terminates waivers of ABAWD work requirements in states and areas with insufficient jobs

In addition to withholding funding altogether, Defendants have also abruptly changed the terms on which Americans can obtain SNAP benefits, with little notice to states and counties

administering the program, little time to prepare, and little support in navigating the changes. Those changes deal with SNAP's work requirements.

***SNAP Work Requirements.*** The Food and Nutrition Act generally requires capable individuals to work in order to be eligible for SNAP benefits. In particular, SNAP imposes two work requirements: a general one and one that applies to people classified as "able-bodied adults without dependents" (ABAWDs). 7 U.S.C. § 2015(d), (o). Under the general work requirement, individuals aged 16-59 and "physically and mentally fit" must, with certain exceptions, register for employment, participate in an employment and training program if offered by their state, take a suitable job if offered, and not voluntarily quit (or reduce their hours below 30 per week) without good cause. *Id.* § 2015(d)(1).

The ABAWD-specific rules impose additional, more stringent requirements on able-bodied adults without dependents. Under these rules, such adults are limited to receiving only three months of SNAP benefits every three years unless they meet the ABAWD work requirements or qualify for an exemption. *Id.* § 2015(o)(2). Until July 2025, the exemptions covered those exempt from the general work requirement (as described above) as well as anyone younger than 18 or older than 54; anyone certified as physically or mentally unfit for employment; a parent or other member of a household that includes a minor under 18; anyone who is pregnant; unhoused individuals; veterans; and young adults under 25 who transitioned out of foster care. *Id.* § 2015(o)(3) (2024).

In July 2025, Congress passed H.R. 1, also known as the "One Big Beautiful Bill Act," which eliminated or modified certain exemptions. Under that law, the exemptions no longer cover individuals aged 55-65, parents or other caretakers of kids 14 years old or older, veterans, unhoused individuals, or former foster youths. *Id.* § 2015(o)(3). SNAP recipients who are

classified as ABAWDs and not exempt must either work 20 hours per week (averaged monthly), participate in a state employment and training program for the same amount of time, or participate in a state's workfare program. *Id.* § 2015(o)(2); 7 C.F.R. § 273.24(a). States are not required to offer ABAWDs a slot in an employment and training program or a workfare program. Dep't of Agric., *Supplemental Nutrition Assistance Program - Clarifications on Work Requirements, ABAWDs, and E&T - May 2018* (May 25, 2018), https://perma.cc/6J4A-8RHH.

SNAP recipients subject to the ABAWD work requirements who fail to comply with them—referred to as accruing "countable months"—face a steep penalty. *See* 7 C.F.R. § 273.24(b). If a recipient accrues three countable months (whether consecutive or not), they lose eligibility for SNAP benefits for any month thereafter in which they fail to meet the ABAWD work requirements for the balance of the three-year period. 7 U.S.C. § 2015(o)(2), (5). Each state determines how to measure and track the three-year period, known as a "clock." 7 C.F.R. § 273.24(b)(3). A SNAP recipient who loses eligibility after not meeting the ABAWD work requirements for three months may regain eligibility by complying with the ABAWD work requirements in a subsequent month. 7 U.S.C. § 2015(o)(5). However, if the recipient then fails to meet the work requirement for three months again, their benefits will be terminated, and they will be ineligible to receive SNAP benefits for the remainder of the three-year period during any time when they are not meeting the minimum work requirement. *Id.* § 2015(o)(5)(C). Thus, accruing "countable months" has lasting legal and practical consequences for recipients throughout the pending three-year period.

**Waivers of ABAWD Work Requirements.** To mitigate the harsh effects of these requirements on individuals who live in areas with limited employment opportunities, the statute permits states to request a waiver from the ABAWD three-month time limit in certain

circumstances. Before passage of H.R. 1 in July 2025, the Food and Nutrition Act allowed states to obtain a waiver of the ABAWD time limit for areas with "an unemployment rate over 10 percent" or that lack "a sufficient number of jobs to provide employment" for recipients in that area. 7 U.S.C. § 2015(o)(4)(A) (2024). Pursuant to that provision, many states requested, and USDA granted, waivers. Dep't of Agric., *ABAWD Waivers* (updated Aug. 29, 2025), https://perma.cc/88ES-S6D3. Those waivers generally last for one year. 7 C.F.R. § 273.24(f)(5). States planned their operations and budgets around those waivers.

In H.R. 1, Congress amended the waiver provision such that, now, states may only obtain a waiver for areas with "an unemployment rate of over 10 percent." 7 U.S.C. § 2015(o)(4)(A). USDA can no longer grant waivers on the ground that an area does not have "a sufficient number of jobs." *See id.* H.R. 1 does not purport to have retroactive effect, nor does it grant USDA new authority to terminate existing waivers.

At the time H.R. 1 was enacted, around 20 states had active ABAWD waivers. Those waivers had differing end dates, with the latest ones expiring in June 2026. Seventeen states, including Rhode Island, Connecticut, New York, and Kentucky, had waivers expiring on or after November 30, 2025. The CBO estimates that pursuant to H.R. 1, in an average month, roughly one million people who would have been protected by a waiver under the prior criteria will be cut off from SNAP. Cong. Budget Off., *Estimated Effects of Public Law 119-21 on Participation and Benefits Under the Supplemental Nutrition Assistance Program (2025)* (Aug. 11, 2025), https://perma.cc/LNV8-2FVA.

**USDA's Early Termination of States' Waivers.** On October 3, 2025, over two months after H.R. 1's passage, USDA announced for the first time and without warning that it would terminate existing ABAWD waivers early. Dep't of Agric., *Supplemental Nutrition Assistance*

*Program Provisions of the One Big Beautiful Bill Act of 2025 – ABAWD Waivers - Implementation Memorandum* (Oct. 3, 2025), https://perma.cc/YN4E-PUF7. In an "Implementation Memorandum" entitled "Supplemental Nutrition Assistance Program Provisions of the One Big Beautiful Bill Act of 2025 — ABAWD Waivers" (ABAWD Termination Memo), USDA stated that it would "review all future waiver requests" under H.R. 1's new standards. *Id.* However, it also went beyond that—and beyond what H.R. 1 requires or authorizes—and announced that it would terminate existing ABAWD waivers which had already been approved under the "lack of sufficient jobs" criteria. *Id.* That termination will be effective 30 days later, *i.e.*, on November 2, 2025, but USDA also encouraged states to terminate their own waivers even earlier. *Id.*

This imposes a demanding and complex change in SNAP administration for waiver states on a newly compressed timeframe. The Termination Memo advised states that they "must prepare to enforce the time limit" in areas that will no longer be covered by a waiver, and specified that, "[a]t a minimum," this would "include updating eligibility systems, notifying SNAP households of the time limit, and training eligibility workers." *Id.* The Memo also advised states to screen work registrants to determine whether to refer them to a SNAP employment and training program. *Id.* Thus, USDA directed states to begin enforcing ABAWD time limits and assessing countable months for failure to meet the ABAWD work requirements, while at the same time acknowledging that state agencies are expected to update systems, provide notice to thousands of recipients, train or retrain their workers, and screen participants for potential referral to an employment and training program.

