# EXHIBIT 15

## DECLARATION OF ABBY BIBERMAN, ASSOCIATE DIRECTOR, PUBLIC BENEFITS UNIT, NEW YORK LEGAL ASSISTANCE GROUP

I, Abby Biberman, hereby declare as follows:

1.     I am the Associate Director of the Public Benefits Unit ("PBU") at the New York Legal Assistance Group ("NYLAG"). I submit this declaration in support of Plaintiffs' application for a temporary restraining order and motion for a stay pursuant to 5 U.S.C. § 705 or a preliminary injunction in this matter.

2.     I have served as Associate Director of the PBU since 2022. I have been an attorney in other positions at NYLAG since 2011.

3.     In my capacity as Associate Director of PBU, I have direct responsibility for overseeing PBU's operations, programs, and services, and I am familiar with the needs of the individuals and families we serve. The facts set forth in this declaration are based on my personal knowledge, information provided to me by NYLAG staff in the course of their duties, and review of NYLAG's records. If called as a witness, I could and would testify competently to the matters stated herein.

4.     NYLAG uses the power of the law to help New Yorkers in need combat social, racial, and economic injustice. We address emerging and urgent legal needs with comprehensive, free civil legal services, impact litigation, policy advocacy, and community education. NYLAG serves immigrants, seniors, the homebound, families facing foreclosure, renters facing eviction, low-income consumers, those in need of government assistance, children in need of special education, domestic violence victims, persons with disabilities, patients with chronic illness or disease, low-wage workers, low-income members of the LGBTQ community, Holocaust survivors, and

veterans, as well as others in need of free legal services. NYLAG impacted the lives of nearly 130,000 individuals in 2024.

5.      NYLAG's Public Benefits Unit serves clients who are experiencing barriers to accessing and maintaining public benefits, including Public Assistance, SNAP, appropriate shelter, Section 8, Medicaid, Homecare, Social Security Disability, Supplemental Security Income, and Veterans' Benefits. We also prepare medical and financial advance planning documents for clients in need. In New York City, where the high cost of living is coupled with a level of benefits insufficient to meet basic needs, we serve clients with overlapping needs related to food scarcity, housing instability, and homelessness.

**NYLAG's SNAP Practice**

6.      NYLAG's Shelter and Economic Stability Project represents clients having trouble accessing or maintaining public assistance, SNAP benefits, related housing subsidies, and appropriate shelter. We represent clients at Administrative Fair Hearings and conduct advocacy with the Department of Social Services and bring impact litigation to ensure that our clients are obtaining and maintaining an adequate level of benefits. We also provide legal services and advocacy to low-income people in and trying to access homeless shelter placements in New York City.

7.      PBU's staffing consists of 22 attorneys and 9 paralegals who serve clients across New York City, in Westchester, and Long Island, who are experiencing barriers to accessing and maintaining public benefits. Within this Public Benefits Unit, our Shelter and Economic Stability Project is staffed by a dedicated team of 6

attorneys and 3 paralegals who focus exclusively on issues related to public assistance, SNAP benefits, and access to shelter.

8.    Since the beginning of 2024, NYLAG has handled over 1300 cases related to public assistance and SNAP benefits and served approximately 3575 clients experiencing problems with their public assistance and SNAP benefits.

9.    PBU partners with several community-based organizations to provide on-site staffing and direct legal services to their members. These organizations are typically located in the neighborhoods where our clients live or spend time and are often visited for services like food pantries or mobile soup kitchens. Clients are referred to NYLAG when they face issues such as wrongful denial of benefits, including SNAP; receiving insufficient benefit amounts, including SNAP; or other barriers to accessing public benefits, including SNAP. We also assist clients who need in-depth consultations, legal analysis, or personalized advice based on their specific circumstances, including about eligibility for benefits like SNAP and public assistance.

10.    PBU also conducts intakes through our dedicated phone line, completing them over the phone or in person when necessary. And we receive internal referrals from other NYLAG units when a client is already receiving legal representation for a different matter. These internal referrals are prioritized in alignment with our commitment to providing holistic legal support.

