**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, *et al.*, | |
| Plaintiffs, | |
| v. | No. 1:25-cv-13165 |
| UNITED STATES DEPARTMENT OF AGRICULTURE, *et al.*, | |
| Defendants. | |

## <u>DEFENDANTS' OPPOSITION TO PLAINTIFFS'</u>
## <u>MOTION FOR AN EMERGENCY TEMPORARY RESTRAINING ORDER</u>

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ........................................................................................................... i

TABLE OF AUTHORITIES .................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 3

      I.     The SNAP Program and its Operation ............................................................. 3

      II.    Funding for SNAP and Other USDA Programs ............................................. 4

      III.   This Litigation ................................................................................................... 7

LEGAL STANDARD ............................................................................................................. 8

ARGUMENT ......................................................................................................................... 8

      I.     Plaintiffs Lack Standing Because They Lack Injuries to Themselves and Their Claims Would not Redress Their Purported Harms ......................................... 8

            A.    Because *parens patriae* standing is foreclosed against the Federal Government, Plaintiffs have identified no injury-in-fact fairly traceable to Defendants. ....................................................................... 8

            B.    To the extent Plaintiffs have cognizable and traceable injuries, vacatur of the suspension would not redress any injury. ................ 10

      II.    Standing Aside, Plaintiffs Cannot Succeed on their APA Claims ............... 11

      III.   Plaintiffs Cannot Satisfy the Remaining Equitable Considerations ........... 16

      IV.   Plaintiffs Should Be Ordered to Post Security in Connection with Any Injunctive Relief and the Court Should Stay any Relief. ............................... 17

CONCLUSION ..................................................................................................................... 18

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
    458 U.S. 592 (1982) ................................................................................................................9

*Cal. Ass'n of Priv. Postsecondary Sch. v. DeVos,*
    344 F. Supp. 3d 158 (D.D.C. 2018) ...................................................................................16

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971) ..............................................................................................................14

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ................................................................................................................9

*CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.,*
    48 F.3d 618 (1st Cir. 1995) ............................................................................................ 16, 17

*Dep't of Educ. v. California,*
    604 U.S. 650 (2025) ..............................................................................................................17

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ..............................................................................................................14

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021) ..............................................................................................................14

*FEC v. Cruz,*
    596 U.S. 289 (2022) ................................................................................................................9

*Haaland v. Brackeen,*
    599 U.S. 255 (2023) ................................................................................................................9

*Hochendoner v. Genzyme Corp.,*
    823 F.3d 724 (1st Cir. 2016) ..................................................................................................8

*Lincoln v. Vigil,*
    508 U.S. 182 (1993) ........................................................................................................ 12, 13

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) .......................................................................................................... 8, 10

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997) ................................................................................................................8

*Milk Train, Inc. v. Veneman,*
   310 F.3d 747 (D.C. Cir. 2002) ............................................................ 12, 13

*Murthy v. Missouri,*
   603 U.S. 43 (2024) ............................................................................... 8

*NIH v. Am. Pub. Health Ass'n,*
   606 U.S. __,145 S. Ct. 2658 (2025) .................................................... 18

*Nken v. Holder,*
   556 U.S. 418 (2009) ............................................................................ 16

*Norton v. S. Utah Wilderness All.,*
   542 U.S. 55 (2004) .............................................................................. 11

*Pennsylvania v. New Jersey,*
   426 U.S. 660 (1976) ............................................................................. 9

*Simon v. E. Ky. Welfare Rights Org.,*
   426 U.S. 26 (1976) .............................................................................. 10

*Spokeo, Inc. v. Robins,*
   578 U.S. 330 (2016) ............................................................................. 8

*TransUnion LLC v. Ramirez,*
   594 U.S. 413 (2021) ............................................................................. 8

*United States v. Texas,*
   599 U.S. 670 (2023) ............................................................................. 9

*United States v. Wiley's Cove Ranch,*
   295 F.2d 436 (8th Cir. 1961) .............................................................. 13

*Wildearth Guardians v. Kempthorne,*
   592 F. Supp. 2d 18 (D.D.C. 2008) ...................................................... 13

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ................................................................................. 8

**Statutes**

5 U.S.C. § 701 ...................................................................................... 12

5 U.S.C. § 704 ...................................................................................... 10

5 U.S.C. § 706 ...................................................................................... 11

7 U.S.C. § 612c *et seq.* ..................................................................... 2, 4

7 U.S.C. § 612c-6 ....................................................................................................................2

7 U.S.C. § 2011 .......................................................................................................................3

7 U.S.C. § 2013 ....................................................................................................................3, 4

7 U.S.C. § 2016 .......................................................................................................................3

7 U.S.C. § 2020 .......................................................................................................................3

7 U.S.C. § 2024 .....................................................................................................................11

7 U.S.C. § 2025 .......................................................................................................................3

7 U.S.C. § 2027 ........................................................................................................5, 6, 11, 15

7 U.S.C. § 2257 ................................................................................................................. 5, 16

28 U.S.C. § 1361 ...................................................................................................................11

31 U.S.C. § 1341 .............................................................................................................. 11, 15

31 U.S.C. § 1512 .....................................................................................................................4

42 U.S.C. § 1786 .....................................................................................................................5

American Recovery and Reinvestment Act of 2009,
    Pub. L. No. 111-5, 123 Stat. 115 (Feb. 17, 2009) ........................................................ 4, 6

Consolidated Appropriations Act, 2024,
    Pub. L. No. 118-42, Div. B, Title IV, 138 Stat. 25 (Mar. 9, 2024) ....................4, 5, 11, 13

Families First Coronavirus Response Act,
    Pub. L. No. 116-127, div. A, tit. I, 134 Stat. 178 (Mar. 18, 2020) ........................................4

