**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| RHODE ISLAND STATE COUNCIL OF CHURCHES, *et al.*, | |
| Plaintiffs, | |
| v. | No. 25-cv-00569-JJM-AEM |
| BROOKE ROLLINS, in her official capacity as Secretary of the United States Department of Agriculture, *et al.*, | |
| Defendants. | |

**<u>DEFENDANTS' RESPONSE TO THE COURT'S ORDER DATED NOVEMBER 4;
RESPONSE TO PLAINTIFFS' MOTION FOR COMPLIANCE OR AN ADDITIONAL
TEMPORARY RESTRAINING ORDER</u>**

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................................1

BACKGROUND..................................................................................................................2

I.     The SNAP Program and its Operation.................................................................2

II.    Funding for SNAP and Other USDA Programs .................................................3

III.   This Litigation ...................................................................................................5

LEGAL STANDARD ........................................................................................................7

ARGUMENT .....................................................................................................................7

I.     DEFENDANTS HAVE COMPLIED WITH THE COURT'S ORDER..............................7

II.    DEFENDANTS ARE LIKELY TO SUCCEED ON THE MERITS OF ANY NEW TEMPORARY RESTRAINING ORDER ...............................................................9

III.   PLAINTIFFS FAIL THE REMAINING EQUITABLE CONSIDERATIONS FOR A NEW TEMPORARY RESTRAINING ORDER..............................................................17

IV.    THE COURT SHOULD ALSO REJECT PLAINTIFFS' REQUEST FOR RELIEF UNDER FEDERAL RULE OF CIVIL PROCEDURE 19 ......................................................18

V.     PLAINTIFFS SHOULD BE ORDERED TO POST SECURITY IN CONNECTION WITH ANY INJUNCTIVE RELIEF AND THE COURT SHOULD STAY ANY RELIEF. .................19

CONCLUSION.................................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Acton Co. v. Bachman Foods, Inc.*,
    668 F.2d 76 (1st Cir. 1982) ........................................................................ 18

*Cal. Ass'n of Priv. Postsecondary Sch. v. DeVos*,
    344 F. Supp. 3d 158 (D.D.C. 2018) ........................................................... 17

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) .................................................................................... 12

*CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*,
    48 F.3d 618 (1st Cir. 1995) ........................................................................ 17

*Dep't of Educ. v. California*,
    No. 24A910, 604 U.S. 650 (2025) .............................................................. 19

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) .............................................................................. 12, 13

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021) .................................................................................... 12

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) ...................................................................................... 7

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................................ 14, 15

*NIH v. Am. Pub. Health Ass'n*,
    606 U.S. __,145 S. Ct. 2658 (2025) (Mem.) .............................................. 19

*Nken v. Holder*,
    556 U.S. 418 (2009) .................................................................................... 17

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .......................................................................................... 7

**U.S. Constitution**

U.S. Const. Art I, § 7, cl. 7 ................................................................................ 14, 15

**United States Code**

2 U.S.C. § 622 ...................................................................................................... 16

5 U.S.C. § 701 ........................................................................................................ 9

7 U.S.C. § 612c ................................................................................................... 1, 4

7 U.S.C. § 2011 ............................................................................................................ 2

7 U.S.C. § 2013 ........................................................................................................ 3, 7, 9

7 U.S.C. § 2014 ............................................................................................................ 2

7 U.S.C. § 2016 ............................................................................................................ 3

7 U.S.C. § 2020 ......................................................................................................... 2, 3

7 U.S.C. § 2025 ............................................................................................................ 3

7 U.S.C. § 2027 ..................................................................................................... *passim*

7 U.S.C. § 2257 ......................................................................................................... 5, 16

31 U.S.C. § 1341 ..................................................................................................... 15, 16

31 U.S.C. § 1512 ............................................................................................................ 4

**Rules**

Fed. R. Civ. P. 19 ............................................................................................ 2, 17, 18, 19

Fed. R. Civ. P. 65 ..................................................................................................... 6, 19

**Regulations**

7 C.F.R. § 271.7 ................................................................................................... *passim*

7 C.F.R § 273.2 ............................................................................................................ 3

7 C.F.R § 273.10 .......................................................................................................... 3

7 C.F.R. § 274.2 ........................................................................................................... 3

7 C.F.R. § 277.4 ........................................................................................................... 3

7 C.F.R. § 280.1 ........................................................................................................... 4

American Recovery and Reinvestment Act of 2009,
    Pub. L. No. 111-5, 123 Stat. 115 (Feb. 17, 2009) ................................................ 3

Consolidated Appropriations Act, 2024,
    Pub. L. No. 118-42, Div. B, Title IV, 138 Stat. 25 (Mar. 9, 2024) ................... 3, 4

Families First Coronavirus Response Act,
    Pub. L. No. 116-127, div. A, tit. I, 134 Stat. 178 (Mar. 18, 2020) ...................... 3

Full-Year Continuing Appropriations and Extensions Act, 2025,
    Div. A, Title I, Sec. 1101(a) and 1109(a), 139 Stat. 9 (Mar. 15, 2025) ............. 3, 4

Healthy, Hunger-Free Kids Act of 2010,
    Pub. L. No. 111-296, 124 Stat. 3183 (Dec. 13, 2010) ........................................ 3

**Other Authorities**

Off. of Mgmt. & Budget, Exec. Off. of the President, Circular No. A-11, Preparation,

Submission, and Execution of the Budget,
    Fiscal Year 2026 § 10.5 (2024) ....................................................................... 7

USDA, Supplemental Nutrition Assistance Program (SNAP) Benefit and Administrative
Expense Update for November 2025 (Oct. 10, 2025),
    https://perma.cc/LDG4- DQMC ....................................................................... 5

USDA, Supplemental Nutrition Assistance Program (SNAP) Benefit and Administrative
Expense Update for November 2025 (Oct. 24, 2025),
    https://perma.cc/4VPF-4ANN ....................................................................... 5

## INTRODUCTION

The Supplemental Nutrition Assistance Program ("SNAP") is a critical program that, through regular allotments and extraordinary disaster disbursements ("D-SNAP"), helps to improve food security for millions of Americans. At its regular level, SNAP requires approximately $8.5 to 9 billion dollars each month to operate. But Congress's failure to make an annual appropriation for SNAP for this fiscal year has led to the current circumstance.