**D.  The nonfunding of SNAP benefits causes Plaintiffs irreparable harm**

USDA's suspension of funds for SNAP benefits beginning November 1, 2025, will cause serious and irreparable harm to Plaintiffs, their members and constituents, and many others.

Most urgently, 42 million Americans will lose access to SNAP benefits, which constitute the primary or sole means by which they can purchase food. Among these SNAP recipients are individual members of Plaintiff SEIU, who rely on SNAP benefits to feed themselves and their families—even though they work part-time or full-time jobs. *See* Ex. 19, Declaration of Elena Medina (Medina Decl.), Attachments A-D. Not having benefits means that Plaintiff SEIU's members who receive SNAP will immediately have to survive on a very reduced diet, which will have critical consequences to their health and ability to work and care for their children. *Id.* They will not be able to get adequate sustenance from food pantries and other emergency food assistance because of their work schedules and the limited availability of food supplies to meet unmet need during a system-wide shutdown of SNAP. *Id.*

Likewise, many of the nonprofit Plaintiffs—including Federal Hill House, East Bay Community Action Program, Dr. Martin Luther King, Jr. Community Center, The Milagros Project, members of Plaintiff Rhode Island State Council of Churches, and members of Plaintiff National Council of Nonprofits—offer direct food assistance to low-income clients, many of whom rely on both SNAP benefits and Plaintiffs' food pantry services to meet their basic nutritional needs. *See* Ex. 11, Declaration of Kimberly Fernandez (Fernandez Decl.) ¶¶ 6, 7; Ex. 10, Declaration of Rilwan Feyisitan (Feyisitan Decl.) ¶¶ 6, 7; Ex. 9, Declaration of Heather Strout (Strout Decl.) ¶¶ 6, 7; Ex. 12, Declaration of Bonnie Piekarski (Piekarski Decl.) ¶ 5; Ex. 1, Declaration of Jeremy Langill (Langill Decl.) ¶¶ 7, 8; Ex. 2, Declaration of Diane Yentel (Decl.) ¶ 11. These nonprofits provide emergency food assistance as a core function of their individual missions, and they will face direct and serious harm if SNAP benefits are suspended on November 1. Fernandez Decl. ¶¶ 4, 25; Feyisitan Decl. ¶¶ 4, 25; Strout Decl. ¶¶ 3, 21; Piekarski Decl. ¶¶ 15, 19; Langill Decl. ¶¶ 3, 26; Yentel Decl. ¶¶ 15, 17.

For example, Plaintiff Federal Hill House, which operates one of the busiest food pantries in Rhode Island, has already had to divert staff and volunteers to support food pantry operations, and from its administrative and development team to attempt to secure food and financial resources to meet the demand; as of October 28, its family support team, which is designed to offer resources and support across programs, is now instead stationed primarily in its food pantry. *See* Fernandez Decl. ¶¶ 6, 23, 24. The harm to Federal Hill House will worsen each day that SNAP benefits are suspended. Despite the diversions of staff time and financial resources to address the food crisis, FHH will be unable to keep up with the pace of demand and expects that it will ultimately have to turn hungry families away if the SNAP funding suspension continues. *Id.* ¶¶ 25. This would frustrate FHH's core mission and harm its relationships and partnerships with the community *Id.* ¶¶ 25, 29, 42.

Plaintiff Rhode Island State Council of Churches member St. Peter and St. Andrew Episcopal Church is diverting funds to its food program to meet the acute needs of its community for groceries. Langill Decl. ¶ 22. With SNAP benefits about to be suspended on November 1, obtaining sufficient food to feed people who would otherwise receive food through SNAP diverts resources away from the church's social worker internship program, ministry to women who have recently come out of prison, and also drains energy that is needed for pastoral care for the parish, the volunteers, and guests. *Id.* ¶ 23.

If the SNAP suspension happens on November 1, Plaintiff The Milagros Project (TMP) will be forced to turn away hungry families who have nowhere else to turn for food, representing a fundamental frustration of TMP's core mission and will prevent TMP from offering programs, services and resources that would help its communities thrive. Piejarski Decl. ¶ 15. For example, in order to try to meet the increased demand for food assistance, TMP would be forced to end its

nonviolence program which works with youth in the city who are justice-impacted and provides them with re-entry services, as well as nonviolence training. *Id.* ¶¶ 16, 17.

As of October 28, 2025, East Bay Community Action Program has had to designate approximately $85,000 in unrestricted funds on emergency food purchases in response to the exponential increase in need. Feyisitan Decl. ¶ 24. This represents a diversion of resources from its other critical programs, including workforce development, health and youth education. *Id.* Additionally, if SNAP benefits are suspended, EBCAP will be forced to reassign staff from other programs, including its workforce development program, to help manage food pantry operations. *Id.* ¶ 27.

Likewise, the SNAP suspension threatens Plaintiff NCN's members that provide food assistance to their communities. Yentel Decl. ¶ 11. NCN member Jewish Family and Career Services (JFCS) in Louisville, Kentucky, will have to divert resources from its older adult programming, career counseling, and clinical services in order to meet the growing demand for food assistance. Ex. 18, Declaration of David Finke (Finke Decl.) ¶¶ 1, 20. Even still, JFCS's operations were not designed to handle the expected influx, and it will likely have to turn families away, which would undermine its core mission. *Id.* ¶¶ 9, 21, 22. NCN member Johnston Partnerships (JP), a food pantry in Iowa, faces similar threats. Ex. 17, Declaration of Andrea Cook (Cook Decl.) ¶¶ 1, 27. JP has already spent more than $8,000 of unbudgeted funds on emergency food purchases in anticipation of the suspension, and is cutting back on mentoring programs, holiday support programs, and local school district food assistance in order to do so. *Id.* ¶¶ 20. Because of the SNAP suspension, JP cannot effectively pursue its mission of mobilizing partnerships, resources, and services to respond to essential community needs. *Id.* ¶¶ 21, 25.