11.    PBU is supported through a combination of program-specific grants and other funding.

## Food Insecurity in New York City

12.    SNAP plays a critical role in addressing hunger and food insecurity in the community that NYLAG serves. SNAP is the first line of defense against hunger for low-income residents. NYLAG sees firsthand what happens when low-income people lose their SNAP benefits and the effects it has on their lives. Many of these recipients are elderly or live with disabilities, and when their SNAP is discontinued, they don't know where to turn to access food.

13.    In a city of roughly 8 million people, almost 1.3 million New York City residents are currently struggling to feed themselves and their families.[1]  Indeed, 1 in 5 children in New York City are suffering from food insecurity.[2] In 2023 alone, 31% of adult New Yorkers and 44% of families with children in New York City experienced food hardship.[3] Since the pandemic, the situation has grown more dire, as 1 in 3 New Yorkers have relied on a food pantry over a three-year period post-pandemic, and monthly visits to soup kitchens and food pantries across the City are up 75%.[4]

14.    These statistics do not affect the City's diverse population equally. Unsurprisingly, families and communities of color face higher levels of hunger. [5] Similarly, rates of diabetes and hypertension, which are closely linked to nutritional intake, are higher among people of color. [6] In fact, people of color are twice as likely to experience diabetes compared to their White neighbors. [7]

---

[1] https://www.cityharvest.org/hunger-in-nyc/
[2] *Id.*
[3] https://robinhood.org/reports/poverty-tracker-spotlight-food-assistance-nyc-pantry-system/
[4] *Id.*
[5] https://www.nyc.gov/assets/foodpolicy/downloads/pdf/nycfoodbythenumbers.pdf
[6] *Id.*
[7] *Id.*

15.     Community health is inextricably linked to adequate nourishment, and research overwhelmingly demonstrates that food insecurity has significant health and economic consequences.[8] In adults, the medical implications of inadequate nutrition include, but are not limited to, diabetes, obesity, heart disease, depression, and fatigue.[9] In children, the consequences extend to low birth weights and delayed cognitive development.[10] Such health concerns can then lead to lowered productivity and higher medical costs.[11] In contrast, children who are well fed do better in school; seniors with adequate food access need not make the choice between feeling nourished and purchasing other necessities; families that are satiated thrive.

**<u>Harms to NYLAG from Recipients' Loss of SNAP Benefits</u>**

16.     If SNAP recipients do not receive their November benefits, and/or if the USDA prematurely terminates the existing waiver of federal work requirements for Able-Bodied Adults Without Dependents (ABAWD), the effects on the community of NYLAG clients will be catastrophic. This, in turn, will place a substantial burden on NYLAG, causing harm to our organization.

17.     First, we expect that the number of clients seeking advice and counsel about the cessation of their benefits will be overwhelming. These clients rely on the delivery of SNAP each month to meet their basic subsistence needs. When clients do not receive their benefits for November and do not understand why, they will reach out directly to NYLAG in unprecedented numbers. We expect that our intake lines

---

[8] https://www.harvesters.org/Learn/How-Many-are-Hungry/The-Impact-of-Hunger
[9] *Id.*
[10] *Id.*
[11] *Id.*

and community clinics will be swamped. NYLAG staff and our intake hotlines have already received many frantic calls from current NYLAG clients and community members who are desperately worried about how they will feed themselves and their families if November SNAP benefits are not issued.

18.    Simultaneously, our public benefits staff will need to help our current NYLAG clients understand the letters they will receive from the NYC Human Resources Administration (HRA) regarding newly applicable work requirements. NYLAG attorneys and paralegals will also be required to assess each client's eligibility for an exemption from work requirements, and to assist clients in gathering and submitting documentation required to obtain work exemptions. Furthermore, NYLAG staff will have to advise clients about how to comply with relevant appointments for ABAWD-qualifying work activities, and to request and conduct fair hearings regarding improper assessments of months counted towards the three-month limit. Each of these tasks will place an enormous additional burden on NYLAG's Public Benefits Unit staff. Moreover, based on our many years of experience responding to HRA agency issues, we anticipate that the work screening system that HRA rushes to develop in response to the abrupt termination of ABAWD waivers will have numerous technical problems and result in many erroneous determinations. We expect that NYLAG attorneys and paralegals will have to represent hundreds of clients who are denied SNAP benefits they are entitled to, due to systems failures and the lack of adequate guidance on how beneficiaries can demonstrate their compliance with work requirements.