Full-Year Continuing Appropriations and Extensions Act, 2025,
    Pub. L. No. 119-4, 139 Stat. 9 (2025).......................................................................4, 5, 11,13

Healthy, Hunger-Free Kids Act of 2010,
    Pub. L. No. 111-296, 124 Stat. 3183 (Dec. 13, 2010) ........................................................4

**Rules**

Fed. R. Civ. P. 65(c)...............................................................................................................17

iv

**Regulations**

7 C.F.R. § 271.7 ............................................................................................................ 6, 15

7 C.F.R. § 273.2 ................................................................................................................... 3

7 C.F.R. § 273.10 ................................................................................................................. 3

7 C.F.R. § 274.2 ................................................................................................................... 3

7 C.F.R. § 277.4 ................................................................................................................... 4

7 C.F.R. § 280.1 ................................................................................................................... 5

**Other Authorities**

Cong. Rsch. Serv., IF12193, Farm and Food Support Under USDA's Section 32 Account (last updated Aug. 5, 2025) ............................................................................................. 5

Off. of Mgmt. & Budget, Exec. Off. of the President, Circular No. A-11, Preparation, Submission, and Execution of the Budget, Fiscal Year 2026 (July 2024), https://www.whitehouse.gov/wp-content/uploads/2018/06/a11.pdf ............................................. 4

U.S. Gov't Accountability Off., B-331094, U.S. Department of Agriculture— Early Payment of SNAP Benefits (Sept. 5, 2019), https://www.gao.gov/assets/b-331094-d20753.pdf. ............................................................ 15

**INTRODUCTION**

The Supplemental Nutrition Assistance Program ("SNAP") is a critical program that, through regular allotments and extraordinary disaster disbursements (the "D-SNAP program"), helps to improve food security for millions of Americans. At its regular level, SNAP requires approximately $8.5 to 9 billion dollars each month. Unfortunately, the ongoing lapse in appropriations has left SNAP with no appropriated funds in its annual allotments account. As a consequence of this never-before-seen-circumstance, the U.S. Department of Agriculture ("USDA") was forced to suspend upcoming November benefits.

In their proposed order, Plaintiffs appear to ask the Court to order USDA to unsuspend allotments and let the system run with full benefits amounts (*i.e.*, deposit full amounts on beneficiaries' SNAP cards) no matter the absence of funds for such benefits. But that is no option at all. That would be a blatant violation of the Antideficiency Act, a criminal statute that forbids the United States from making such an obligation without an appropriation.

In their brief, Plaintiffs argue that the Court should force USDA to deplete its long-term emergency fund, currently containing around $5.25 billion, to provide SNAP benefits for November. But Congress has not appropriated any SNAP funding for fiscal year 2026. And depletion of the long-term emergency fund would eliminate money for the D-SNAP program over the coming years, a program that provides critical support in the event of natural disasters and other uncontrollable catastrophes. Even assuming USDA had discretion to reallocate these funds, the question of how to allocate limited funds among multiple crucial safety-net programs, when there are insufficient funds, is one that the agency is empowered to make—not a federal court, and certainly not Plaintiffs.

Equally important, what Plaintiffs request is operationally fraught. The amounts in the emergency fund are inadequate to cover November's benefits. USDA cannot provide full benefit allotments if it lacks the funds to pay for them—that would almost certainly lead to an Antideficiency Act violation and cause a proverbial "run on the bank" as States and beneficiaries exploit the pot of funds before it is depleted. It could also potentially wipe out benefits saved by beneficiaries that were funded under fiscal year 2025 appropriations. Nor can USDA solve this problem by providing *partial*

benefits. Such a partial payment has never been made—and for good reason. It would require each State to recalculate the benefits owed based on the reduced funds available. USDA estimates that such a calculation, involving complicated system changes and processes dictated by statute and regulation, would take weeks, if it can be done at all—thus significantly delaying issuance of benefits. Moreover, each system would then have to be calibrated to generate a regular payment following the lapse. The disruption this would entail, with each State required to repeatedly reprogram its systems, would lead to chaos and uncertainty for the following months, even after a lapse concludes.

Plaintiffs also argue in their brief that the Court could force USDA to transfer funds generated under Section 32 of the Agricultural Adjustment Act of 1935, which appropriates certain tariff revenue for various programs. *See* 7 U.S.C. § 612c *et seq.* Most notably, the bulk of these funds are dedicated to the Child Nutrition Programs. *See id.* § 612c-6(b)(1). This approach also raises calamitous concerns. First, the authority is generally limited. Then, even if USDA could reprogram its Child Nutrition Programs funds at will, the result would be a substantial shortfall in funding school meals, among other things, that may not be made up in any future appropriation.

Given the thorny legal and operational obstacles at play, USDA issued a suspension, authorized by regulation, to await the end of the lapse in appropriations and permit seamless distribution of November benefits (and beyond) at that time. This of course raises its own tradeoffs, including a lack of disbursed benefits prior to the end of the lapse. But it also avoids many of the worst consequences of the other options. It maintains the long-term emergency fund for disasters that may arise, rather than expending them all at once on partial payments and hoping that no emergency will require their use over the coming years. It ensures that the Child Nutrition Programs remain fully funded. It avoids any run on the SNAP system, or the catastrophe likely to result from each State reprogramming its system repeatedly for pro-rated payments and full payments. And it means that, if Congress does take action to fund SNAP, the system will be able to issue payments quickly.

In short, there was no option to simply fund the SNAP program fully without an appropriation. Each option Plaintiffs identify, even if lawful in the first place, portended its own costs and damaging consequences. The suggestion otherwise is disconnected from the reality of the

2

situation. Under these circumstances, the Court must deny the requested injunction.