On October 31, this Court ordered the U.S. Department of Agriculture ("USDA") to disburse the funds in its contingency fund to support benefits. Defendants have complied with that order but, as the parties agree, the emergency funds are insufficient to fully pay November benefits. USDA accordingly directed the States to reduce the maximum allotments by 50% for November, which is what the governing regulations require.

The Court also ordered USDA to consider transferring funds from other critical programs, including the Child Nutrition Programs, to support SNAP benefits. Defendants fully complied with that order too. In conformity with the Administrative Procedure Act ("APA"), Defendants have reasonably determined not to divert billions of dollars from the Child Nutrition Programs. In brief, if USDA were forced to transfer funds generated under Section 32 of the Agricultural Adjustment Act of 1935, which appropriates certain tariff revenue for various programs, *see* 7 U.S.C. § 612c *et seq.*, it would blow a hole in the funds dedicated to the Child Nutrition Programs. *See id.* § 612c-6(b)(1). That would raise calamitous concerns. The result would be a substantial shortfall in funding school meals, among other things, that would likely not be filled by any future appropriation.

Given Congress's failure to appropriate sufficient funds for November SNAP benefits and USDA's adherence to both the statute and its own regulations regarding partial benefits, it cannot be arbitrary and capricious for USDA to decline to raid an entirely different program, to the tune of billions of dollars, in the mere hope that Congress will fix the ensuing deficit through the general appropriations process. And it would be unprecedented and unworkable for a court to mandate that USDA complete such a transfer using its discretionary interchange authority; it also raises the

specter of innumerable conflicting injunctions demanding that every plaintiff's unfunded benefit program be supported by moving money from elsewhere. There is no basis in law for such an order.

For these reasons, USDA did not violate the Court's order and is likely to succeed on the merits of the second request for a temporary restraining order.

The balance of the equities and irreparable harm factors also squarely favor Defendants. The harm to Plaintiffs is limited, as at least some benefits will issue based on the Court's prior order. And a court order to use the Child Nutrition Programs would inflict substantial harm on groups dependent on those other programs. Harm would also flow to the States who would have to once again reprogram their systems and implement a new set of orders. Indeed, for these reasons, Federal Rule of Civil Procedure 19 requires those parties to have a say before this Court inflicts substantial damage on their interests.

All told, Defendants understand that Congress's failure to appropriate SNAP funds has created a difficult situation for millions of Americans. But Plaintiffs' sweeping plan to siphon funds from the Child Nutrition Programs is not a viable alternative, let alone one the Court can mandate. USDA reasonably rejected such a course, and Plaintiffs' motion should be denied.

## <u>BACKGROUND</u>

### I.    **The SNAP Program and its Operation**

SNAP is a federal nutrition assistance program administered by USDA at the federal level and implemented by state SNAP agencies at the local level. *See* 7 U.S.C. § 2020. Under the Food and Nutrition Act ("FNA"), SNAP benefits "shall be furnished to all eligible households" that apply, *id.* § 2014(a)—but, crucially, "[s]ubject to the availability of funds appropriated under section 2027 of this title," *id.* § 2013(a).

Since 1964, SNAP (or its predecessor) has provided monthly benefits to low-income households to purchase nutritious food. *Id.* § 2011. Eligible households receive their SNAP benefits on electronic benefit transfer (EBT) cards, *id.* § 2020, which may be used to purchase food from authorized retailers, *id.* § 2013(a). States are responsible for determining household

eligibility and benefit amount, and loading benefits to EBT cards. *Id.* § 2020. States determine whether a household is eligible to receive SNAP benefits and determine the monthly benefit amount by assessing household size and income through an application and interview process. *See* 7 C.F.R §§ 273.2, 273.10. State agencies allocate federal funds to participating households' SNAP benefit cards on a set, staggered schedule each month. *See* 7 U.S.C. § 2016(g); 7 C.F.R. § 274.2(d).

States receive partial reimbursements for the costs of operating their SNAP programs (while the Federal Government pays for the entire cost of the benefits themselves). 50% of the cost of the administration of SNAP is borne by States while the federal government covers the other 50%. 7 U.S.C. § 2025(a); 7 C.F.R. § 277.4(b).

The system of moving money from the Federal Government, to the States, to the processors, to the beneficiaries' cards, and to the retailers is both required by statute and regulation and complex. *See* Decl. Patrick A. Penn, Doc. No. 14-2 ¶¶ 1-9, 16-28.

## II. Funding for SNAP and Other USDA Programs

**A.** Congress appropriates federal funds for SNAP benefits during the annual appropriations process. *See* 7 U.S.C. § 2013(a)(1) ("Subject to the availability of funds appropriated under section 2027 of this title, the Secretary is authorized to formulate and administer [SNAP]."). In the last regular appropriations bill, Congress fully funded the program through the end of the 2024 Fiscal Year ("FY"). *See* Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, Div. B, Title IV, 138 Stat. 25, 93 (Mar. 9, 2024). Congress continued the program through the end of FY 25 through a full-year continuing appropriations act. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Div. A, Title I, Sec. 1101(a) and 1109(a), 139 Stat. 9, 10, 13 (Mar. 15, 2025). Congress has not provided an appropriation to fund SNAP benefits or administrative costs for the current fiscal year.[1]

---

[1] In addition to annual appropriations, Congress may provide for other appropriations; it has done so on various occasions, though those are generally time or situation bound. *See, e.g.*, American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115 (Feb. 17, 2009), *as amended by the* Healthy, Hunger-Free Kids Act of 2010, Pub. L. No. 111-296, 124 Stat. 3183, 3265 (Dec. 13, 2010) (providing an increase in SNAP benefits through October 31, 2013); Families

After SNAP funds are appropriated by Congress, OMB "apportions" them for USDA's administration of SNAP. *See* 31 U.S.C. § 1512; Off. of Mgmt. & Budget, Exec. Off. of the President, Circular No. A-11, Preparation, Submission, and Execution of the Budget, Fiscal Year 2026 § 10.5 (2024) ("OMB Circular A-11") (July 2024) § 10.5. The apportionment provides USDA the necessary authority to obligate and expend funds for SNAP.