Plaintiff NYLAG serves clients who are experiencing barriers to accessing and maintaining public benefits, including SNAP, and expects to be inundated with requests as soon as SNAP benefits are suspended. Ex. 15, Declaration of Abby Biberman (Biberman Decl.) ¶ 17. NYLAG's clients rely on the delivery of SNAP each month to meet their basic subsistence needs. *Id.* When clients do not receive their benefits for November and do not understand why, they will reach out to NYLAG in unprecedented numbers. *Id.* NYLAG has already received many frantic calls from current clients and community members who are desperately worried about how they will feed themselves and their families if November SNAP benefits are not issued. *Id.* NYLAG will need to provide individual advice and develop materials that can be shared widely, both of which will consume substantial staff time and expertise. *Id.* ¶ 21. NYLAG will therefore have to divert resources from other clients who need assistance and other areas of essential legal support. *Id.*

City Plaintiffs, too, will be irreparably harmed by the imminent suspension of SNAP benefits for their most vulnerable residents. *See generally* Ex. 3, Declaration of Mayor Maria Rivera (Rivera Decl.); Ex. 4, Declaration of Mayor Donald Grebien (Grebien Decl.); Ex. 5, Declaration of Courtney Hawkins (Hawkins Decl.); Ex. 6, Declaration of Letitia Dzirasa; Ex. 7, Declaration of Christopher Long (Long Decl.); Ex. 8, Declaration of Mayor Justin Elicker (Elicker Decl.). For example, nearly one-fourth of the City of Central Falls' population receives SNAP benefits, and many residents live paycheck to paycheck and depend on the timely and predictable issuance of their SNAP benefits to feed themselves and their families. Rivera Decl. ¶¶ 6, 8. Central Falls expects to experience a dramatic increase in demand for City services and programs as a result of the SNAP suspension, as residents who suddenly lose their primary means of purchasing food will turn to City resources, and the City will be forced to expend

significant financial resources, including overtime for public safety staff, staffing from multiple city departments at emergency food distribution centers, increased funding for emergency food assistance programs, purchasing of gift cards for families to purchase food, and expanded hours at city facilities serving as emergency response centers. *Id.* ¶¶ 18, 19. This Saturday, November 1, 2025, because SNAP will be suspended, Central Falls is hosting a city-wide food drive, designed to provide food for up to 800 families and which will require the City to expend resources, including thousands of dollars to purchase grocery store gift cards and staffing from the police department, the department of public works, and the office of constituent services— resources that would have otherwise been spent on the delivery of city services and public safety. *Id.* ¶ 20.

The City of Columbus, Ohio has already allocated emergency funding for the area's largest food collective, and it is working on an emergency response plan, which includes coordinating with other local governmental units, local non-profits, and for-profit corporations to further address issues of food insecurity and providing additional funding in support of individuals who have had their SNAP benefits cancelled. Long Decl. ¶ 11. As a result, it will be forgoing other investments central to maintaining core city services. *Id.* ¶ 17.

Finally, the suspension of benefits will have devastating impacts on the local economy and small businesses like Plaintiff Black Sheep Market. As just one example, Plaintiff Black Sheep Market stands to lose the 40 percent of its revenue that is currently fulfilled by SNAP transactions. Ex. 14, Declaration of Patrick Cheatham (Cheatham Decl.) ¶ 12. It will not be able to recoup that money and, in the meantime, also risks damaging its relationships with food suppliers and community partners, as well as its ability to offer full work schedules to its twelve employees. *Id.* ¶ 13. Plaintiff Black Sheep Market exists to meet the needs of low-income

15

individuals in its community, but without SNAP benefits being available to those individuals, Plaintiff Black Sheep Market will not be able to fulfill that mission. *Id.* ¶ 14.

These stories just scratch the surface of the instability and irreparable harm created by Defendants' actions. The harms to each and every Plaintiff described above would be irreparable if SNAP benefits are suspended. Each day that SNAP benefits remain suspended, more Americans like SEIU's SNAP recipient members will go hungry, more resources will be diverted from nonprofit and city Plaintiffs' other critical programs, more unrecoverable revenue will be lost for small business Plaintiffs, and more damage will be done to each Plaintiff's ability to fulfill their missions of supporting their communities. Furthermore, the uncertainty and disruption created by the SNAP suspension harm Plaintiffs' ability to plan—whether SEIU's members' ability to budget for groceries, food pantries' abilities to fill their shelves, legal service organizations' abilities to meet client demand, or cities' abilities to care for their residents. *See, e.g.*, Medina Decl., Attachments A-D; Fernandez Decl. ¶ 44; Biberman Decl. ¶¶ 17, 18; Rivera Decl. ¶ 36. The longer the SNAP suspension continues, the more difficult it will be for Plaintiffs to resume their normal activities.

## E. The early termination of ABAWD waivers causes impacted Plaintiffs irreparable harm

USDA's early and sudden termination of states' previously approved ABAWD waivers on November 2, 2025, will also cause serious and irreparable harm to Plaintiffs Rhode Island State Council of Churches, United Way of RI, Federal Hill House, The Milagros Project, City of Central Falls, City of Providence, City of Pawtucket, City of New Haven, NYLAG, and NCN (the "Waiver Plaintiffs"), their members and constituents, and many others.

Even if the immediate SNAP payment suspension is resolved, SNAP recipients who are subject to ABAWD requirements in many jurisdictions—including parts of Rhode Island,

Connecticut, New Jersey, New York, and Kentucky—will face potential loss of benefits soon, up to eight months earlier than they expected under their state's waiver. And they will immediately face having to meet—and having to figure out how to meet—new work requirements that until now had been waived due to the lack of sufficient jobs in their communities. They will be doing so in jurisdictions that have administered SNAP with a waiver in place, but now must adapt and create new protocols and processes, on an exceptionally compressed timeframe, to assess SNAP eligibility under new requirements. *See* Biberman Decl. ¶ 18. The difficulty of this unexpectedly shortened adaptation period will compound the difficulties described below. *See id.*

Waiver Plaintiffs that help with SNAP benefit applications—like United Way of Rhode Island, NYLAG, and NCN member Brothers Building A Better Nation—anticipate that their staff will be inundated with requests for assistance navigating new ABAWD requirements. Ex. 13, Declaration of Cortney M. Nicolato (Nicolato Decl.) ¶¶ 14-18, 22; Biberman Decl. ¶ 17; Yentel Decl. ¶ 13; Ex. 16, Declaration of Quadeer Porter (Porter Decl.) ¶ 19. USDA's sudden termination of the waivers also requires them to expend time and resources educating themselves about these changes, training staff members to assist clients with these changes, developing operational infrastructure, including technology, to support changing reporting requirements, and educating clients that their support will be available. Nicolato Decl. ¶ 17; Biberman Decl. ¶ 18; Yentel Decl. ¶ 14; Porter Decl. ¶ 19. Plaintiffs are already stretched thin and will have to divert resources from their other programs to meet this need. Nicolato Decl. ¶ 25; Biberman Decl. ¶ 21; Yentel Decl. ¶ 14; Porter Decl. ¶ 19. Under the waivers' established durations, Waiver Plaintiffs should have had longer to make these changes and to train staff; the abrupt termination of the waivers accelerates the timeline, makes it more difficult to make the necessary changes, and

forces Waiver Plaintiffs to divert resources toward making the changes in a now-rushed timeframe. Biberman Decl. ¶ 18; *see also* Fernandez Decl. ¶ 37.

For example, Plaintiff United Way of Rhode Island (UWRI) operates the state's only 211 Contact Center and Aging and Disability Resource Center (ADRC), which is a central access point for residents seeking help with benefits, employment and community resources. Niciolato Decl. ¶ 23. The removal of the ABAWD waiver would lead to a significant increase in the number of individuals contacting UWRI for factual information, referrals and direct support, as well as a rise in in-person visits and outreach requests. *Id*. ¶ 24. UWRI staff would face an influx of calls and cases requiring complex explanations of new rules, employment requirements and reinstatement procedures, that would not only strain its contact center capacity, but also extend to UWRI's outreach, community impact and partnership networks, as more residents seek urgent help and UWRI will be forced to divert resources from other programs to meet those needs. *Id*. The heightened demand would stretch UWRI's human and financial resources beyond sustainable limits, as overtime costs would rise, staff fatigue and burnout would increase, and its ability to maintain timely responses across all 211 and ADRC call categories would decline. *Id*. ¶ 25. In effect, a single policy shift could disrupt the entire ecosystem of assistance that United Way provides to tens of thousands of Rhode Islanders every year. *Id*.