19.     Second, we anticipate receiving vastly more referrals from our partner organizations. For many community members, these organizations are the first point of contact when they face a deprivation of public assistance benefits. But in a time of overwhelming, Citywide food insecurity, those organizations will themselves lack resources to assist all comers. We therefore expect that in addition to a substantially higher volume of clients directly contacting NYLAG for assistance, we will receive unprecedented numbers of referrals from our partner organizations.

20.     For example, several years ago, a computer error in New York City's Section 8 voucher recertification program caused thousands of recipients to receive erroneous notices of termination. Within days, our partner organizations contacted NYLAG seeking emergency advice on behalf of hundreds of affected clients. NYLAG public benefits and housing attorneys spent thousands of hours responding to our community partners, social workers, and community organizers who were frantically attempting to figure out how to assist our shared client population.

21.     NYLAG will need to provide individual advice to each client and community advocate, and to develop materials that can be shared widely with clients and partner organizations. Both such efforts will consume substantial staff time and expertise. Given that PBU has limited staff and we are already operating at or beyond our capacity, directing time and effort to addressing this anticipated surge in clients will divert our resources from other clients and programs who need assistance.

22.     Third, NYLAG will need to refer these clients to organizations and resources that can address their food insecurity, such as food pantries. This, too, will consume NYLAG staff resources.

23.     Fourth, we expect these food assistance resources to be thinly stretched during a period of massive, Citywide food insecurity. As a result, many individuals will not be able to feed their families if they rely on those resources. And certain of NYLAG's clients have special dietary needs such that they cannot eat the food at pantries. For these clients who cannot obtain food assistance elsewhere, we will need to spend extensive time helping clients who cannot be served by food pantries access the very limited other sources of food aid available in the city.

24.     Fifth, because SNAP allows families experiencing poverty to meet their most basic needs, when SNAP benefits cease, individuals will also face other overwhelming financial pressures for which we expect them to seek advice from NYLAG. For example, we anticipate an increasing number of intake callers and current clients who have utility bills and rent arrears. These clients will need NYLAG's advice and counsel on applying for other forms of benefits relief that can fill those gaps.

25.     Sixth, the organizations that partner with and refer to NYLAG regularly help clients with applications and recertifications for other benefits besides SNAP, as well as a range of non-SNAP other issues. Because the referring organizations will be stretched so thin, they will likely not have the capacity to continue that work. Accordingly, we expect a higher volume of referrals on non-SNAP issues as well,

straining the capacity of PBU and other NYLAG staff that provide advice and counsel about these same issues.

26.     Disruptions to SNAP, whether through failure to issue November benefits or diminished eligibility from early termination of the ABAWD waiver, will also place substantial additional burden on multiple NYLAG units and practices other than PBU.

27.     Many of NYLAG's clients are extremely financially insecure, and monthly SNAP benefits are a crucial support that allow them to feed their families while preserving other financial resources for rent and utilities. If SNAP benefits become unavailable, we anticipate that many more families will be unable to meet these other obligations.

28.     These effects would be widespread and immediate if no SNAP benefits are issued for the month of November. Similarly, early termination of the ABAWD waiver would have the effect of ceasing SNAP benefits in the coming months for many individuals and families who historically have relied on them, as described above.

29.     NYLAG's Tenants Rights Unit ("TRU") represents families facing eviction in Housing Court. TRU fights for housing justice: fair, safe, and affordable housing for adults and families so that they can stay in their communities and thrive. Last fiscal year TRU represented clients in over 2,000 eviction cases in New York City Housing Court.

30.     Families who rely on SNAP to secure food and do not receive benefits in November, or are denied SNAP in the coming months because of the ABAWD waiver,

will be forced to devote their scarce resources to purchasing food to protect the health and safety of their families. For many, this will render them unable to pay rent.

31.     Without SNAP benefits, we expect tenants to fall behind on rent and for eviction filings to increase; those clients will all be in need of representation in their housing court cases. In addition, in the future, as families and individuals lose eligibility due to the early termination of the ABAWD waiver, we expect a greater share of those individuals to be sued for eviction in Housing Court. Those increased filings will put additional pressure on TRU's staff to represent these respondents, when TRU staff are already working at capacity.