Finally, the balance of the equities and irreparable harm factors squarely favor Defendants. The cognizable harm to the States is limited and not irreparable. And a court order picking a different one of the difficult options here would inflict substantial harms on other groups and programs, and lead to procedural chaos, for the reasons provided.

All told, Defendants understand that the lack of SNAP funds has created a difficult situation for millions of Americans. But as a matter of both law and practical consequence, it is not a problem that this Court can solve through the remedy that Plaintiffs here seek.

## BACKGROUND

### I.    The SNAP Program and its Operation

SNAP is a federal nutrition assistance program administered by USDA at the federal level and implemented by state SNAP agencies at the local level. *See* 7 U.S.C. § 2020. Under the Food and Nutrition Act ("FNA") SNAP benefits "shall be furnished to all eligible households" that apply for SNAP, *id.* § 2014(a)—but, crucially, subject to the availability of appropriations, *id.* § 2013(a).

Since 1964, SNAP (or its predecessor) has provided monthly benefits to low-income households to purchase nutritious food. *Id.* § 2011. Eligible households receive their SNAP benefits on electronic benefit transfer (EBT) cards, *id.* § 2020, which may be used to purchase food from authorized retailers, *id.* § 2013(a). States are responsible for determining household eligibility and benefit amount, and loading benefits to EBT cards. *Id.* § 2020. States determine whether a household is eligible to receive SNAP benefits and sets the monthly benefit amount by assessing household size and income through a written application and interview process. *See* 7 C.F.R §§ 273.2, 273.10. State agencies allocate federal funds to participating households' SNAP benefit cards on a set, staggered schedule each month; some SNAP households may receive benefits on the first of each month, others on the fifth of each month, and so on. *See* 7 U.S.C. § 2016(g); 7 C.F.R. § 274.2(d).

States receive partial reimbursements for the costs of processing their SNAP programs (while the Federal Government pays for the entire cost of the benefits themselves). 50% of the cost of the administration of SNAP is borne by States while the federal government covers the other 50%. 7

U.S.C. § 2025(a); 7 C.F.R. § 277.4(b).

The system of moving money from the Federal Government, to the States, to the beneficiaries' cards, to the processors, and finally to the retailers is complex. *See* Decl. Patrick A. Penn, Doc. No. 17 ¶¶ 1-9, 16-28. The details, set forth in the USDA declaration, bear on the operational difficulties associated with Plaintiffs' requested relief.

## II. Funding for SNAP and Other USDA Programs

**A.** Congress appropriates federal funds for SNAP benefits during the annual appropriations process. *See* 7 U.S.C. § 2013(a)(1) ("Subject to the availability of funds appropriated under section 2027 of this title, the Secretary is authorized to formulate and administer [SNAP]."). In the last regular appropriations bill, Congress fully funded the program through the end of the 2025 Fiscal Year ("FY"). *See* Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, Div. B, Title IV, 138 Stat. 25, 93 (Mar. 9, 2024). As of November 1, 2025, there is no SNAP account covering FY 2026 benefits and administrative costs as Congress has not provided an appropriation to fund the account.[1]

After SNAP funds are appropriated by Congress, OMB "apportions" them for USDA's administration of SNAP. *See* 31 U.S.C. § 1512; Off. of Mgmt. & Budget, Exec. Off. of the President, Circular No. A-11, Preparation, Submission, and Execution of the Budget, Fiscal Year 2026 § 10.5 (2024)("OMB Circular A-11") (July 2024) § 10.5.[2] The apportionment provides USDA the necessary authority to obligate and expend funds for SNAP.

**B.** Plaintiffs note that Congress has provided, through a multi-year fund, emergency reserves for SNAP funding. *See* Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, § 6, 138 Stat. 25, 93-94 (2024); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, §

---

[1] In addition to annual appropriations, Congress may provide for other appropriations; it has done so on various occasions. *See, e.g.,* American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115 (Feb. 17, 2009), *as amended by the* Healthy, Hunger-Free Kids Act of 2010, Pub. L. No. 111-296, 124 Stat. 3183, 3265 (Dec. 13, 2010) (providing an increase in SNAP benefits through October 31, 2013); Families First Coronavirus Response Act, Pub. L. No. 116-127, div. A, tit. I, 134 Stat. 178, 179 (Mar. 18, 2020) (allowing USDA to provide emergency allotments to all SNAP households).

[2] Available at https://www.whitehouse.gov/wp-content/uploads/2018/06/a11.pdf

1101(a), 139 Stat. 9, 10 (2025). Each bill includes funds to "be placed in reserve for use only in such amounts and at such times as may become necessary to carry out program operations." Consolidated Appropriations Act, 2024, 138 Stat. at 93. The long-term emergency fund currently sits at $5.25 billion. Consequently, it could not fully fund SNAP benefits for the month of November even assuming it could be used for that purpose. And if fully expended, no funding would remain available for any future crises.

The long-term emergency fund has been used sparingly and has never before been used to fund benefits in a lapse. Doc. No. 17 ¶¶ 11-13. Generally, those funds are used in the event of a crisis, such as a hurricane, to provide critical relief. *Id.* This is called the D-SNAP program. 7 C.F.R. § 280.1. For example, in 2017, after Hurricanes Maria, Rita and Harvey heavily impacted the southeastern United States and Puerto Rico, FNS spent approximately $4.3 billion on the affected States and roughly $1.7 billion in Puerto Rico for disaster assistance using contingency funds. Doc. No. 17 ¶ 11.