**B.** Congress has provided, through a multi-year fund, emergency reserves for SNAP funding. *See* Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, § 6, 138 Stat. 25, 93-94 (2024); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(a), 139 Stat. 9, 10 (2025). Each bill includes funds to "be placed in reserve for use only in such amounts and at such times as may become necessary to carry out program operations." Consolidated Appropriations Act, 2024, 138 Stat. at 93.

The contingency fund has been used sparingly and has never before been used to fund benefits in a lapse due to Congressional opposition to continuing appropriations. Doc. No. 14-2 ¶¶ 11-13. Generally, those funds are used in the event of a disaster, such as a hurricane, to provide critical relief. *Id.* 7 C.F.R. § 280.1. For example, in 2017, after Hurricanes Maria, Rita and Harvey heavily impacted the southeastern United States and Puerto Rico, FNS spent approximately $4.3 billion on the affected States and roughly $1.7 billion in Puerto Rico for disaster assistance using the contingency fund. Doc. No. 14-2 ¶ 11. In response to this Court's order, USDA earlier this week took the steps necessary to use the fund as set out in 7 C.F.R. § 271.7 and statute. Doc No. 21-1.

**C.** Under Section 32 of the Agricultural Adjustment Act of 1935, 7 U.S.C. § 612c *et seq.*, Congress has set forth a mandatory, and permanent, appropriation that stems from 30% of customs receipts on all imports from the prior calendar year. *See id.*; Cong. Rsch. Serv., IF12193, Farm and Food Support Under USDA's Section 32 Account (last updated Aug. 5, 2025). The breakdown of

---

First Coronavirus Response Act, Pub. L. No. 116-127, div. A, tit. I, 134 Stat. 178, 179 (Mar. 18, 2020) (allowing USDA to provide emergency allotments to all SNAP households) (authority expired after February 2023).

the *projected* appropriation for FY 2026, is reflected in the chart in that congressional Research Service report. As the diagram shows, the majority of the funding is expected to be appropriated for the Child Nutrition Programs. Within limits, that money can sometimes be discretionarily transferred. 7 U.S.C. § 2257.

**D.** Recognizing that SNAP may suffer from insufficient appropriations, Congress through statute, and USDA through regulation, have set forth procedures and guidelines governing such an event. First, Congress directed that "[i]n any fiscal year, the Secretary shall limit the value of those allotments issued to an amount not in excess of *the appropriation for such fiscal year*." 7 U.S.C. § 2027(b) (emphasis added). In the event of a potential shortfall of the appropriated funds, the Secretary may issue a reduction, and "[n]otwithstanding any other provision of this chapter," "the Secretary shall direct State agencies to reduce the value of such allotments to be issued to households certified as eligible to participate in the supplemental nutrition assistance program to the extent necessary to comply with the provisions of this subsection." *Id*. The regulation detailing the calculation of a reduction is located at 7 C.F.R. § 271.7(a)-(h).

## III.   This Litigation

On September 30, 2025, the FY 2025 appropriation for the SNAP account lapsed. As the lapse in appropriation continued unabated, USDA informed States that SNAP benefits were at risk. On October 10, USDA explained that "if the current lapse in appropriations continues, there will be insufficient funds to pay full November SNAP benefits for approximately 42 million individuals across the Nation." USDA, Supplemental Nutrition Assistance Program (SNAP) Benefit and Administrative Expense Update for November 2025 (Oct. 10, 2025), https://perma.cc/LDG4-DQMC. ("Oct. 10 Letter"). Because of these difficulties, USDA "direct[ed] States to hold their November issuance files and delay transmission to State EBT vendors until further notice." *Id*.

Two weeks later, as the lapse in appropriations dragged on, USDA sent a second letter. At that time, USDA formally "suspend[ed] all November 2025 benefit allotments until such time as sufficient federal funding is provided, or until FNS directs State agencies otherwise." USDA, Supplemental Nutrition Assistance Program (SNAP) Benefit and Administrative Expense Update

for November 2025 (Oct. 24, 2025), https://perma.cc/4VPF-4ANN. ("Oct. 24 Letter").

On October 30, 2025, Plaintiffs, a coalition of organizations and municipalities filed suit. Compl., Doc. No. 1. Plaintiffs bring claims under the Administrative Procedure Act ("APA"). They seek to challenge both the suspension of SNAP benefits due to the lack of funds as well as the termination of certain waivers. *Id.* ¶¶ 105-40. Plaintiffs filed, that afternoon, a motion for temporary restraining order, Doc. No. 3 and memorandum in support, Pl.'s Mem., Doc. No. 3-1. At the same time, a group of States filed an action in the District of Massachusetts, seeking similar emergency relief. *Commonwealth of Massachusetts et. al., v. USDA et. al,* 1:25-cv-13165 (D. Mass.).