Likewise, NYLAG will need to help clients understand the newly applicable work requirements. Biberman Decl. ¶ 18. NYLAG will have to assess each client's eligibility for an exemption from work requirements and assist clients in gathering and submitting documentation. *Id.* And NYLAG will have to advise clients about how to comply with relevant appointments for ABAWD-qualifying work activities. *Id.* These tasks will place a substantial burden on NYLAG's Public Benefits Unit staff. *Id.* Given that the Public Benefits Unit has limited staff and is already

operating at or beyond capacity, directing time and effort to addressing this anticipated surge in clients will divert NYLAG's resources from other clients who need assistance and other areas of essential legal support. *Id.* ¶ 21.

NCN member BBABN serves a population that is significantly impacted by the early termination of New Jersey's waiver, as more than 90 percent of its community members are both eligible for SNAP benefits and subject to ABAWD requirements. Porter Decl. ¶¶ 6, 15. BBABN provides support with SNAP applications and job placement, and it expects to be inundated with requests for help in light of the sudden changes to its constituents' eligibility and work requirements. *Id.* ¶¶ 17, 19. BBABN expects to spend considerable staff time educating itself and its constituents about the new requirements; hire advocates to represent its constituents at their SNAP hearings; and put time into helping its constituents track their work hours. *Id.* ¶ 19. BBABN will have to divert resources from its other critical programs to meet this need, as it is already stretched thin. *Id.* ¶¶ 18, 19.

Finally, the termination of the ABAWD waiver will result in an entire category of individuals that cannot meet the new requirements losing SNAP benefits months earlier than expected and turning to Waiver Plaintiffs for emergency assistance. For the same reasons that a suspension of SNAP benefits during the shutdown will frustrate the missions of Plaintiffs Rhode Island State Council of Churches and its members, National Council of Nonprofits and its members, United Way of RI, Federal Hill House, The Milagros Project, City of Central Falls, City of Providence, City of Pawtucket, and City of New Haven and force them to divert resources in response, the early waiver termination will also increase demand on their already-strained resources and prevent them from effectively serving their communities. *See supra* Background section D.

For example, the termination of the ABAWD waiver will result in an entire category of residents in the Plaintiff Cities of Providence, Central Falls, and Pawtucket potentially losing SNAP benefits four months earlier than expected and turning to Plaintiff's City services and local food pantries—which are funded in part by these Plaintiff Cities—for emergency assistance. Hawkins Decl. ¶ 29; Rivera Decl. ¶ 30; Grebien Decl. ¶ 29. The residents in Providence, Central Falls, and Pawtucket who are subject to ABAWD requirements already face significant barriers to employment, including limited English proficiency, lack of transportation, criminal records, or health issues that do not meet the threshold for disability. Hawkins Decl. ¶ 27; Rivera Decl. ¶ 28; Grebien Decl. ¶ 27. When these residents of Plaintiff Cities lose their SNAP benefits after three months of noncompliance, they will turn to City agencies for assistance with food, housing and emergency needs. Hawkins Decl. ¶ 27; Rivera Decl. ¶ 28; Grebien Decl. ¶ 27.

Even though Waiver Plaintiffs would have had to make adjustments for the eventual termination of their states' waivers in the coming months, the extra months of emergency support that they will need to provide will be a substantial drain on their resources, and their other programs and missions will suffer as a result. *See* Hawkins Decl. ¶ 25; Rivera Decl. ¶ 26; Grebien Decl. ¶ 25. The early waiver terminations threaten to overwhelm Plaintiffs' capacity from multiple directions and will cause ongoing, irreparable harm.

## LEGAL STANDARD

The Administrative Procedure Act (APA) authorizes courts to "to postpone the effective date of an agency action" or "issue all necessary and appropriate process . . . to preserve status or rights pending conclusion of the review proceedings" when "necessary to prevent irreparable injury." 5 U.S.C. § 705. Courts also have equitable authority to grant a temporary restraining order. *See* The Judiciary Act, § 11, 1 Stat. 73, 78 (1789). The same standards apply to both types

of preliminary relief. *See New Hampshire Hosp. Ass'n v. Burwell*, No. 15-CV-460-LM, 2016 WL 1048023, at *5 n.6. (D.N.H. Mar. 11, 2016).

To obtain preliminary relief of either type, Plaintiffs must establish (1) a likelihood of success on the merits; (2) that irreparable harm is likely without preliminary relief; (3) that the balance of equities tips in Plaintiffs' favor; and (4) that a preliminary injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where the government is the opposing party, the final two factors merge. *Nken v. Holder,* 556 U.S. 418, 435 (2009). Irreparable injury operates on "a sliding scale" such that "the greater the likelihood [of success], the less harm must be shown." *Soscia Holdings, LLC v. Rhode Island*, 684 F. Supp. 3d 47, 49 (D.R.I. 2023) (citing *Braintree Labs., Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 42–43 (1st Cir. 2010)).

## ARGUMENT

The federal government's actions to abruptly discontinue SNAP funding and abruptly and prematurely terminate waivers are not just cruel and chaotic, they are unlawful. For nearly a century, federal law has prohibited the government from taking actions that are, among other things, arbitrary and capricious, unexplained, without authority, or inconsistent with the law. 5 U.S.C. § 706. It has also prohibited federal agencies from withholding or delaying action that Congress has required. Defendants have violated these prohibitions by suspending SNAP funding and prematurely terminating waivers from certain work requirements for areas with insufficient jobs.

Defendants' actions have irreparable and dire consequences: they will lead to a lack of basic food for millions, harm grocers and food retailers that rely on SNAP transactions to fuel their business, overwhelm city and community programs and organizations, and leave food

kitchens, churches, and nonprofits unable to fulfill their missions, requiring a diversion of critical resources. The factors for emergency relief are plainly met and the Court should grant Plaintiffs' motion.