32.     TRU currently represents many individuals and families in eviction proceedings who have settlement stipulations or judgments which obligate the families to pay arrears and make certain rent payments going forward. When TRU attorneys negotiated that relief, many clients committed to payment agreements based on an expectation that they would continue to receive the SNAP benefits to which they are entitled. If all or some of them do not receive those benefits, we anticipate that they will be unable to pay the court-ordered amounts, placing them in default. Defaulting on court-ordered stipulations or judgments causes the underlying housing proceedings to resume, which requires TRU attorneys to engage in active representation as they file emergency orders to show cause to stave off imminent evictions.

33.     Many TRU clients apply for one-time rental assistance from New York City's Human Resources Administration. Under these grants, the agency will pay an

applicant's back rent, but only upon a finding that the applicant will be able to afford rent going forward. The evaluation by the agency typically considers the ongoing resources that will be available to a family; such resources often include SNAP benefits. If applicants who previously would have received SNAP benefits will no longer receive such benefits, either because of the shutdown or because of reduced eligibility following early termination of the ABAWD waiver, then it may impact applicants' ability to secure these rental assistance grants. If TRU's clients cannot secure the grants, then TRU attorneys must expend additional resources defending them in court.

34. Similarly, a key responsibility of TRU attorneys is to negotiate settlements of clients' eviction proceedings. These stipulations depend on a client's ability to pay rent going forward. If SNAP eligibility is constricted because of early termination of the ABAWD waiver, it will make it harder for TRU attorneys to negotiate resolutions on behalf of those clients, consuming valuable attorney time and effort.

35. NYLAG's LegalHealth unit will also be impacted by SNAP disruptions, either from a failure to pay November benefits or from reduced eligibility resulting from the early termination of the ABAWD waiver.

36. LegalHealth partners with 38 hospitals and community-based health organizations to provide free legal services to patients that address the health harming legal needs of low-income people with serious health problems. LegalHealth trains healthcare professionals to understand that the social drivers of health often

have legal solutions, allowing them to refer patients to LegalHealth's free, hospital-based clinics. LegalHealth attorneys work as part of a patient's care team, providing representation in matters such as immigration, housing, public benefits, and advance planning.

37.     LegalHealth serves many clients, including children, who receive SNAP benefits. If these clients experience an interruption of their benefits, whether from a failure to issue November benefits or early termination of the ABAWD waiver, LegalHealth expects to receive a surge of requests for emergency appointments for consultation with LegalHealth staff. This will burden LegalHealth, since its staff is already working at capacity to handle the existing volume of requests.

38.     LegalHealth also regularly provides advice and resources to social workers at its 38 partner hospitals. Legalhealth anticipates that these social workers will be inundated with hospital patients seeking advice about their SNAP benefits and, with regard to the ABAWD waiver, seeking assistance meeting additional eligibility requirements. These social workers are likely to ask NYLAG for resources to guide their responses to this client need; creating such resources, and answering questions about them, will place an additional burdens on LegalHealth staff.

39.     The adults and children that LegalHealth serves are often very seriously or chronically ill, suffering from diseases like cancer, heart disease, diabetes and others. Individuals with these conditions often have specific food and dietary needs, and SNAP is very effective in helping them meet those needs. Alternative food sources, even if individuals can find them, such as food pantries and delivery services,

often do not have appropriate food. And even providers that do carry specialized food, such as certain dedicated food services for cancer patients, are likely to be unable to meet all needs in the event of City-wide food insecurity. The health effects on these ill individuals are likely to result in more hospitalizations, and, consequently, more legal needs by hospitalized patients that are likely to be referred to LegalHealth. Historically, when hospitals become stretched, LegalHealth has seen increased referrals for our services and increased burden on our staff. We anticipate a similar surge following any serious SNAP disruptions.

40.    Other NYLAG units, such as the Consumer Protection Unit and Financial Empowerment and Advocacy Unit, are also likely to see additional clients due to the severe economic effects of SNAP deprivations.

****

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing declaration is true and correct to the best of my knowledge, information, and belief.


Dated: October 29, 2025              /s/ Abby Biberman
New York, New York                   Abby Biberman