Plaintiffs also identify another set of funds. Under Section 32 of the Agricultural Adjustment Act of 1935, 7 U.S.C. § 612c *et seq.*, Congress has set forth a mandatory, and permanent, appropriation that stems from 30% of customs receipts on all imports from the prior calendar year. *See id.*; Cong. Rsch. Serv., IF12193, Farm and Food Support Under USDA's Section 32 Account (last updated Aug. 5, 2025).[3] The breakdown of the *projected* appropriation for FY 2026, is reflected in the chart in that Congressional Research Service report. As the diagram shows, the majority of the funding is expected to be appropriated for the Child Nutrition Programs. With limits, that money can sometimes be discretionarily transferred. 7 U.S.C. § 2257.[4]

**C.** Recognizing that SNAP may suffer from insufficient appropriations, Congress through

---

[4] Recently, $300 million of Child Nutrition Programs funds was transferred to the Women, Infants, and Children ("WIC") program. Doc. No. 17 ¶¶ 33-35. Congress provided two-year appropriations to fund WIC; thus, funds remain available to carry out the program and to be supplemented by such a transfer. Pub. L. No. 118-42, § 6, 138 Stat. 25, 93 (2024); Pub. L. No. 119-4, § 1101(a), 139 Stat. 9, 10 (2025). On the other hand, SNAP funds normally used for benefits are provided on an annual basis, and no such funds have been provided for FY 2026. While the SNAP statute explicitly limits allotments to "the appropriation for such fiscal year," 7 U.S.C. § 2027(b), the WIC statute, 42 U.S.C. § 1786, contains no such language.

statute, and USDA through regulation, has set forth procedures and guidelines governing such an event. First, Congress directed that "[i]n any fiscal year, the Secretary shall limit the value of those allotments issued to an amount not in excess of *the appropriation for such fiscal year.*" 7 U.S.C. § 2027(b) (emphasis added). In the event of a potential shortfall of the appropriated funds, the Secretary may issue a reduction, and "[n]otwithstanding any other provision of this chapter," Congress requires that "the Secretary shall direct State agencies to reduce the value of such allotments to be issued to households certified as eligible to participate in the supplemental nutrition assistance program to the extent necessary to comply with the provisions of this subsection." *Id.*

A calculated partial allotment for the entire country is an extraordinary event that has never happened in the history of the program. Doc. No. 17 ¶¶ 23-27. To implement such a reduction would be exceedingly difficult, highly disruptive, and delayed, requiring a reworking of every State system to recognize and set forward a reduced benefit. *Id.* The regulation detailing the calculation of a reduction is located at 7 C.F.R. § 271.7(a)-(h). Any attempt to calculate and implement a nationwide reduction would long delay this round of benefits, any round of benefits restoring beneficiaries to the full amount for November, and a future round of benefits returning to the standard calculation. Doc. No. 17 ¶ 26.

In addition to a reduction, USDA has consistently interpreted its authority to allow for the suspension or cancellation of benefits when necessary. 7 C.F.R. § 271.7. A suspension is a temporary halt in payment of benefits pending sufficient funds. *See id.* A cancellation is the permanent termination of funds for a set period. *See id.*

**D.** It is true that "[a]cross various previous federal government shutdowns, SNAP benefits have never been interrupted by a lapse in appropriations." Compl., Doc. No. 1 ¶ 2. But those prior lapses were either short enough not to threaten a gap between appropriated funds and full benefits or featured unique situations that permitted USDA to ensure fully funded benefits. As described in USDA's declaration, in October 2013 a leftover provision from Section 101 of the American Recovery and Reinvestment Act ( Pub. L. No. 111-5) required it to maintain benefits at a certain level through October 31, which provided sufficient appropriations authority. Doc. No. 17 ¶ 37. In January 2019,

6

though there were insufficient long-term emergency fund moneys available, USDA was able to structure "early issuance" of benefits and the lapse ended before any shortfall in funds required drawing down the long-term emergency fund. *Id.* at 38. Critically, then, USDA has never been faced with a situation like this one.

## III.    This Litigation

On September 30, 2025, the FY 2025 appropriation for the SNAP account lapsed. As the lapse in appropriation continued unabated, USDA informed States that SNAP benefits were at risk. On October 10, USDA explained that "if the current lapse in appropriations continues, there will be insufficient funds to pay full November SNAP benefits for approximately 42 million individuals across the Nation." Ex. 2, Doc. No. 7-3 at 1 ("Oct. 10 Letter"). That was and remains true. There are no funds in the SNAP account and, even including the long-term emergency fund, there are insufficient funds to pay full benefits, unlike prior lapses in appropriation. Because of these difficulties, USDA "direct[ed] States to hold their November issuance files and delay transmission to State EBT vendors until further notice." *Id.* Two weeks later, as the lapse in appropriations dragged on, USDA sent a second letter. At that time, USDA formally "suspend[ed] all November 2025 benefit allotments until such time as sufficient federal funding is provided, or until FNS directs State agencies otherwise." Ex. 3, Doc. No. 7-4 at 1("Oct. 24 Letter"). USDA, recognizing the difficulties for States, urged States to "limit administrative expenses only to the activities necessary to support the eligibility and issuance processes, integrity/oversight, and system maintenance." *Id.* That directive reduced the burden on States by limiting expenses and ensured the system would be ready as soon as funds are appropriated.

On October 28, 2025, Plaintiffs, a coalition of States, filed suit.. Doc. No. 1. Plaintiffs bring two claims, both under the Administrative Procedure Act ("APA"). They seek to "hold unlawful and set aside" the "suspension of November SNAP benefits" as being "contrary to the SNAP Act and its implementing regulations" or "arbitrary and capricious." *Id.* ¶¶ 171-98. Plaintiffs seek, in sum, vacatur of the November suspension, including permitting Plaintiffs to begin sending SNAP benefit issuance files immediately, and otherwise requiring obligations under the SNAP program despite the lack of appropriated funds. *Id.* Prayer for Relief. Plaintiffs filed, that afternoon, a motion for temporary

7

restraining order, memorandum in support, Pl.'s Mem., Doc. No. 4, declaration and exhibits, Doc. Nos. 7, 9, and a proposed order, Doc. No. 3-1. Plaintiffs' proposed order would vacate the suspension without explaining how Defendants would fund the SNAP account. Proposed Order, Doc. No. 3-1 at 1-3. If implemented as written, the order would simply lift the suspension, allowing Plaintiffs to begin obligating moneys from the empty USDA SNAP account.