On October 31, this Court issued an oral ruling granting Plaintiffs' motion for a temporary restraining order. The minute entry stated, "the Court orders the USDA to distribute contingency funds; report to the Court by 12:00 PM on Monday, November 3, 2025, regarding the status of the distribution; and to honor the existing waivers." Minute Entry (Oct. 31, 2025). After Defendants filed an emergency motion for the Court's order to be reduced to writing under Rule 65, Doc. No. 18, the Court issued a written ruling. Doc No. 19. In that ruling the Court explained its reasoning— that "use of those contingency funds has now become required because available funding is necessary to carry out the program operations, i.e., to pay citizens their SNAP benefits." *Id.* at 3-4. The Court further ordered that "[i]f the Government chooses to make the full payment, then it must do so by the end of the day Monday," and if the Government does not "use its discretion to use funds available to make a full payment of SNAP benefits for November, then it must expeditiously resolve the administrative and clerical burdens it described in its papers but under no circumstances shall the partial payments be made later than Wednesday, November 5, 2025." *Id.* at 5-6 (footnote and citation removed).

On November 3, Defendants filed a status report and declaration laying out USDA's compliance, including the relevant memorandum to States and the required tables for States to

calculate the reduced benefits available for each eligible household in that State. Doc. No. 24.[2] As discussed below, this action completes USDA's direct, immediate steps necessary to comply with the Court's order. 7 C.F.R. § 271.7(d)(1). USDA also explained, in its declaration, why it had declined to transfer billions of dollars from other food security programs.

On November 4, Plaintiffs filed a motion to enforce the order or, in the alternative, for a new temporary restraining order. Doc No. 22.

## LEGAL STANDARD

Injunctive relief "is an extraordinary and drastic remedy." *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (quotation omitted). To warrant preliminary relief, the movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## ARGUMENT

I.    **DEFENDANTS HAVE COMPLIED WITH THE COURT'S ORDER**

Defendants have fully complied with the Court's order. That order explicitly set out two possible options for compliance—full payments or partial payments in the discretion of USDA. Doc. No. 19 at 3-6. USDA chose the latter path and explained why. And the contingency fund has now been provided to States for payments.

Plaintiffs' apparent premise that only a full payment could constitute compliance has no basis in law or in the Court's order.

Partial benefits are explicitly contemplated in both statute and regulation. Recognizing that SNAP may suffer from insufficient appropriations during the fiscal year, Congress through statute, and USDA through regulation, has set forth procedures and guidelines governing such an event. Congress directed that "[i]n any fiscal year, the Secretary *shall limit the value of those allotments*

---

[2] After further calculations, USDA anticipates issuing updated tables tonight or tomorrow and Defendants will file a notice once they are issued.

issued to an amount not in excess of *the appropriation for such fiscal year*." 7 U.S.C. § 2027(b) (emphasis added); *see id.* § 2013(a)(1) ("Subject to the availability of funds appropriated under section 2027 of this title, the Secretary is authorized to formulate and administer [SNAP].").

If the Secretary finds that the benefit amounts needed by State agencies will exceed the appropriation, "[n]otwithstanding any other provision of this chapter," the Secretary must "direct State agencies to reduce the value of such allotments to be issued to households certified as eligible to participate in the supplemental nutrition assistance program to the extent necessary to comply with the provisions of this subsection." *Id.* § 2027(b). USDA has followed the requirements in its regulation for calculating and implementing such a reduction. 7 C.F.R. § 271.7.

Consistent with Congress's direction, the Court's order also contemplates partial payments as an option. And, in compliance with the Court's order, USDA promptly issued a memorandum and tables to the States, who ultimately implement any SNAP-related disbursements (again, by congressional design). Doc No. 24; Doc No. 21-1 ¶¶ 24-31 (explaining all the steps USDA must accomplish to make funds available to States). USDA has therefore "resolve[d] the administrative and clerical burdens it described in its papers" for which it is responsible and released the money to States. *See* Doc 19 at 5. In just one business day, USDA issued the reduction notice and revised maximum allotment tables for the country. As the regulation requires, "State agencies shall act immediately to implement the reduction," including by making the necessary changes to their "computerized issuance systems." 7 C.F.R. § 271.7(d)(1)(ii). To help resolve the States' own difficulties, USDA has pledged that "[t]o assist State agencies with the massive changes, USDA will have staff available for technical assistance." Doc No. 21-1 ¶ 26. USDA has further expended nearly half a billion dollars to compensate States for the resulting administrative costs. *Id.* ¶ 2. As a result, USDA has made the necessary funds available and has authorized the States to begin disbursements. And to the extent Plaintiffs imply that the partial payment process was *per se* unavailable because it would take time for states to fully implement, Defendants do not understand this Court's order, which expressly contemplated two options, to have *sub silentio* mandated a full payment despite the statutory and regulatory scheme.

Indeed, there is nothing more USDA could do. The States are nonparties to this suit, and the Court has not ordered them to, for example, hire additional technical staff or meet any particular deadlines. And Plaintiffs have not identified any authority for USDA to compel States to do anything other than distribute reduced benefits once the States have been authorized and the funds provided, as USDA has already done. As a result, Defendants have complied with the Court's order.[3]

The only remaining inquiry involves, as the Court laid out in footnote 6, the requirement that "[a]ny decision by the agency on use of this discretion [to transfer funds] must be made in accordance with the Administrative Procedure Act and cannot be arbitrary or capricious." Doc No. 19 at 5 n.6. For the reasons described below, it was not arbitrary and capricious.