## I.    Plaintiffs Are Likely to Succeed on the Merits

### A.  Plaintiffs have standing

#### 1.   *Plaintiffs have standing to challenge the withholding of funding for SNAP*

Plaintiffs have standing to challenge the suspension of SNAP benefits because they will each suffer an "injury in fact" that is "fairly traceable" to the action and "may be redressed by" a judicial order enjoining its implementation. *McBreairty v. Miller*, 93 F.4th 513, 518 (1st Cir. 2024). As detailed here and in the accompanying declarations, Plaintiffs have demonstrated that the suspension of benefits will impose a range of injuries, including their members losing food access and critical benefits; losing a substantial portion of business revenue; frustration of their missions to provide emergency food assistance; and diversion of resources from core programs to meet their communities' critical need for support. *See supra* Background section D; *see also Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 383, 395 (2024) (confirming that organizations are injured where the challenged actions "directly affect[] and interfere[] with [their] core business activities" and where plaintiffs have shown that "third parties will likely react in predictable ways, that in turn will likely injure the plaintiffs") (internal quotations and citations omitted); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).[1] Here, each

---

[1] Plaintiffs Service Employees International Union, National Council of Nonprofits, and Main Street Alliance have associational standing to challenge Defendants' withholding of SNAP funding. Plaintiff SEIU may sue on behalf of its SNAP recipient members—who would have standing to sue in their own right due to the loss of critical food and benefits—because ensuring that their members have access to SNAP benefits is "germane" to SEIU's purpose of improving

injury flows directly from the suspension of benefits and the resulting need for increased food assistance and would be redressed by immediate injunctive relief.

### 2. *Waiver Plaintiffs have standing to challenge the early termination of the ABAWD waivers*

Waiver Plaintiffs likewise have standing to challenge the ABAWD waiver terminations.[2] Waiver Plaintiffs have demonstrated that the early waiver terminations will likewise impose a range of injuries, including frustration of their missions to provide emergency food assistance, SNAP application support, and job placement services; and diversion of resources from core programs to meet their communities' critical need for support. *See supra* Background section E; *see also All. for Hippocratic Med.*, 602 U.S. at 383, 395; *Havens Realty Corp.*, 455 U.S. at 379. Each injury flows directly from the termination of the waivers and the resulting need for increased support with SNAP applications, job placement, and food assistance and would thus be redressed by immediate injunctive relief.

---

the lives of workers and their families. *See* Medina Decl. ¶¶ 6-12; *see also United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553 (1996). Plaintiff NCN may sue on behalf of its nonprofit members that provide food assistance and other support to SNAP recipients—which would have standing to sue in their own right given the severe harms to their missions and resources—because ensuring that their members can provide services to their constituents is "germane" to NCN's purpose of supporting nonprofits to ensure that communities thrive. *See* Yentel Decl. ¶ 5; *see also United Food & Com. Workers Union Loc. 751*, 517 U.S. at 553. Plaintiff MSA may sue on behalf of its small business members that accept SNAP benefits—which would have standing to sue in their own right on the basis of lost revenue and its consequences—because ensuring that their members in low-income areas can rely on SNAP benefits for sales is "germane" to MSA's purpose of creating an economy where all small business owners have an equal opportunity to succeed. Neither Plaintiffs' claims nor their requested relief requires the participation of individual SNAP recipients, individual nonprofits, or individual small businesses. *Id.*

[2] Plaintiff NCN also has associational standing to challenge Defendants' early termination of ABAWD waivers. *See supra* note 1.

### B. Defendants' Actions Violate the APA

#### 1. *APA standard of review*

Under the APA, courts can review "final agency action" and must set it aside if it is "in excess of statutory jurisdiction, authority, or limitations," "not in accordance with law," or "arbitrary [and] capricious." 5 U.S.C. §§ 704, 706(2)(A), (C).

To qualify as final agency action, two conditions must be satisfied: the action (1) "must mark the consummation of the agency's decisionmaking process," and (2) "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks and citation omitted). Both are met here.

For agencies charged with administering statutes, "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). An agency "literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). And "if an agency acts without statutory authority, then a court must set that action aside" under the APA. *Drs. for Am. v. OPM*, No. 25-cv-322, 2025 WL 1836009, at *17 (D.D.C. July 3, 2025). So too if an agency action conflicts with a statute. *See* 5 U.S.C. § 706(A). In determining whether an agency has acted within its statutory authority and consistent with the governing statute, "courts must exercise their independent judgment," and "may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 413 (2024).

Courts must also set aside any agency action that is arbitrary and capricious—that is, any action that is "not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292

(2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). To pass muster under arbitrary-and-capricious review, an agency must offer "a satisfactory explanation for its action" and can neither "rel[y] on factors which Congress has not intended it to consider" nor ignore "an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). While agencies are free to change their existing policies, they must "display awareness that" they are doing so, provide "good reasons for the new policy," and demonstrate that they have taken account of "reliance interests" engendered by the prior policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). In assessing the reasonableness of an agency's explanation for its action, "the Court must look to 'the grounds that the agency invoked when it took the action.'" *New York v. Kennedy*, 789 F. Supp 3d 174, 205 (D.R.I. 2015)(quoting *Michigan v. EPA*, 576 U.S. 743, 758, (2015)).

### 2. *The suspension of SNAP benefits violates the APA*

USDA's suspension of SNAP benefits violates the APA because it is final agency action that is both contrary to law and arbitrary and capricious and because, in failing to release funding required to pay benefits, Defendants are unlawfully withholding agency action required by law.

#### a. *The suspension is reviewable final agency action*

The suspension is reviewable final agency action. In its October 10 guidance, USDA directed state agencies to "delay transmission to State EBT vendors until further notice." U.S. Dep't of Agric., *Supplemental Nutrition Assistance Program (SNAP) Benefit and Administrative Expense Update for November 2025* (Oct. 10, 2025), https://perma.cc/LDG4-DQMC. Then, in its October 24 memo, USDA informed SNAP state agencies that it was suspending "all November 2025 benefit allotments," effective November 1. U.S. Dep't of Agric., *Supplemental Nutrition Assistance Program (SNAP) Benefit and Administrative Expense Update for November*

*2025* (Oct. 24, 2025), https://perma.cc/4VPF-4ANN. The agency's decisionmaking process is

over. And legal consequences flow from USDA's action, as USDA instructed the state agencies

to "take immediate action to implement this suspension," including to "notify households of the

suspension." *Id.* USDA's suspension of SNAP benefits, as reflected in both the October 10 and

October 24 memos, constitutes final agency action under the APA.

       *b. The suspension is contrary to law*

       USDA's suspension of SNAP benefits must be set aside as contrary to law. In

establishing the SNAP program, Congress used mandatory language providing that "[a]ssistance

under this program shall be furnished to all eligible households." 7 U.S.C. § 2014(a). Even

assuming the obligation to pay SNAP benefits is subject to the availability of appropriated funds,

nothing in the statutory scheme permits USDA to suspend benefits where appropriated funds are

available.

       Here, appropriated funds are available for the SNAP program from at least two sources.

First, the Consolidated Appropriations Act of 2024 provides that $3 billion, "to remain available

through September 30, 2026, shall be placed in reserve for use only in such amounts and at such

times as may become necessary to carry out program operations." Pub. L. No. 118-42, 138 Stat.

25, 93. Those funding levels were maintained in the Full-Year Continuing Appropriations and

Extensions Act of 2025. Pub. L. No. 119-4, 139 Stat. 9, 13. In other words, Congress set aside $6

billion in appropriated funds to be used for the SNAP program when necessary. USDA's failure

to use those funds as Congress intended is contrary to law.