## LEGAL STANDARD

Injunctive relief "is an extraordinary and drastic remedy." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quotation omitted). To warrant preliminary relief, the movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## ARGUMENT

I. **PLAINTIFFS LACK STANDING BECAUSE THEY LACK INJURIES TO THEMSELVES AND THEIR CLAIMS WOULD NOT REDRESS THEIR PURPORTED HARMS**

"[A] plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Plaintiffs "must demonstrate standing for each claim that they press" against each defendant, "and for each form of relief that they seek." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (quoting *TransUnion LLC*, 594 U.S. at 431). And they bear the burden to clearly allege facts for each element. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

A. **Because *parens patriae* standing is foreclosed against the Federal Government, Plaintiffs have identified no injury-in-fact fairly traceable to Defendants.**

Plaintiffs lack the "irreducible constitutional minimum of standing" required to maintain a suit for the sweeping relief they seek. *Lujan*, 504 U.S. at 560. Fatally, Plaintiffs are States, not beneficiaries, so they must demonstrate injury to themselves as State entities, rather than to any individual citizen. Article III requires that "a plaintiff must 'be himself among the injured.'" *Hochendoner v. Genzyme Corp.*,

823 F.3d 724, 734 (1st Cir. 2016) (quoting *Lujan*, 504 U.S. at 563). And that injury must be fairly traceable to the actions that Plaintiffs challenge. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). The States have identified no such fairly traceable injury.

First, Plaintiffs' invocation of harms to their citizens cannot support standing. *See, e.g.*, Doc No. 1 ¶ 165 ("Defendants' actions thus interfere with Plaintiff States' interests in protecting the health, safety, and well-being of all residents."). "[A] State does not have standing as *parens patriae* to bring an action against the Federal Government." *Haaland v. Brackeen*, 599 U.S. 255, 295 (2023) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610, n.16 (1982)). That means it may not seek to sue "on behalf of its citizens" notwithstanding "creative arguments" that may be employed to circumvent this bedrock principle. *See id.* at 294-95.

Second, Plaintiffs' threat to inflict injury on themselves, by making payments outside the SNAP program without reimbursement, Doc. No. 4 at 11, is the prototypical example of an action that cannot impart standing. A "self-inflicted injur[y]" is not cognizable. *Clapper*, 568 U.S. at 418**.** And any choice by a State to pay benefits gratuitously to the State's citizens would be precisely such a self-inflicted fiscal injury. Consider *Pennsylvania v. New Jersey*, 426 U.S. 660 (1976) (*per curiam*). There, "the unilateral decisions by a group of States to reimburse their residents for taxes levied by other States was not a basis to attack the legality of those taxes." *FEC v. Cruz*, 596 U.S. 289, 297 (2022) (characterizing *Pennsylvania*). As there, "[n]othing in the challenged [SNAP suspension] require[s] the plaintiff States to offer reimbursements; accordingly, the financial injury those States suffered [is] due to their own independent response." *See id.* (citing *Pennsylvania* 426 U.S. at 664). Thus, "the expenditure of [S]tate funds to provide SNAP benefits or other nutrition assistance programs" cannot suffice to confer standing. Doc. No. 4 at 11.

Plaintiffs' additional invocation of purported harms to themselves is also insufficient. *See id.* (citing operational difficulties at State agencies and fiscal and operational harm). Of course, "federal policies frequently generate indirect effects" on a State including "on state revenues or state spending." *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023). "[T]hose kinds of indirect effects" are not enough, even if they flow ultimately from the challenged action. *Id.* Indeed, the direct effect of this action on

the States (rather than their citizens) is that Plaintiffs will likely save on administration costs for the month of November. Indeed, Plaintiffs do not even cite administrative costs (rather than general "administrative burdens") to justify standing.[5] Doc. No. 4.

### B. To the extent Plaintiffs have cognizable and traceable injuries, vacatur of the suspension would not redress any injury.

Plaintiffs also lack standing to vacate the suspension of November disbursements because such a vacatur would not redress their purported injuries. Redressability requires that it is "'likely,' as opposed to merely 'speculative,'" that the particular cognizable injury will be redressed by the claims Plaintiffs bring and the relief sought. *Lujan*, 504 U.S. at 561 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976)).

Plaintiffs here bring APA claims, which permit a Court to vacate and set aside particular final agency actions. 5 U.S.C. § 704. Those actions must be discrete and identified. Here, Plaintiffs identify the "suspension of November SNAP benefits" as the final agency action Doc. No. 1 ¶¶ 171-98.

But Plaintiffs asserted injuries stem from something distinct—the lack of funding for November SNAP benefits. While USDA has recognized that lack of funding through its suspension, vacatur would do nothing to affirmatively provide funding. It would merely remove the roadblock forbidding States from releasing their November issuance files, for which no funds are available in the SNAP account to pay. This is akin to giving someone a debit card for an empty bank account. Plaintiffs' fears of operational and fiscal harm would not be alleviated by such an order. Indeed, the resulting chaos and uncertainly would likely be even greater than the present status quo.

Perhaps recognizing this error, Plaintiffs seek relief wholly apart from their claims. They suggest that the Court order expenditure of the long-term emergency fund, or transfer of funds from other distinct programs. Doc. No. 1 Request for Relief; Doc. No. 4. But that is not what vacating and setting aside the suspension would do. That is instead a claim for agency delay or inaction under 5

---

[5] And even if the lack of 50% reimbursement this month were sufficient to provide standing over some kind of relief, the result would be to vacate suspension of the reimbursements for administrative costs—not a wholesale vacatur and demand for disbursement of benefits. Plaintiffs cannot bootstrap a remedy for one (purported) injury to seek a much broader remedy.