## II. DEFENDANTS ARE LIKELY TO SUCCEED ON THE MERITS OF ANY NEW TEMPORARY RESTRAINING ORDER

### A. The decision not to drain the Child Nutrition Programs' funds is not reviewable.

Plaintiffs argue that USDA violated the APA by declining to transfer billions of dollars from other food-security programs in order to permit full SNAP benefits for November. But the decision to deplete the funds for one congressionally mandated program to pay for another program without sufficient appropriations falls squarely within the APA exception for decisions committed to agency discretion by law. 5 U.S.C. § 701(a)(2). In constituting the SNAP program, Congress directed that "[i]n any fiscal year, the Secretary shall limit the value of those [SNAP] allotments issued to an amount not in excess of *the appropriation for such fiscal year*." 7 U.S.C. § 2027(b) (emphasis added). The context refers to the appropriation for the SNAP program, not

---

[3] Plaintiffs' early payment discussion makes little sense. Doc. No. 22-1 at 13 & n.2. USDA provided full October benefits, covering the first 31 days of the lapse in appropriations. Plaintiffs' further insinuation that USDA should have started the partial benefits process earlier also falls short of the mark. No prior lapse has ever involved this situation, where there are no, or insufficient, funds appropriated for the SNAP program to cover benefits. *See* Doc. No. 14-2 ¶¶ 36-38. So there is no precedent guiding this situation. But if USDA had moved forward at Plaintiffs preferred, it would have itself brought massive risks and challenges. Requiring States to reprogram their systems in anticipation of an unprecedently long lapse in appropriations, such that it would interfere with any full payment following the lapse, would have been an unreasonable and dangerous course. *See id.* ¶¶ 22-28.

any appropriation made to USDA for other programs. *See id.* § 2013(a)(1) ("Subject to the availability of funds *appropriated under section 2027 of this title*." (emphasis added)). Nothing else in the SNAP framework says otherwise; no portion of the scheme contains mandatory language directing the raiding (and ultimately destruction by fiscal shortfall) of every other USDA program to fund SNAP. What is left is, at most, an entirely discretionary decision.

The Supreme Court has long recognized that an agency's determination of how to allocate funds among competing priorities and recipients is the classic action committed to agency discretion by law. *See Lincoln v. Vigil*, 508 U.S. 182, 193 (1993). In *Lincoln*, the Court explained that a funding decision is committed to agency discretion where it requires "a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," including whether "resources are best spent on one program or another; whether it is likely to succeed in fulfilling its statutory mandate; whether a particular program best fits the agency's overall policies; and, indeed, whether the agency has enough resources to fund a program at all." *Id.* (cleaned up). An "agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* The APA "gives the courts no leave to intrude." *Id.* Thus, "the decision about how the moneys" for programs "could best be distributed" is classically committed to agency discretion. *See Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751-52 (D.C. Cir. 2002).

The decision to transfer funds from an operating program to another program is in the heartland of this exception to APA review. Section 2257 authorizes (but nowhere requires) that an amount "[n]ot to exceed 7 per centum of the amounts appropriated for any fiscal year for the miscellaneous expenses of the work of any bureau, division, or office of the Department of Agriculture" can be transferred to another appropriation "within ... such bureau division, or office, but no more than 7 per centum shall be added to any one item of appropriation." 7 U.S.C. § 2257. The statute provides for cap exceptions "in cases of extraordinary emergency," *id.*, but at no point does it make a transfer mandatory. The choice to deplete one program to try and shore up another ticks every box discussed in *Lincoln*: (1) complicated balancing of factors within the agency's purview; (2) consideration of best use of resources "on one program or another"; (3) whether

USDA "is likely to succeed in fulfilling its statutory mandate"; and (4) "whether the agency has enough resources to fund a program at all." *See Lincoln*, 508 U.S. at 193; *see* Doc. No. 14-2 ¶¶ 16-35 (laying out the challenges); Doc No. 21-1 ¶¶ 7-23 (laying out USDA's decisionmaking with respect to partial payment). Simply put, if depleting one program to bolster one without sufficient funds is not committed to agency discretion under the *Lincoln* principles, it is hard to see how any funding decision would be. And the extraordinary emergency portion of that authority only reinforces this conclusion. *See, e.g.*, *Wildearth Guardians v. Kempthorne*, 592 F. Supp. 2d 18, 25 (D.D.C. 2008) (explaining that language "giv[ing] the Secretary the authority—but not the duty— to [take an action on an] emergency basis" is committed to agency discretion); *accord United States v. Wiley's Cove Ranch*, 295 F.2d 436, 446 (8th Cir. 1961) (holding "certificate of [individual's] eligibility to receive benefits under the Emergency Feed Program" was committed to agency discretion).

Plaintiffs' contrary position is too facile. They cite Section 2014's statement that benefits, "shall be furnished to all eligible households who make application for such participation," and say that suffices to give the Court law to apply. Doc No. 22-1 at 15 (quoting 7 U.S.C. § 2014(a)). But this citation ignores the crux of the issue. As previously discussed, Congress recognized, in multiple places, that any such provision is subject to the availability of appropriations for the SNAP program. 7 U.S.C. § 2027(b); *id.* § 2013(a)(1) ("Subject to the availability of funds appropriated under section 2027 of this title, the Secretary is authorized to formulate and administer [SNAP]."). Indeed, "[n]otwithstanding any other provision of this chapter," Congress requires that "the Secretary shall direct State agencies to reduce the value of such allotments to be issued to households certified as eligible to participate in the supplemental nutrition assistance program to the extent necessary to comply with the provisions of this subsection." *Id.* § 2027(b). As a result, the "shall" language provided by Plaintiffs is explicitly limited by the appropriations made available for the SNAP program, and therefore does not advance their argument here.

Meanwhile, the language authorizing transfer of separate funds for separate programs falls under Section 2257—which has no mandatory language and is not an appropriation referenced in

the governing SNAP statutes. That is the classic open funding authorization that lies within agency discretion. "Shall" language, cabined to the availability of SNAP appropriations, does not somehow leech into the funding for every other program that has remaining funds—rendering it mandatory to deplete their appropriated moneys. Instead, taking from one program to fund another involves the precise balancing that places the decision outside the APA.