       USDA has insisted that the contingency funds are "not available to support FY 2026

regular benefits, because the appropriation for regular benefits no longer exists." U.S. Dep't of

Agric., *Impact of the Government Lapse on November Supplemental Nutrition Assistance*

*Program (SNAP) Household Benefits*, https://perma.cc/L343-L7YA. But the agency has provided no support for that claim, which is directly at odds with the statutory language making clear that the reserve is to be used when "necessary to carry out program operations." And USDA previously took the exact opposite position: during the first Trump administration, USDA advised regional partners that funding from the contingency reserve was available to provide SNAP benefits. Letter from Jessica Shahin to FNS Regions, *Early Issuance of February 2019 SNAP Benefits – Questions & Answers #2* (Jan. 14, 2019), https://perma.cc/9HCL-5GCU. The Obama administration took the same view. *See* U.S. Dep't of Agric., *Q&A for SNAP Recipients in the Event of a Government Shutdown*, https://perma.cc/P5YF-ARV9 (USDA guidance indicating that contingency funds could be used for some SNAP benefits).

Beyond that, a second source of funding is available as well. USDA is authorized under 7 U.S.C. § 2257 to use a percentage of appropriated funds "interchangeably" for certain expenditures. And other funds are available for transfer under this authority. For example, another fund available to USDA had over $23 billion in it as of October 8, 2025. *See* OpenOMB, *State Child Nutrition Programs*, https://perma.cc/39Y3-4K9F. USDA recently used some of this money to fund the Women, Infants & Children (WIC) program during the shutdown, invoking its authority under 7 U.S.C. § 2257. *See* OpenOMB, *Special Supplemental Nutrition Program for Women, Infants, and C*, https://perma.cc/G34G-X898; Marcia Brown, *USDA Tells Lawmakers WIC Will Be Funded Through October*, Politico (Oct. 10, 2025), https://perma.cc/74PN-7R2F. USDA could take the same approach to fund the SNAP program. Its failure to do so is contrary to the statutory mandate that assistance "shall" be furnished to eligible households, *see* 7 U.S.C. § 2014(a).

c. *The suspension is arbitrary and capricious*

USDA's suspension of SNAP benefits is also arbitrary and capricious for several reasons. For one, USDA failed to provide a reasoned explanation for its decision not to fund the SNAP program with contingency funds or other available appropriations. The agency made no effort to account for the enormous harms that will result to SNAP beneficiaries, as well as to organizations that provide emergency food assistance and other services and will be forced to divert resources due to the suspension of benefits. USDA thus failed to consider "important aspects of the problem" or to articulate a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983) (citations omitted).

Nor did USDA consider the extraordinarily weighty reliance interests at stake in the SNAP program—including the reliance interests of beneficiaries who rely on SNAP for adequate nutrition for themselves and their families, retailers who rely on SNAP to keep their stores (including stores in food deserts) operational, and organizations, cities, and other jurisdictions that rely on SNAP as the primary way to address food insecurity for the low-income communities they serve. The Supreme Court has made clear that failure to "consider[] potential reliance interests"—standing alone—renders agency action arbitrary and capricious. *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020). The suspension of funding is arbitrary and capricious for that reason alone.

Beyond that, USDA also failed to acknowledge that its decision not to use contingency funding reflects a change in policy or to reasonably explain the reasons for that change. Previous administrations, including the first Trump administration, issued guidance explaining that contingency funds appropriated by Congress would be available to fund SNAP in the event of a

government shutdown. USDA then abruptly deviated from that position without any justification. In doing so, the agency did not "display awareness that" it was changing positions or provide "good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *see also Regents*, 591 U.S. at 30 ("When an agency changes course . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." (internal quotation marks and citation omitted)).

Defendants' withholding of funds is also arbitrary and capricious because its premise that no funds are available is incorrect. In fact, funds are available both from the FY 2024 and FY 2025 contingency appropriations and in the funds available under 7 U.S.C. § 2257, as explained above.

Lastly, the agency's conduct after announcing the suspension further illustrates that its decision was arbitrary and capricious. A banner displayed on USDA's website during the shutdown blames "Senate Democrats" for not voting to "reopen the government so mothers, babies, and the most vulnerable among us can receive critical nutrition assistance," and states that "there will be no benefits issued November 01." U.S. Dep't of Agric., https://perma.cc/BL88-8QU6. Withholding these critical funds from millions of Americans for political purposes plainly qualifies as arbitrary and capricious.

> d. *Defendants have unlawfully withheld agency action by refusing to release SNAP funding*

Plaintiffs are also likely to succeed on their claim under 5 U.S.C. § 706(1) to "compel agency action unlawfully withheld." To prevail on such a claim, a plaintiff must identify a "discrete agency action" that the agency is "required to take," either by statute or regulation. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis omitted). Defendants' refusal to release funding for the immediately-due November SNAP benefits satisfies that

requirement. Congress has directed that "[a]ssistance under this program *shall* be furnished to all eligible households who make application for such participation." 7 U.S.C. § 2014(a) (emphasis added). This imposes a mandatory duty on Defendants to provide assistance to eligible people who apply, at least insofar as funding is available. As explained above, funding is available both in the contingency funds Congress appropriated in FY 2024 and FY 2025 and in the funds available to USDA under its authority under 7 U.S.C. § 2257. In withholding funding necessary to furnish assistance to all eligible households, Defendants failed to take "discrete" steps "required" by law. *Norton*, 542 U.S. at 64.

###### 3. *The early termination of ABAWD waivers violates the APA*

Defendants' premature termination of ABAWD waivers also violates the APA for two independent reasons: The abrupt and premature waiver termination both exceeds Defendants' statutory authority and is arbitrary and capricious.

###### a. *The early termination is reviewable final agency action*

The early termination is reviewable final agency action. Defendants have made a final decision to terminate states' existing ABAWD waivers before their expiration dates. The decision determines rights and obligations and produces legal consequences by changing the eligibility requirements for SNAP benefits and by requiring recipients to meet—and state administrators to enforce—work requirements that were waived under the prematurely terminated waivers.

###### b. *The early termination exceeds Defendants' statutory authority*

No provision of the Food and Nutrition Act—or of H.R. 1's amendments to it—authorizes Defendants to terminate ABAWD waivers early. H.R. 1 changed the standard for granting *new* waivers: Under the amended law, USDA "may waive" the ABAWD work

requirement for people living areas with an unemployment rate above 10 percent, but can no longer grant such waivers for people living in areas with "insufficient jobs." *See* 7 U.S.C. § 2015(o)(4). But, at the time H.R. 1 was enacted, USDA had already granted waivers based on "insufficient jobs," and those waivers were for a set duration (generally one year, *see* 7 C.F.R. § 273.24(f)(5)) that expired in the future. Food and Nutrition Serv., *ABAWD Waivers* (2025). Nothing in H.R. 1 authorized USDA to terminate those previously approved waivers. Indeed, with H.R. 1's amendments, the statute provides only that the USDA Secretary "may waive" the requirements "on the request of" a state. 7 U.S.C. § 2015(o)(4)(A). It does not authorize the agency to terminate any existing waivers that were approved under the previous standard. Because the statute does not authorize Defendants to terminate existing waivers due to noncompliance with the standard that applies to new waivers, the early termination must be set aside as exceeding Defendants' statutory authority, 5 U.S.C. § 706(2)(C).