U.S.C. § 706(1); an inquiry wholly distinct from the claims brought by Plaintiffs. *See.* Doc. No. 1 (never citing Section 706(1) as a basis for the claims). It is no wonder Plaintiffs did not make such a claim, as it would require the equivalent of a showing of mandamus relief under 28 U.S.C. § 1361, a showing they have not even attempted. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004).

In short, because Plaintiffs' APA claims permit only setting aside the November suspension—an action that would not redress their alleged injuries—Plaintiffs lack standing.

## II.   STANDING ASIDE, PLAINTIFFS CANNOT SUCCEED ON THEIR APA CLAIMS

Plaintiffs argue that because Congress directs that "[a]ssistance under this program shall be furnished to all eligible households," Doc. No. 4 at 11 (quoting 7 U.S.C. § 2014(a)), Defendants must fund the SNAP program irrespective of the $0 in the SNAP account. That is patently barred by the statutory text. "In any fiscal year, the Secretary shall limit the value of those allotments issued to an amount not in excess of *the appropriation for such fiscal year*." 7 U.S.C. § 2027(b) (emphasis added). There is of course no appropriation to the SNAP program for this fiscal year. So to simply allow the SNAP disbursements to process, disbursements which Plaintiffs recognize "are 'obligations of the United States,'" Doc. No. 4 at 11 (quoting 7 U.S.C. § 2024(d)), would violate the Antideficiency Act. 31 U.S.C. § 1341 (forbidding " involv[ing] [the] government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law").

So by default, USDA may not expend funds on the SNAP program. As discussed above, there is a long-term emergency fund available "in such amounts and at such times as may become necessary to carry out program operations." Pub. L. No. 118-42, § 6, 138 Stat. 25, 93-94 (2024); Pub. L. No. 119-4, § 1101(a), 139 Stat. 9, 10 (2025). Plaintiffs argue that USDA is required by law to deplete this entire multi-year appropriation in the face of a SNAP account without an appropriation. That is plainly wrong. As an initial matter, there is no available money in the annual program account—that account has lapsed—and therefore no annual program allotments to support using the emergency funds. "[T]he appropriation for such fiscal year," 7 U.S.C. § 2027(b), meaning FY 2026, is *zero*. But even assuming the emergency funds could be allocated to fund benefits at this time, nothing in that language facially requires the one-time use of the entire fund on a partial payment in a single month. USDA

therefore did not act contrary to law when it determined it was necessary to instead "suspend all November 2025 benefit allotments until such time as sufficient federal funding is provided, or until FNS directs State agencies otherwise." Oct. 24 Letter, Doc. No. 7-4 at 1.

Nor was USDA's decision arbitrary or capricious. Plaintiffs do not challenge any decision not to transfer funds into the SNAP account. Instead, Plaintiffs seek to vacate the letters suspending SNAP disbursement this month due to the undisputed lack of funds in the SNAP account. For the reasons previously discussed, that forecloses Plaintiffs' sought relief. *Supra* part I.B. Even assuming the decision not to transfer or expend funds is properly part of this suit, and even assuming that USDA were legally permitted to transfer the emergency funds, that decision would be committed to agency discretion by law and therefore cannot be challenged under the APA. 5 U.S.C. § 701(a)(2).

The Supreme Court has long recognized that an agency's determination of how to allocate funds among competing priorities and recipients is classic discretionary agency action. *See Lincoln v. Vigil*, 508 U.S. 182, 193 (1993). In *Lincoln*, the Court explained that a funding decision is committed to agency discretion where it requires "a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," including whether "resources are best spent on one program or another; whether it is likely to succeed in fulfilling its statutory mandate; whether a particular program best fits the agency's overall policies; and, indeed, whether the agency has enough resources to fund a program at all." *Id.* (cleaned up). An "agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* The APA "gives the courts no leave to intrude." *Id.* Thus, "the decision about how the moneys" for programs "could best be distributed" is classically committed to agency discretion. *See Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751-52 (D.C. Cir. 2002).

Again, all parties agree there are currently no appropriated funds in the SNAP account. The ostensible options available are to deplete the long-term emergency fund or to divert funds from the Child Nutrition Programs. To the extent these extraordinary choices are legally permissible, they are all committed to agency discretion by law.

The long-term emergency fund may be tapped "only in such amounts and at such times as

may become necessary to carry out program operations." 138 Stat. at 93-94 (2024); 139 Stat. at 13. Opaque phrases like that, designed to permit flexibility in the use of funds, are precisely the kind that signal the use of funds is committed to agency discretion. *See Milk Train*, 310 F.3d at 751-52. Determining whether a particular emergency situation is "such time[]" requiring expenditure, and "in such amount[]" as some or all the fund, implicates the "many variables involved in the proper ordering of [agency] priorities." *Lincoln*, 508 U.S. at 193. And the practical reality bolsters that understanding. To deplete the entire fund would leave USDA with no funds to deal with D-SNAP disbursements, or any other emergencies that may arise in the near future.  Doc. No. 17 ¶ 22. This is not a hypothetical concern, such funds are routinely needed for such emergencies. *Id.* at 11 (citing a D-SNAP example).