**B.  If USDA's decision is reviewable, it is well reasoned and should be upheld.**

Even if the APA permits review, Plaintiffs cannot prevail. Under the arbitrary and capricious standard, the agency's decision is presumed valid, and a court reviews only whether that decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). "Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). A court must "uphold [even] a decision of less than ideal clarity if the agency's path may reasonably be discerned." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (quotation marks omitted).

USDA reasonably decided against depleting "at least $4 billion from th[e] Child Nutrition funds to provide full SNAP benefits instead of reduced benefits for the month of November." Doc No. 21-1 ¶ 7. USDA "contemplated various factors" including (1) that Congress appropriated funds for the Child Nutrition Programs specifically (not generally for any program needing funds); (2) "the impact a transfer of the magnitude necessary to support SNAP would have on Child Nutrition Programs"; (3) "the likelihood (or lack thereof) of Congress's ability to appropriate additional billions of dollars for Child Nutrition Programs for FY26 to make up the funding shortfall"; and (4) the Court orders at issue. *Id.* ¶ 8. Ultimately, USDA decided "to protect full operation of Child Nutrition Programs throughout the fiscal year." *Id.* ¶ 9. Those Programs "provide critical, nutritionally-balanced meals and food assistance benefits to millions of children every day" serving "[t]hrough the National School Lunch Program alone, approximately 29 million children per day." *Id.* ¶ 10.

USDA balanced the importance of the Child Nutrition Programs against the dangers of a shortfall in funds. *Id.* ¶¶ 8-20. "[T]he $4 billion removed from Child Nutrition Programs for one month of SNAP benefits would be a permanent loss to Child Nutrition Programs for the entirety of their annual operations in FY26." *Id.* ¶ 17. "To make Child Nutrition Programs whole for FY26, Congress would need to appropriate an additional $4 billion in new budget authority." *Id.* ¶ 19. Such a shortfall would be "unprecedented and significant." *Id.* ¶ 16. "In other words, instead of Congress appropriating the estimated $13.2 billion for Child Nutrition Programs in FY26, Congress would need to appropriate more than *$17.2 billion* for Child Nutrition Programs to continue funding the Child Nutrition Programs." *Id.* ¶ 19. If Congress passes a continuing resolution, maintaining earlier levels of funding, or if Congress simply chooses to appropriate the sum originally anticipated, the Child Nutrition Programs will face a large shortfall. *See id.* ¶¶ 8-20. In sum, "creating a shortfall in Child Nutrition Program funds to fund one month of SNAP benefits is an unacceptable risk, even considering the procedural difficulties with delivering a partial November SNAP payment, because shifting $4 billion dollars to America's SNAP population merely shifts the problem to millions of America's low income children that receive their meals at school." *Id.* ¶ 22.

In exercising its statutory discretion, USDA also considered congressional intent. *Id.* ¶ 21. Congress provides the SNAP program a contingency fund. *Id.* Congress also provides the Child Nutrition Programs with sufficient funds to carry out their operations. *Id.* "USDA would ignore those provisions while also threatening its ability to administer Child Nutrition Programs if it were to repurpose funds Congress explicitly intended be used only for Child Nutrition Programs." *Id.* That issue does not arise with the Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC") because the relatively small quantity of funds does not threaten to impair Child Nutrition Programs operations. *Id.* ¶¶ 20-21. Finally, "[t]here are no other large blocks of funding—that is, funding not tied to yearly appropriations—within [the relevant bureau, division, or office] that could be used to supplement SNAP." *Id.* ¶ 23.

Ultimately, USDA has reasonably chosen to protect funding for the critical Child Nutrition

Programs rather than speculate that Congress will, in the future, appropriate billions of additional dollars reallocated by USDA to comply with the Court's order. *Id.* ¶¶ 7-23. It simply cannot be arbitrary and capricious to determine that maintaining appropriate funds for their intended purpose, when there is no suggestion that a deficit will be restored, is the proper course of action here. Indeed, to deplete the Child Nutrition Programs on the speculative hope that Congress will bail out the resulting shortfall, would itself risk failing arbitrary and capricious review. And to the extent that Plaintiffs or the Court assume that Congress will necessarily appropriate such funds in the future (or that it will have no choice but to be compelled to do so), and therefore it is appropriate to disburse funds now, such a premise risks violating the Appropriations Clause's requirement that "[n]o money shall be drawn from the Treasury, but in consequence of Appropriations made by Law." U.S. Const. Art I, § 7, cl. 7.

Plaintiffs' counterarguments do not detract from this well-reasoned conclusion. First, Plaintiffs allege that USDA did not consider the drawbacks of a partial allotment. Doc No. 22-1 at 18-19. But of course, USDA provided paragraphs of consideration and detail regarding this point, Doc No. 21-1 ¶¶ 24-30, and explicitly "determined that creating a shortfall in Child Nutrition Program funds to fund one month of SNAP benefits is an unacceptable risk, even considering the procedural difficulties with delivering a partial November SNAP payment, because shifting $4 billion dollars to America's SNAP population merely shifts the problem to millions of America's low income children that receive their meals at school." *Id.* ¶ 22. Plaintiffs may disagree with USDA's weighing of the considerations, but USDA did in fact "account for an 'important aspect of the problem.'" Doc No. 22-1 at 19 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Second, Plaintiffs' claim that USDA made a legal error by allegedly concluding that, for the Child Nutrition Programs funds, Congress "intended to restrict their use only to Child Nutrition Programs." *Id.* at 19-20. USDA made no such conclusion. Instead, USDA reasoned that taking funds substantial enough to impair the operations of the Child Nutrition Programs during this fiscal year does not accord with congressional intent. Doc No. 21-1 ¶ 21. For USDA to take $4 billion

from the programs would "threaten[] its ability to administer Child Nutrition Programs." *Id.* And Congress established those programs, and provided funding, so that the programs could be carried out. USDA acknowledged that use of a transfer authority, including for WIC, is appropriate so long as the transfer does not threaten to impair the congressionally created Child Nutrition Programs. *Id.* But seizing billions of dollars for a partial month's worth of SNAP benefits would so threaten the Child Nutrition Programs.