        *c.   The early termination is arbitrary and capricious*

     The early termination decision must also be set aside for the independent reason that it is arbitrary and capricious. For one, the early termination fails the most basic requirement of the APA because it has "not been explained at all." *Martin Luther King, Jr. Cnty. v. Turner*, 785 F. Supp. 3d 863, 889 (W.D. Wash. 2025). Defendants provided no explanation for their actions, much less "a satisfactory explanation for [their] action, including a rational connection between the facts found and the choice made." *Ohio*, 603 U.S. at 292 (quotations omitted).

     Defendants' early termination of waivers is also arbitrary and capricious because they did not consider the "serious reliance interests" of states and counties that administer SNAP, the participants who rely on SNAP benefits for food, or the municipalities and nonprofits that rely on SNAP to provide food security in their communities. *See DHS v. Regents of Univ. of Cal.*, 591

U.S. 1, 30 (2020). The Supreme Court has made clear that the failure to "consider[] potential reliance interests," standing alone, renders agency action arbitrary and capricious. *Id.* Specifically, an agency is "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.* at 33. There is no indication Defendants did that here.

Similarly, Defendants failed to consider an "important aspect of the problem," *State Farm*, 463 U.S. at 43, because they did not account for the effects of USDA's abrupt action on states' and counties' ability to come into compliance with new rules that, under the existing waivers, should not have applied until later. Defendants did not consider how states and counties would be able to update their systems, train staff, revise their policies and procedures, provide sufficient notice to recipients regarding the now un-waived requirements, or provide work activities and referrals to enable ABAWD recipients to comply with the requirements. Nor did they consider how the early waiver termination made existing challenges even worse by accelerating already challenging timelines to implement H.R. 1's other new rules.

Defendants also failed to consider the effects on ABAWD SNAP recipients, who will be expected to find employment or alternative work activities within a compressed timeframe, or else begin accruing "countable months" toward the three-month SNAP time limit. Nor do Defendants appear to have considered how abruptly compressing the timeframe for states to comply with new rules—and to prepare to help their residents find jobs or alternative placements—would make it more difficult for ABAWD beneficiaries to find opportunities that would satisfy the work requirement.

Finally, Defendants also considered factors Congress did not permit them to consider by apparently terminating existing waivers in light of the standard for approving or disapproving

*new* waivers. For all these reasons, the early termination must be set aside as arbitrary and capricious.

## II. Plaintiffs Will Suffer Irreparable Injury Absent Emergency Relief

### A. Plaintiffs face irreparable harm from the withholding of funding for SNAP benefits

USDA's suspension of funding for SNAP benefits will irreparably harm Plaintiffs. "District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989) (citations omitted). "To establish irreparable harm, . . . a plaintiff need not demonstrate that the denial of injunctive relief will be fatal to its business"; rather, "[i]t is usually enough if the plaintiff shows that its legal remedies are inadequate." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir. 1996) (citations omitted). Thus, "[i]f the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel." *Id.* at 19. Additionally, "'[o]bstacles that unquestionably make it more difficult for the plaintiff to accomplish its primary mission provide injury for purposes of irreparable harm.'" *Massachusetts v. NIH*, 770 F. Supp. 3d 277, 322 (D. Mass. 2025) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016)) (internal quotation marks, citation, and alterations omitted).

The record here is replete with examples of just such harms. Plaintiff SEIU's members who receive SNAP will lose those benefits for the duration of the lapse in appropriations, which will critically impair their ability to feed themselves and their families. Medina Decl., Attachments A-D. Plaintiff Black Sheep Market will lose upwards of twenty thousand dollars in revenue each week, which will harm Black Sheep Market's partnerships with its suppliers and its

ability to plan day-to-day operations effectively. Cheatham Decl. ¶ 13. It will also cause Black Sheep Market to cut back its employees' hours, which will in turn make it more difficult for those employees to make ends meet. *Id.*

The nonprofit Plaintiffs that offer direct food assistance to low-income clients will have to expend significant resources to meet the influx of need, which will require them to scale back on other critical programs like a youth nonviolence program, ministry to women who have recently come out of prison, a cross-program family support team, clinical services, and a mentoring program. *See* Piekarski Decl. ¶ 17; Langill Decl. ¶ 23; Fernandez Decl. ¶ 24; Finke Decl. ¶ 20; Cook Decl. ¶ 20. Moreover, these organizations' missions largely focus on providing their clients with comprehensive support, of which providing emergency food assistance is only one part. *See supra* Background section D. The crisis they are forced to meet severely undermines their missions, and they will have to turn people in need away. *Id.* Plaintiffs that assist individuals seeking to access SNAP will also be forced to divert substantial resources to help clients who have lost benefits. Nicolato Decl. ¶ 14; Bibender Decl. ¶ 17.

The city Plaintiffs, too, will have to expend and divert funds to meet their residents' food needs. They operate as the first line of defense for their most vulnerable residents, and they are using the resources that would otherwise go toward city services and public safety to stand up their own food drives and provide emergency funding to their nonprofit food delivery partners. *See* Rivera Decl. ¶ 20; Long Decl. ¶ 11. Forcing cities to divert funds from other critical functions to feed their residents is an "economic harm" that cannot be remedied by monetary damages. *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021). And several Plaintiffs attest that their inability to meet their constituents' needs will damage their reputations and relationships with community partners. *See, e.g.*, Rivera Decl. ¶ 34; Elicker Decl. ¶ 33;

Fernandez Decl. ¶¶ 25, 29, 42; *see also Ross-Simons of Warwick, Inc.*, 102 F.3d at 20 (describing

damage to reputation as "not easily measured or fully compensable in damages" and therefore

"often held to be irreparable"); *Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245,

1264 (10th Cir. 2016) (governor's directive to withhold funding to health services provider

would irreparably harm provider's reputation).

      Plaintiffs have established irreparable harm as to Defendants' suspension of SNAP

benefits.

### B. Plaintiffs face irreparable harm from the early termination of ABAWD waivers

      For similar reasons, Waiver Plaintiffs are also irreparably harmed by USDA's premature

termination of the ABAWD waivers. In addition to the strains on nonprofit Plaintiffs providing

food assistance directly, nonprofit Plaintiffs that help with SNAP benefit applications anticipate

that their staff will be inundated with requests for assistance navigating new ABAWD

requirements. Nicolato Decl. ¶ 24; Biberman Decl. ¶ 18; Porter Decl. ¶ 19. They will have to

educate themselves and their clients on sudden changes to their eligibility and work

requirements. Biberman Decl. ¶ 21; Yentel Decl. ¶ 14; Porter Decl. ¶ 19. As a result, their ability

to meet their other programmatic obligations—including responding across 211 and ADRC call

categories across Rhode Island, representing clients facing other legal assistance issues in New

York, and maintaining workforce programming in Newark—will decline. Nicolato Decl. ¶ 25;

Biberman Decl. ¶ 21; Porter Decl. ¶ 19.