The decision to transfer funds from an operating program to another program is another funding decision in the heartland of this exception to APA review. Section 2257 authorizes (but nowhere requires) that an amount "[n]ot to exceed 7 per centum of the amounts appropriated for any fiscal year for the miscellaneous expenses of the work of any bureau, division, or office of the Department of Agriculture" can be transferred to another appropriation "but no more than 7 per centum shall be added to any one item of appropriation." The statute provides for exceptions "in cases of extraordinary emergency." The choice to deplete one program to try and shore up another ticks every box discussed in *Lincoln*: (1) complicated balancing of factors within the agency's purview; (2) consideration of best use of resources "on one program or another"; (3) whether USDA "is likely to succeed in fulfilling its statutory mandate" and (4) "whether the agency has enough resources to fund a program at all." *See Lincoln*, 508 U.S. at 193; *see* Doc. No. 17 ¶¶ 16-35 (laying out the challenges). Simply put, if depleting one program to bolster one without sufficient funds is not committed to agency discretion under the *Lincoln* principles, it is hard to see how any funding decision would be. And the extraordinary emergency portion of that authority only reinforces this conclusion. *See, e.g.,* *Wildearth Guardians v. Kempthorne*, 592 F. Supp. 2d 18, 25 (D.D.C. 2008) (explaining that language "giv[ing] the Secretary the authority—but not the duty—to [take an action on an] emergency basis" is committed to agency discretion); *accord United States v. Wiley's Cove Ranch*, 295 F.2d 436, 446 (8th Cir. 1961) (holding "certificate of [individual's] eligibility to receive benefits under the Emergency Feed

13

Program" was committed to agency discretion).

Even if the APA permits review, Plaintiffs cannot prevail. Under the arbitrary and capricious standard, the agency's decision is presumed valid, and a court reviews only whether that decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). "Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). A court must "uphold [even] a decision of less than ideal clarity if the agency's path may reasonably be discerned." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (quotation marks omitted).

Plaintiffs take issue with USDA's suspension in various ways. But none permits the Court to compel the agency to deplete its emergency funds, or to divert funds from one program to another.

Foremost, Plaintiffs contend that USDA's decision not to deplete the long-term emergency fund constitutes an "about face." Doc. No. 4 at 15. But that is simply not the case. Even if the funds were legally available, this lapse in appropriations represents a unique circumstance. Unlike prior lapses, no appropriation is available, and the long-term emergency fund is insufficient to cover a full month of benefits. Doc. No. 17 ¶ 10. As a result, USDA was not faced with the decision of whether to fully fund disbursements or not fund them at all. Instead, USDA was faced with the choice of whether to require a partial calculation—with the devastating months-long disruption that would follow—or instead maintain the system and the emergency fund. And Plaintiffs cite to no prior position that USDA would expend funds from entirely separate programs, like the Child Nutrition Fund, to bolster the SNAP program.

Plaintiffs' other criticisms are all similar. In short, they argue that USDA failed to consider costs and disruption, complain that funds are allegedly legally available for use, and ultimately argue that USDA abused its discretion by issuing a suspension. Doc. No. 4 at 15-17. But, as USDA expands upon in its declaration, even assuming all of these options were legally available, the tradeoffs all come with their own costs, disruptions, and legal risks.

1.  USDA could not simply let the program run without action. The Antideficiency Act bars any

obligations through SNAP allotments without accompanying appropriation. 31 U.S.C. § 1341; *see also* 7 U.S.C. § 2027(b). So allowing States to simply release November issuance files would be patently illegal and was thus a nonstarter. Doc. No. 17 ¶ 17. Moreover, simply allowing States to submit their payment requests would, because of technical reasons, potentially allow for the disbursement of funds notwithstanding the lack of appropriations, violating the Antideficiency Act and potentially creating significant liabilities for the government. Doc. No. 17 ¶ 20 (discussing liability in the event of such a disbursement).

2. Expending the long-term emergency fund to fund full allotments despite the language limiting allotments to "an amount not in excess of the appropriation for such fiscal year," 7 U.S.C. § 2027(b), entailed legal risk and would ultimately violate the Antideficiency Act in a similar way. *Cf.* U.S. Gov't Accountability Off., B-331094, U.S. Department of Agriculture—Early Payment of SNAP Benefits (Sept. 5, 2019) (determining that early SNAP payments in 2019 were unlawful).[6] Even assuming use of the long-term emergency fund was legal, it would still not permit full disbursements for the month of November. Attempting to provide full allotments with insufficient funds would cause a "run on the bank" as States and beneficiaries sought to use up their funds before depletion. Doc. No. 17 ¶ 18. And given the limited monitoring tools available to USDA, it is not clear if the system could be frozen before the well ran dry. *Id,* at 9, 16-21. And the only means to freeze the system would be to cancel all use of SNAP benefits, including those that were leftover from FY 2025. *Id.* at 21. A partially funded full allotment was then also unavailable.

3. Requiring a reduction in benefits pursuant to the calculations in 7 U.S.C. § 2027 and 7 C.F.R. § 271.7(a)-(h) similarly portended substantial chaos. No such reduction has ever been calculated previously. Doc. No. 17 ¶ 24. USDA expects that State-by-State reprogramming of benefit systems would take weeks, if it is even possible. *Id.* at 26. It would also likely require different reprogramming efforts—one for the partial calculation for November, then for the next allotment.

---

[6] Available at https://www.gao.gov/assets/b-331094-d20753.pdf.

*Id.* at 27. This massive undertaking could potentially delay months of future benefits and might fail entirely. *Id.* Regardless, it would not deliver immediate relief, and the associated procedural chaos rendered it an unsuitable option.

4. Finally, even if legally permitted, USDA could not both deplete the long-term emergency fund and transfer billions of dollars from the Child Nutrition Programs to support a full SNAP benefit. *Id.* at 30-35. First, the transfer authority generally limits movement to "no more than 7 per centum shall be added to any one item of appropriation except in cases of extraordinary emergency." 7 U.S.C. § 2257. Even assuming both the Child Nutrition Programs funds and long-term emergency fund could be freely moved without limit, the results would be devastating. It would leave the D-SNAP program without any funding, eliminate any future flexibility with emergencies affecting the integrity of the SNAP program, and leave a gaping hole in the funds allocated for the Child Nutrition Programs; the choice to backfill USDA's raiding of that program would be entirely at Congress's discretion. Doc. No. 17 ¶ 35. At the very least, USDA is not required to defund one program to support another, and it certainly did not abuse its discretion by refusing to do so.