Third, Plaintiffs contend that there will be no shortfall for Child Nutrition Programs because (1) during the lapse in appropriations there would be sufficient money until May and (2) Congress will make up any shortfall either directly or by funding the SNAP program. Doc. No. 22-1 at 21-22. The former premise is simply not a basis for USDA's decision. USDA has focused on the entire fiscal year, not specifically the lapse in appropriations. For the latter, Plaintiffs' speculation about hypothetical congressional action cannot overcome the agency's reasoned choice. As an initial matter, Plaintiffs' hope that "Congress would . . . take special action to fill any gap—. . . given that Congress, with bipartisan support, has always fully funded child nutrition." *Id.* at 22. To accept Plaintiffs' contention would require USDA to assume that in this unprecedented situation, Congress will simply ratify the use of funding not appropriated for the SNAP program and allocate billions more for the Child Nutrition Programs. That kind of speculation about the actions of Congress, which ultimately let funding lapse for various critical programs – and the entirety of the federal government, cannot overcome the agency's reasonable choice to protect the Child Nutrition Programs from a deficit that would impair its operations. Plaintiffs similarly speculate that Congress will appropriate funds for the SNAP program making up for the lack of funds for November benefits. That is also entirely theoretical.

Even setting all that aside, it risks violating both the Appropriations Clause and the Antideficiency Act to generate a deficit in the Child Nutrition Programs on anticipation of *future* congressional appropriations. U.S. Const. Art I, § 7, cl. 7; 31 U.S.C. § 1341 (forbidding "involv[ing] [the] government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law"). Indeed, the Antideficiency Act appears precisely

designed to avoid agencies generating precisely the kind of liability that Plaintiffs ask for—a multi-billion dollar gap in funds that Congress must choose to repair. So at the very least USDA did not abuse its discretion by generating such an obligation "before an appropriation" in anticipation of such an appropriation.

Finally, Plaintiffs contend that USDA's decision is really "partisan." *Id.* at 23. But USDA has provided detailed, consistent reasoning for why it cannot take hold of billions of dollars from the Child Nutrition Programs in the speculative hope that those funds will be made up in the future. And Plaintiffs point to no precedent for USDA having done so (and certainly no precedent for any court ordering agencies to exercise their discretion to transfer funds from one program to another). Fundamentally, USDA determined that leaving a gaping hole in the funds allocated for the Child Nutrition Programs was too dangerous. Doc. No. 14-2 ¶ 35. USDA is not required to defund one program to support another, and it certainly did not abuse its discretion by refusing to do so.

To hold otherwise would also open a Pandora's box. SNAP is far from the only program that includes mandatory language but is dependent on congressional appropriations. And Section 2257 is not the only statute that provides discretionary authorization for agencies to transfer funds from one purpose to another. If Plaintiffs can secure a court order requiring USDA to exercise that authority to ensure that their program remains funded despite a lapse, there is nothing to stop the beneficiaries of every benefit program from seeking analogous relief, imposing conflicting and unworkable obligations on agencies as the federal courts usurp the role of fiscal management and direct movement of funds across the government.[4] Plaintiffs conceive of this Court as playing the

---

[4] The fact that SNAP is an entitlement does not mandate a different outcome. While 2 U.S.C. 622(9)(B) explicitly designates SNAP as an entitlement program, it must do so separately from other programs that fall under the general definition in paragraph (9)(A): "the authority to make payments (including loans and grants), the budget authority for which is not provided for in advance by appropriation Acts, to any person or government if, under the provisions of the law containing that authority, the United States is obligated to make such payments to persons or governments who meet the requirements established by that law." In fact, as Defendants have shown, the authority to make SNAP payments is subject to budget authority provided in appropriation Acts. The fact that Congress had to separately identify SNAP as an entitlement precisely because it did not fall into the definition in paragraph (9)(A) cannot mean that it is arbitrary and capricious not to treat SNAP as if it did fall within paragraph (9)(A).

role of a bankruptcy judge, giving priority to certain claims over others, but that is entirely improper and an offense against the separation of powers.

## III.  PLAINTIFFS FAIL THE REMAINING EQUITABLE CONSIDERATIONS FOR A NEW TEMPORARY RESTRAINING ORDER

"A prospective injury that is sufficient to establish standing . . . does not necessarily satisfy the more demanding burden of demonstrating irreparable injury." *Cal. Ass'n of Priv. Postsecondary Sch. v. DeVos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018). And irreparable harms must be harms *to the Plaintiffs*; not third parties. *CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 48 F.3d 618, 622 (1st Cir. 1995). Meanwhile, when the Federal Government is a party, the balance of the equities and public interest merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). All considerations support USDA.

For irreparable harm, Plaintiffs successfully argued that the Court should require use of the entire contingency fund to pay partial benefits. Doc No. 19. Plaintiffs argue that irreparable harm nonetheless flows because SNAP benefits will be reduced and delayed. But the Court found irreparable harm previously, as quoted by Plaintiffs, because of "the terror it has caused some people about the availability of funding for food for their family, that irreparable harm will occur if this injunction does not pass and if SNAP benefits are not paid consistent with the mandate from Congress." Doc. No. 22-1 at 24 (quoting TRO Hr'g Tr. at 38:14-20). But here, the Court's order, widely reported, has made clear that benefits will be available, even if at a reduced level. And SNAP benefits are being paid consistent with the mandate from Congress specifying the reduction of benefits in situations just like this one. 7 U.S.C. § 2027(b). The temporary reduction or delay cannot satisfy irreparable harm.