      Indeed, in *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 40–41

(D.D.C. 2020), the court found that organizational plaintiff Bread for the City, which provided

both food and legal services to SNAP recipients, had established irreparable harm in a challenge

related to ABAWD waivers because it would be forced "to divert resources to its food assistance

program and to helping ABAWDs navigate the new time limits and away from other social

service programs and from legislative advocacy and community organizing." Waiver Plaintiffs

have established the same irreparable harm here.

## III.    The Balance of Equities and Public Interest Favor Immediate Temporary Relief

The balance of the equities and public interest favor immediate temporary relief. The

final two temporary restraining order factors—balancing the equities and weighing the public

interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418,

435 (2009). Here, Plaintiffs' strong likelihood of success on the merits, *see supra* Argument

section I, itself establishes that the equities and public interest favor preliminary relief. "[T]he

government cannot suffer harm from an injunction that merely ends an unlawful practice."

*Massachusetts v. NIH*, 770 F. Supp. 3d at 326–27 (citation modified). Rather, there is

"substantial public interest 'in having governmental agencies abide by the federal laws.'" *Id.* at

326 (citation omitted). Therefore, the injunction would serve the public interest as USDA is

forced to abide by existing law and regulations.

The consequences for Plaintiffs and their members stemming from USDA's actions

cannot be overstated. Countless families, residents, clients, programs, organizations, and

communities will suffer if SNAP benefits to pay for food are suspended and the ABAWD

waivers are ended prematurely. The cumulative effect of SNAP benefits being suspended and the

ABAWD waivers being cut short will not only directly harm Plaintiff members that receive

SNAP benefits, but programs and organizations dedicated to directly and indirectly addressing

such issues will become overburdened through the abrupt cessation of payments. *See Maine v.*

*USDA*, 778 F. Supp. 3d 200, 235–36 (D. Me. 2025) ("[T]he balance of the equities weighs

heavily in favor of granting the Plaintiff's TRO" where action by the federal government resulted

36

in "no way to get funds from the USDA to the schools and other facilities, and children will not be fed. . . . absent such an order" (citation omitted)). "[A]bsent such an order, there is a substantial risk that the . . . citizens will face a significant disruption in health, education, and other public services that are integral to their daily lives due to this pause in federal funding." *New York v. Trump*, 764 F. Supp. 3d 46, 52 (D.R.I. Jan. 31, 2025).

Conversely, Defendants' assertion that such funds will not and cannot be made available does not demonstrate a comparable harm. If the Court were to grant the requested emergency relief, Defendants would merely be required to draw on SNAP contingency reserve funds that USDA itself and OMB have deemed available for such uses in the past and the existing ABAWD waivers that were already approved would simply not be cut short.

Thus, the balance of the equities and the public interest is clear. On one hand, granting the requested TRO maintains the status quo and implements processes that USDA has itself previously approved or in the case of the ABAWD waivers, already granted. On the other hand, allowing the SNAP benefit payments to cease and improperly ending the ABAWD waivers both violate the APA and would impact Plaintiffs and their members in countless and devastating ways. Particularly here, where so much is at stake, the government should not be permitted to "leverag[e] the needs of our most vulnerable fellow humans" to advance its own goals. *Martin Luther King, Jr. Cnty. v. Turner*, 785 F. Supp. 3d 863, 891(W.D. Wash. 2025). Such an action would be "breathtaking in its callousness." *Id.*

The public interest and the equities clearly favor Plaintiffs. Immediate temporary relief is necessary to protect the SNAP benefits and ABAWD waivers that are so vital to Plaintiffs and their members.

\* \* \*

The requested temporary restraining order should compel the release of all withheld SNAP funding, insofar as funds are available under the contingency funds from the FY 2024 and FY 2025 appropriations or under USDA's authority under 7 U.S.C. § 2257, and necessary to meet the November payment schedule. Given the geographic diversity of Plaintiffs and their membership as well as the injuries certain Plaintiffs suffer from the elimination of SNAP in their communities and states as a whole, a more limited order would not provide complete relief. *Trump v. CASA, Inc*., 606 U.S. 831, 853–54 (2025). Further, the requested preliminary Section 705 stays operate against the agency actions themselves, and they should be preliminarily stayed. *Rhode Island Coal. Against Domestic Violence v. Bondi*, No. CV 25-279, 2025 WL 2271867, at *10 (D.R.I. Aug. 8, 2025); *see also CASA*, 606 U.S. at 847, n.10 ("Nothing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action.").

The Court also should not require Plaintiffs to post a bond in granting this relief. Rule 65(c) "vest[s] broad discretion in the district court to determine the appropriate amount" of a bond, "including the discretion to require no bond at all." *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 477 (D.R.I. 2025), *appeal pending on other grounds*, No. 25-1428. Where requiring a bond "would have the effect of denying the plaintiffs their right to judicial review of administrative action," no bond is necessary. *Id.*; *see also Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases). A bond would have that effect here because Plaintiffs do not have the resources to post a significant bond, and even requiring a modest one would require them to divert resources from their critical programs. At most, the Court should require Plaintiffs post only a nominal bond, because

Plaintiffs already "have plenty on the line in this litigation." *See New York v. Kennedy*, 789 F. Supp. 3d 174, 214 (D.R.I. 2025).

## CONCLUSION

For the foregoing reasons, the Court should grant immediate temporary relief as detailed in Plaintiffs' motion.

October 30, 2025                    Respectfully submitted,

                                   */s/ Amy R. Romero*
                                   Amy R. Romero (RI Bar # 8262)
                                   Kevin Love Hubbard (MA Bar #704772)^
                                   DeLuca, Weizenbaum, Barry & Revens, Ltd.
                                   199 North Main Street
                                   Providence, RI 02903
                                   (401) 453-1500
                                   Amy@dwbrlaw.com
                                   Kevin@dwbrlaw.com
                                   Cooperating counsel, Lawyers' Committee for RI

                                   */s/ Kristin Bateman*
                                   Kristin Bateman (D.C. Bar No. 90037068)^
                                   Jyoti Jasrasaria (D.C. Bar No. 1671527)^
                                   Michael J. Torcello (D.C. Bar No. 90014480)^
                                   Andrew Bookbinder (D.C. Bar No. 90028967)^
                                   Adnan Perwez (D.C. Bar No. 90027532)^
                                   Robin F. Thurston (D.C. Bar No. 1531399)^
                                   Skye L. Perryman (D.C. Bar No. 984573)^
                                   Democracy Forward Foundation
                                   P.O. Box 34553
                                   Washington, D.C. 20043
                                   (202) 448-9090
                                   kbateman@democracyforward.org
                                   jjasrasaria@democracyforward.org
                                   mtorcello@democracyforward.org
                                   abookbinder@democracyforward.org
                                   aperwez@democracyforward.org
                                   rthurston@democracyforward.org
                                   sperryman@democracyforward.org

                                   *Counsel for Plaintiffs*

^ *Pro hac vice* motion forthcoming