That then leaves the option USDA pursued. It temporarily "suspend[ed] all November 2025 benefit allotments until such time as sufficient federal funding is provided." Oct. 24 Letter, Doc. No. 7-4. In the meantime, States are urged to "limit administrative expenses only to the activities necessary to support the eligibility and issuance processes, integrity/oversight, and system maintenance." *Id.* USDA did not act arbitrarily and capriciously, or contrary to law, when it took that step.

## III.    PLAINTIFFS CANNOT SATISFY THE REMAINING EQUITABLE CONSIDERATIONS

Even if the Court concludes that Plaintiffs have demonstrated an injury sufficient to show standing, "[a] prospective injury that is sufficient to establish standing . . . does not necessarily satisfy the more demanding burden of demonstrating irreparable injury." *Cal. Ass'n of Priv. Postsecondary Sch. v. DeVos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018). And irreparable harms must be harms *to the Plaintiffs*, not third parties. *CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 48 F.3d 618, 622 (1st Cir. 1995). Meanwhile, when the Federal Government is a party, the balance of the equities and public interest merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). All considerations support USDA.

To start, much of Plaintiffs' purported irreparable harms are based on harms to their citizens, merchants, and indirect effects of those harms. *See* Doc. No. 4 at 15-18. Those third-party harms must be disregarded. *CMM Cable Rep.*, 48 F.3d at 622. As to themselves, Plaintiffs cite difficulties with "the administration and provision of food safety net programs." Doc. No. 4 at 17-19. And that "food insecurity for Plaintiffs' residents will irreparably harm the provision of other state services." *Id.* at 19-20. Plaintiffs' contentions fail because both sets of harms will continue even with their proposed order. That is true, first, because Plaintiffs' APA claims can merely vacate and set aside the suspension, and does not remedy the underlying problem—a lack of appropriated funds in the SNAP account. Second, even if the Court issues an order that ultimately leads to partial or full allotments, States will still have to contend with the massive procedural challenges that would result from a partial calculation or delayed (and legally questionable) full allotments for the month of November. These would lead to precisely the kinds of operational and reputational challenges Plaintiffs allege.

As to the equities, granting the order that Plaintiffs seek would replace the safest choice in this situation—a temporary suspension alongside an order for the States to maintain their systems in anticipation for a future appropriation—with one of several tumultuous ones. Anything other than a suspension risks violating the Antideficiency Act, throwing the entire SNAP system into chaos, depleting the long-term emergency fund, blasting a hole in the budget for the Child Nutrition Programs, or any combination of the four. The damage to nonparties, including States not plaintiffs to this suit who may be forced to act in the event of vacatur of the suspension, strongly counsels in favor of rejecting Plaintiffs' motion. USDA should continue with the present suspension while monitoring any Congressional efforts to appropriate funds for this important program.

## IV. PLAINTIFFS SHOULD BE ORDERED TO POST SECURITY IN CONNECTION WITH ANY INJUNCTIVE RELIEF AND THE COURT SHOULD STAY ANY RELIEF.

For the reasons stated above, Defendants submit that the Court can and should deny Plaintiffs' motion in its entirety. However, should the Court be inclined to order any injunctive relief, the Court should also order Plaintiffs to post an appropriate bond commensurate with the scope of any such order. *See* Fed. R. Civ. P. 65(c); *cf. Dep't of Educ. v. California*, No. 24A910, 604 U.S. 650, 652 (2025).

To the extent the Court issues injunctive relief, Defendants respectfully request that such relief be stayed pending the disposition of any appeal that is authorized by the Solicitor General, or at a minimum, administratively stayed for a period of forty-eight hours to allow the United States to seek an emergency, expedited stay from the court of appeals if an appeal is authorized. That is especially true because any distributed moneys may be forever lost. *See NIH v. Am. Pub. Health Ass'n*, 606 U.S. __,145 S. Ct. 2658 (2025) (Mem.) (finding the government irreparably harmed where plaintiffs failed to commit to "repay[ing] grant money if the Government ultimately prevails").

## CONCLUSION

This coalition of States cannot demonstrate Article III standing to support their extraordinary suit. Moreover, Defendants reasonably and correctly concluded that wiping out the long-term emergency fund, or depleting the Child Nutrition Programs, would be both legally dubious and practically disastrous. The limited irreparable harm to the States themselves cannot support emergency sweeping relief, and any such order would lead to a chaotic, and still insufficient, disbursement of SNAP benefits. The Court should deny Plaintiffs' motion.

Dated: October 29, 2025                Respectfully submitted,

STANLEY WOODWARD, Jr.
Associate Attorney General

BRETT A. SHUMATE
Assistant Attorney General

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

TYLER BECKER
Counsel to the Assistant Attorney General

JOSEPH E. BORSON
Assistant Branch Director
Federal Programs Branch

*/s/ Jason Altabet*
JASON ALTABET (Md. Bar No. 2211280012)
Trial Attorney, U.S. Department of Justice

Tel.: (202) 305-0727
Email: jason.k.altabet2@usdoj.gov
1100 L Street, N.W. 20005
Washington, D.C. 20005

*Attorney for the United States*

## CERTIFICATE OF SERVICE

On October 29, 2025, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court for the District of Massachusetts, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Fed. R. Civ. P. 5(b)(2).

_/s/ Jason Altabet_

Trial Attorney