As for the equities—the damage to nonparties, including States and the beneficiaries of the Child Nutrition Programs, strongly counsels in favor of rejecting Plaintiffs' motion. If this Court ultimately were to order the depletion of billions of dollars from the Child Nutrition Programs on the speculative hope of a congressional fix on the backend, it would substantially damage the interests of both the States (who are not involved in this litigation) and those beneficiaries who rely

on those other programs. Indeed, as explained below, Federal Rule of Civil Procedure 19 requires the Court to reject relief because of these harms.

## IV.    THE COURT SHOULD ALSO REJECT PLAINTIFFS' REQUEST FOR RELIEF UNDER FEDERAL RULE OF CIVIL PROCEDURE 19

This Court lacks jurisdiction to issue the order that Plaintiffs request because at least two sets of indispensable parties have not been included—the States (who must expend hundreds of millions of dollars to comply with the rapidly changing circumstances resulting from the Court's orders) and the beneficiaries of the Child Nutrition Programs. Federal Rule of Civil Procedure 19 is precisely designed to forbid an order impairing the interests of such groups without a chance for them to have their say.

Rule 19 requires, when possible, a party that is indispensable to a lawsuit be joined to that suit. *See* Fed. R. Civ. P. 19. A party is "required" if either: (1) the court cannot accord "complete relief among existing parties" in the party's absence, or (2) proceeding with the suit in its absence will "impair or impede" the party's ability to protect a claimed legal interest relating to the subject of the action, or "leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." Fed. R. Civ. P. 19(1)(A)-(B). The policies underlying the rule are simple: "the public interest in preventing multiple and repetitive litigation, the interest of the present parties in obtaining complete and effective relief in a single action, and the interest of absentees in avoiding the possible prejudicial effect of deciding the case without them." *Acton Co. v. Bachman Foods, Inc.,* 668 F.2d 76, 78 (1st Cir. 1982).

Here, both the States and beneficiaries of the Child Nutrition Programs will have their interests "impair[ed] or impede[d]" if the Court orders full allotment of benefits by depleting those programs. First, several States have brought their own lawsuit, *Commonwealth of Massachusetts et. al., v. USDA et. al,* 1:25-cv-13165 (D. Mass.), and are presently pursuing their interests there. To issue additional orders risks imposing inconsistent obligations on the States, who process distribution of benefits, if a partial allotment is imposed in one Court and a full allotment in another court. Moreover, if this Court were to now order a full allotment, as States begin work on the

partial distribution currently ordered, it imposes obligations on the States that they should have an opportunity to address. It also impairs and impedes their own asserted legal interests to the extent it adjudicates these issues without an opportunity for them to appear.

As for the beneficiaries of the Child Nutrition Programs, they are a group that most naturally face impairment and impediment to their interests. Plaintiffs ask the Court to expend their programs' funds on the hope of a congressional fix later on. That impairs their interests because it makes it less likely they will receive the full services of the Child Nutrition Programs during fiscal year 2026. Indeed, if USDA had chosen in the first place to expend Child Nutrition Programs funds to pay for the unappropriated SNAP program, those Child Nutrition Programs beneficiaries would have had a strong argument to challenge that agency action themselves.

In sum, by operation of Rule 19, this Court should find that feasible necessary parties to the suit have not been joined and therefore require their say before issuing any order impairing their interests.

### V.    PLAINTIFFS SHOULD BE ORDERED TO POST SECURITY IN CONNECTION WITH ANY INJUNCTIVE RELIEF AND THE COURT SHOULD STAY ANY RELIEF.

For the reasons stated above, Defendants submit that the Court can and should deny Plaintiffs' motion in its entirety. However, should the Court be inclined to order any injunctive relief, the Court should also order Plaintiffs to post an appropriate bond commensurate with the scope of any such order. *See* Fed. R. Civ. P. 65(c); *cf. Dep't of Educ. v. California*, No. 24A910, 604 U.S. 650, 652 (2025).

And Defendants respectfully request that such relief be stayed pending the disposition of any appeal that is authorized by the Solicitor General, or at a minimum, administratively stayed for a period of forty-eight hours to allow the United States to seek an emergency, expedited stay from the court of appeals if an appeal is authorized. That is especially true because any distributed moneys may be forever lost. *See NIH v. Am. Pub. Health Ass'n*, 606 U.S. __, 145 S. Ct. 2658 (2025) (Mem.) (finding the government irreparably harmed where plaintiffs failed to commit to "repay[ing] grant money if the Government ultimately prevails"). Plaintiffs have asserted that no

bond should be required here, even though they have failed to commit to repay the billions of dollars the Government will have expended if the Court grants Plaintiffs' requested relief and the Government later succeeds on appeal. And the deficit that would be created for the Child Nutrition Programs, upon the Court's injunction, cannot be undone except through Act of Congress. That strongly counsels a short stay to permit, if authorized, appellate review.

## CONCLUSION

The Court should deny Plaintiffs' motion to enforce and reject the motion for a temporary restraining order.

Dated: November 5, 2025                    Respectfully submitted,

STANLEY WOODWARD, Jr.
Associate Attorney General

BRETT A. SHUMATE
Assistant Attorney General

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

/s/ *Tyler J. Becker*
TYLER J. BECKER (V.A. Bar No. 97636)
Counsel to the Assistant Attorney General
U.S. Department of Justice, Civil Division
Tel.: (202) 514-4052
Email: tyler.becker@usdoj.gov

JOSEPH E. BORSON
Assistant Branch Director
Federal Programs Branch

JASON ALTABET
Trial Attorney
Federal Programs Branch

*Attorneys for the United States*

## <u>CERTIFICATE OF SERVICE</u>

On this 5th day of November, 2025, I caused the within document to be filed electronically. It is available for viewing and downloading from the Court's ECF system, which will serve it upon all counsel of record.

<u>*/s/ Tyler J. Becker*</u>
TYLER J. BECKER
Counsel to the Assistant Attorney General
U.S. Department of Justice, Civil Division