# United States Court of Appeals
## For the First Circuit

---

No. 25-2089

RHODE ISLAND STATE COUNCIL OF CHURCHES; NATIONAL COUNCIL OF
NONPROFITS; SERVICE EMPLOYEES INTERNATIONAL UNION; MAIN STREET
ALLIANCE; CITY OF CENTRAL FALLS; CITY OF PAWTUCKET; CITY OF
PROVIDENCE; CITY OF ALBUQUERQUE; CITY OF BALTIMORE; CITY OF
COLUMBUS; CITY OF DURHAM; CITY OF NEW HAVEN; AMOS HOUSE; DR.
MARTIN LUTHER KING, JR. COMMUNITY CENTER; EAST BAY COMMUNITY
ACTION PROGRAM; FEDERAL HILL HOUSE ASSOCIATION; THE MILAGROS
PROJECT; UNITED WAY OF RHODE ISLAND; NEW YORK LEGAL ASSISTANCE
GROUP; BLACK SHEEP MARKET,

Plaintiffs, Appellees,

v.

BROOKE L. ROLLINS, in her official capacity as Secretary of the
United States Department of Agriculture; UNITED STATES
DEPARTMENT OF AGRICULTURE; RUSSELL T. VOUGHT, in his official
capacity as Director of the United States Office of Management
and Budget; UNITED STATES OFFICE OF MANAGEMENT AND BUDGET; SCOTT
BESSENT, in his official capacity as Secretary of the United
States Department of the Treasury; UNITED STATES DEPARTMENT OF
THE TREASURY; UNITED STATES,

Defendants, Appellants.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. John J. McConnell, Jr., U.S. District Judge]

---

Before

Barron, Chief Judge,
Gelpí and Rikelman, Circuit Judges.

---

Brett A. Shumate, Assistant Attorney General, Eric D. McArthur, Deputy Assistant Attorney General, Michael S. Raab, and Laura E. Myron, Attorneys, Appellate Staff Civil Division, U.S. Department of Justice, on brief for appellants.

Amy R. Romero, Kevin Love Hubbard, DeLuca, Weizenbaum, Barry & Revens, Ltd., Kristin Bateman, Catherine M.A. Carroll, Jyoti Jasrasaria, Michael J. Torcello, Andrew Liang Bookbinder, Adnan Perwez, Robin F. Thurston, Skye L. Perryman, and Democracy Forward Foundation, on brief for appellees.

Jonathan Miller, Jenny Ma, Jean Larsen, and Public Rights Project, on brief for local governments and local government leaders as amici curiae in support of appellees.

Andrea Joy Campbell, Attorney General of Massachusetts, Anna Lumelsky, Deputy State Solicitor, Michelle Pascucci, Vanessa Arslanian, State Trial Counsel, Liza Hirsch, Chief, Children's Justice Unit, Cassandra Thomson, Rauvin Johl, Peter Walkingshaw, Jak Kundl, Assistant Attorneys General, Katherine Dirks, Chief State Trial Counsel, Kristin K. Mayes, Attorney General of Arizona, Rob Bonta, Attorney General of California, Philip J. Weiser, Attorney General of Colorado, William Tong, Attorney General of Connecticut, Kathleen Jennings, Attorney General of Delaware, Brian L. Schwalb, Attorney General of the District of Columbia, Anne E. Lopez, Attorney General of Hawai'i, Kwame Raoul, Attorney General of Illinois, Laura Kelly, in her official capacity as Governor of Kansas, Andy Beshear, in his official capacity as Governor of Kentucky, Aaron M. Frey, Attorney General of Maine, Anthony G. Brown, Attorney General of Maryland, Dana Nessel, Attorney General of Michigan, Keith Ellison, Attorney General of Minnesota, Aaron D. Ford, Attorney General of Nevada, Matthew J. Platkin, Attorney General of New Jersey, Raúl Torrez, Attorney General of New Mexico, Letitia James, Attorney General of New York, Jeff Jackson, Attorney General of North Carolina, Dan Rayfield, Attorney General of Oregon, Josh Shapiro, in his official capacity as Governor of Pennsylvania, Peter F. Neronha, Attorney General of Rhode Island, Charity R. Clark, Attorney General of Vermont, Nicholas W. Brown, Attorney General of Washington, and Joshua L. Kaul, Attorney General of Wisconsin, on brief for Massachusetts, et al., as amici curiae in support of appellees.

Elizabeth B. Deutsch, Laurel A. Raymond, Brian Hauck, Jenner & Block LLP, Julia Spiegel, Emily Kirby, Allegra Chapman, Carlos Guevara, Inbar Pe'er, and Governors Action Alliance, on brief for bipartisan former governors as amici curiae in support of appellees.

November 9, 2025

     **RIKELMAN**, **Circuit Judge**.  Forty-two million people, one out of every eight Americans, use monthly benefits from the federal Supplemental Nutrition Assistance Program (SNAP) to buy food for themselves and their families.  On October 24, 2025, a few weeks into the current government shutdown, the United States Department of Agriculture (USDA), which administers SNAP funding on behalf of the federal government, announced it would not provide any funds for November SNAP benefits.  The plaintiffs in this case -- nonprofits, local governments, a union, and a food retailer -- sued to require USDA to provide full November benefits using SNAP contingency funds Congress had appropriated for this very purpose, as well as other funds available to USDA.  The district court granted a temporary restraining order requiring the government to provide either full SNAP payments by November 3 or partial payments by November 5.  The government elected to provide partial benefits.  On Thursday, November 6, the district court determined that the government had failed to comply with the order because it did not provide partial payments in a timely manner; it thus ordered the full payment of SNAP funds for November.  The government now asks us to stay that order in its entirety pending its appeal.  We deny that request.

## I. BACKGROUND

## A. Relevant Facts

SNAP provides monthly benefits to around one in eight Americans, including fourteen million children and eight million elderly individuals. Beneficiaries receive funds through an electronic debit card that they use to buy food at grocery stores and other food retailers. Although the federal government pays for SNAP benefits, state governments administer them, including by determining who is eligible and the amount of benefits that eligible individuals and families should receive. See 7 U.S.C. § 2020(a). Under federal law, SNAP benefits "shall be furnished to all eligible households" that apply. Id. § 2014(a).

For low-income Americans, SNAP is a vital bulwark against hunger and food insecurity. Access to food is, of course, a basic human need. Further, food security is a critical factor in health and well-being, the ability to stay in stable housing, and children's physical and educational development. Without SNAP, tens of millions would go hungry -- the first among a cascade of other health and financial harms that would befall those forced to go without enough food, particularly in the months leading up to winter.

Congress appropriates federal funding for SNAP on an annual basis. See id. § 2013(a). The latest annual appropriation for SNAP expired on September 30, 2025. To take into account

emergencies, however, Congress has provided for additional funds to "be placed in reserve for use only in such amounts and at such times as may become necessary to carry out program operations" ("contingency funds").  Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 25, 93; see also Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, §§ 1101(a), 1103, 1109(a), 139 Stat. 9, 10.  At the beginning of October 2025, the contingency funds amounted to about $6 billion.

The current lapse in congressional appropriations -- the government shutdown -- began on October 1, 2025.  On October 10, USDA sent a memorandum to state officials stating that "if the current lapse in appropriations continues, there will be insufficient funds to pay _full_ November SNAP benefits for approximately 42 million individuals across the [n]ation." Memorandum from U.S. Dep't of Agric. on Supplemental Nutrition Assistance Program (SNAP) Benefit and Administrative Expense Update for November 2025 (Oct. 10, 2025) (emphasis added), https://perma.cc/LDG4-DQMC.

Statutes governing SNAP provide for how the government should manage shortfalls in funding.  The statutes indicate that USDA "shall limit the value of [SNAP payments] issued to an amount not in excess of the appropriation" for a given fiscal year.  7 U.S.C. § 2027(b).  USDA regulations then set forth procedures for making those reduced payments.  See 7 C.F.R. § 271.7.  The

regulations require, for example, that once USDA decides to make reduced payments, it "shall notify State agencies of the date the reduction is to take effect and by what percentage maximum SNAP allotments amounts are to be reduced." Id. § 271.7(d)(1)(i). According to the record here, USDA did not take any steps to prepare to make partial payments either before or after the shutdown. Instead, it only acted after it was ordered to do so by the district court on October 31, during this litigation. The record reflects that, before early November, USDA did not even perform the calculation to determine what percentage of November benefits could be paid with the contingency funds.

On October 24, as the shutdown continued, USDA announced that it would "suspend[] all November 2025 benefit allotments until such time as sufficient federal funding is provided, or until [it] directs State agencies otherwise." Memorandum from U.S. Dep't of Agric., Supplemental Nutrition Assistance Program (SNAP) Benefit and Administrative Expense Update for November 2025 (Oct. 24, 2025). Thus, one week before November SNAP benefits should have kicked in, the government communicated that it would not provide any benefits. USDA also announced that it would not use the $6 billion in contingency funds that Congress had previously appropriated to make up for a shortfall. See Memorandum from U.S. Dep't of Agric., Impact of the Government Lapse on November Supplemental Nutrition Assistance Program (SNAP) Household

Benefits (Oct. 24, 2025), https://perma.cc/L343-L7YA.  As USDA explained its view at the time, those contingency funds were available only to supplement benefits for which an appropriation existed, so the funds could not be used once an appropriation lapsed.[1]  On October 27, USDA posted to its website a banner stating that "there will be no [SNAP] benefits issued November 01" because "the well has run dry" in light of the shutdown.  Food & Nutrition Serv., U.S. Dep't of Agric. (Oct. 27, 2025), https://perma.cc/BL88-8QU6.

## B. Procedural History

The plaintiffs are nonprofit organizations, local governments, a union, and a food retailer that represent and serve people who rely on SNAP benefits.  On October 30, they filed a lawsuit alleging that USDA and other government entities and officials ("the government") had violated the Administrative Procedure Act (APA) through their October 24 directive suspending November SNAP benefits.  They claimed that suspending benefits was arbitrary and capricious and contrary to law, and that the

---

[1] The district court noted that in the past, including in 2019 during President Trump's previous term in office, the government had acknowledged that it could use these contingency funds to cover SNAP benefits in the event of a government shutdown.

government had "unlawfully withheld" SNAP payments.[2]  See 5 U.S.C. § 706(1), (2)(A).

On the same day the plaintiffs filed this lawsuit, they moved for a temporary restraining order (TRO).  Specifically, they asked the district court to preliminarily enjoin USDA's October 10 and 24 directives.  They also asked the district court to require the government to "release the withheld funding for SNAP benefits insofar as funds are available under the contingency funds . . . [or] under 7 U.S.C. § 2257."  Section 2257 is a statute providing that seven percent of the annual appropriations "for the miscellaneous expenses of the work of any bureau, division, or office of [USDA] shall be available interchangeably for expenditures on the objects included within the general expenses of such bureau, division, or office."  7 U.S.C. § 2257 (emphasis added).  It further states that USDA may not add more than that amount (seven percent) "to any one item of appropriation except in cases of extraordinary emergency."  Id. (emphasis added).

At a hearing on October 31, the district court granted plaintiffs' motion for a TRO.  In a November 1 written order, it ordered the government to use the contingency funds to supplement SNAP benefits.  The court also acknowledged that those contingency

---

[2]  The plaintiffs also brought claims arising from the government's handling of work requirements related to the SNAP program.  Those claims are not at issue in this appeal, so we do not discuss them further.

funds would be insufficient to fully cover SNAP benefit payments for November.

In light of the shortfall in funds, the district court presented the government with two options to comply with its TRO. First, the government could, "within its discretion, find the additional funds necessary (beyond the contingency funds) to _fully fund_ the November SNAP payments."  (Emphasis added.)  The court explained that the government could do so by using its § 2257 authority to transfer money from a fund established by section 32 of the Agricultural Adjustment Act of 1935, 7 U.S.C. § 612c ("Section 32 fund").  The government conceded during the October 31 TRO hearing that it had the authority to fund November SNAP payments in this way.  The court further ordered that, should the government select this option, it must make the SNAP payments by Monday, November 3.

Second, and alternatively, the district court permitted the government to make "partial payments" of November SNAP benefits, including by using the contingency funds (but not the Section 32 fund).  The court specified that in doing so, however, the government "must expeditiously resolve the administrative and clerical burdens [associated with the partial payments that] it described in its" prior filings.  The court explained that this option would require the government to "come up with a plan" to distribute the partial payments "to all entitled beneficiaries."

And "under no circumstances," the TRO stated, "shall the partial payments be made later than Wednesday, November 5, 2025." Finally, the court specified that if the government selected this second option and chose, in its discretion, "not [to] use other funds in addition to the contingency funds to make a full payment," any decision to use such discretion "cannot be arbitrary or capricious."

At no point did the government challenge the October 31 TRO after the district court issued it or request that the court modify it in any way.  Instead, on Monday, November 3, the government submitted a report to the district court that it had chosen the second option and had "worked diligently to comply with the Court's order."  It stated that by the end of the day on November 3, the government would have "made the necessary funds available" and "generat[ed] the table required for [s]tates to calculate the [partial] benefits available for each eligible household," given that full payments would not be forthcoming.  An accompanying declaration by a USDA official explained, however, that even once the funds were made available and the table circulated, at least some states would have to implement technical changes to their SNAP systems that "w[ould] take anywhere from a few weeks to up to several months."

The following day, November 4, the plaintiffs asked the district court to enforce the October 31 TRO by requiring the

government to provide full SNAP benefits in November.  They argued that, given the government's representation that it had elected to make partial payments despite acknowledging that those partial payments were unlikely to reach many SNAP recipients during November, it had not complied with the court's original TRO.  The plaintiffs also asked, "in the alternative," for the district court to "grant additional preliminary relief on the ground that the decision to deny full benefits is arbitrary and capricious."

Following a November 6 hearing, the district court granted both parts of the plaintiffs' November 4 motion -- that is, it decided to enforce its October 31 TRO and to enter a new TRO.  It ruled first that the government had failed to comply with the October 31 TRO, both by not resolving the administrative burdens of making partial payments and by failing to ensure that partial payments were actually disbursed to needy individuals by November 5.  The court explained that despite the government's admission that partial payments would mean no SNAP payments in November for many individuals, the government chose that option anyway.  Given the foreseeability of the problems that the government's chosen path would entail, the court concluded that the government's noncompliance with the October 31 TRO was inexcusable.  In order to effectuate its October 31 TRO, the court thus required the government to make full November SNAP payments by November 7.

As to the plaintiffs' alternative request for a new TRO, the district court agreed that the government's decision not to make full SNAP payments was likely arbitrary and capricious. It concluded that the plaintiffs' APA claim was likely to succeed on four grounds: the government's failure to account for the practical consequences of trying to make partial payments, the government's legal misunderstanding of its § 2257 authority, the government's implausible reasoning for refusing to access the Section 32 fund, and the pretextual nature of that reasoning in light of the government's shifting positions. Because of the plaintiffs' likelihood of success on the merits, along with the weight of the equities in their favor, the court issued a second TRO. That new TRO required the government to make full SNAP payments by November 7, "by utilizing available Section 32 funds in combination with the contingency funds."

On November 6, the government filed a notice of appeal of the district court's orders. On November 7, it moved this court for a stay pending appeal and an immediate administrative stay.

In the early evening of November 7, we denied the request for an administrative stay and noted that the government's request for a stay pending appeal remained pending. Shortly before our order issued, the government filed an emergency motion in the U.S. Supreme Court, also requesting a stay pending appeal and an administrative stay. Justice Jackson granted an administrative

stay pending our disposition of the government's motion for a stay. That administrative stay is set to expire forty-eight hours after we issue our decision on the government's stay request.

We conclude that the government has not met its burden under the applicable stay factors and thus deny its request to stay the district court's order granting the motion to enforce.

## II. DISCUSSION

### A. Jurisdiction

Before turning to the merits of the government's stay motion, we address whether we have jurisdiction to consider it. Generally, a TRO is not immediately reviewable on appeal. See 28 U.S.C. § 1292(a)(1). But we do have statutory jurisdiction to review a TRO that has the "'practical effect' of granting or denying an injunction." Abbott v. Perez, 585 U.S. 579, 594 (2018) (quoting Carson v. Am. Brands, Inc., 450 U.S. 79, 83 (1981)).

The government argues, and the plaintiffs do not dispute, that the November 6 orders amount to a preliminary injunction. We agree. Regardless of how we resolve this appeal, the consequences are substantial and immediate. If we grant the stay, millions of Americans will not receive their SNAP benefits. If we deny the stay, the district court's orders require the transfer and disbursement of billions of dollars. Further, the district court entered the orders after adversarial briefing and a hearing. See Sampson v. Murray, 415 U.S. 61, 87 (1974). Thus,

the "practical effect" of the orders is a preliminary injunction.
Accordingly, we have jurisdiction under § 1292(a)(1) to consider
this motion.

### B. The Government's Motion

"A stay pending appeal is an 'intrusion into the ordinary
processes of administration and judicial review,'" so this
"'extraordinary' relief" is never "granted as 'a matter of right.'"
Rhode Island v. Trump, 155 F.4th 35, 41 (1st Cir. 2025) (first
quoting New York v. Trump, 133 F.4th 51, 65 (1st Cir. 2025); and
then quoting Somerville Pub. Schs. v. McMahon, 139 F.4th 63, 68
(1st Cir. 2025)).  "As the party seeking a stay pending appeal,
the [government] bears the burden of justifying the extraordinary
relief it requests."  Am. Pub. Health Ass'n v. Nat'l Insts. of
Health, 145 F.4th 39, 47 (1st Cir. 2025) (citing Nken v. Holder,
556 U.S. 418, 433-34 (2009)).

To meet its burden for a stay, the government must
satisfy four well-established requirements.  It must make: "(1) a
strong showing that [it] is likely to succeed on the merits; (2) a
showing that it will be irreparably injured absent a stay; (3) a
showing that the issuance of the stay will [not] substantially
injure the other parties interested in the proceeding; and (4) a
showing that the public interest lies with [it], not the
plaintiffs."  Id. (first two alterations in original) (internal
quotation marks omitted) (quoting Does 1-3 v. Mills, 39 F.4th 20,

24 (1st Cir. 2022)).  When we consider a stay motion, "[w]e rely on the parties to frame the issues for decision."  <u>Rhode Island</u>, 155 F.4th at 41 (internal quotation marks omitted) (quoting <u>New York</u>, 133 F.4th at 66).

The government has asked us to stay two orders entered by the district court on November 6: the enforcement order and the second TRO.[3]  Both of these orders granted the same relief -- full payment of November SNAP benefits, including through the use of the Section 32 fund, by November 7.

In its stay papers, the government largely ignores the enforcement order.  Instead, it focuses on why it is likely to succeed in showing that the district court lacked authority under the APA to require it to expend funds to fully cover November SNAP benefits.  It claims that there are no legal standards against which the district court could review its decision under § 2257 not to draw on Section 32 funds and that Congress left that discretionary decision entirely up to the agency.  In so contending, the government makes a serious argument that, under <u>Lincoln</u> v. <u>Vigil</u>, 508 U.S. 182 (1993), the district court could not review that purely discretionary decision to decline to transfer money in the Section 32 fund to cover SNAP.

_____

[3] The government also asks us to stay the October 31 order "[t]o the extent [that it] require[s] USDA to expend funds beyond the SNAP contingency fund."

But the district court did not order the government to use the Section 32 fund until November 6. It did so after it concluded that the government had failed to comply with its October 31 TRO. As a remedy for that noncompliance, the court ordered the government to make the full payment of November SNAP benefits by November 7. Thus, even if we were to stay the second TRO, the government could not obtain the relief that it seeks unless it also meets its burden under the stay factors as to the enforcement order.

For the reasons that follow, we conclude that the government has failed to meet the stay factors as to the enforcement order, and we deny a stay of that order.

## 1. Likelihood of Success on the Merits

"The most important" of the stay factors is the "likelihood of success on the merits." Akebia Therapeutics, Inc. v. Azar, 976 F.3d 86, 92 (1st Cir. 2020). If the government fails to make a strong showing that it is likely to succeed on the merits, "the remaining elements are of little consequence." Id.

We review an order to enforce a judgment for abuse of discretion, and we see no reason not to apply the same standard to the analogous order here. See Harvey v. Johanns, 494 F.3d 237, 240 (1st Cir. 2007). Nor does the government argue for a different standard in its stay papers. We review the district court's underlying findings of fact in support of its enforcement order

for clear error.  See, e.g., Becky's Broncos, LLC v. Town of Nantucket, 138 F.4th 73, 78 (1st Cir. 2025).  In light of the record and the arguments before us, we conclude that the government has not met its burden to show that the district court abused its discretion in issuing the enforcement order.

　　　　To begin, we emphasize what the parties do not dispute. First, the government agrees that it can use the contingency funds to provide partial November SNAP benefits (despite its initial position that those funds were inaccessible).  Indeed, in its stay papers to us, the government requests a stay only "[t]o the extent [that the district court's orders] require USDA to expend funds beyond the SNAP contingency fund." (Emphasis added.)  Second, the government agrees that it has the authority, under governing statutes including § 2257, to transfer money from the Section 32 fund and use it to pay November SNAP benefits in full.  In fact, when the district court posed this question directly to the government at the October 31 hearing by asking, "You would agree under [a] statutory reading that the agency could use Section 32 to pay benefits?", the government responded, "Yes."  The Section 32 fund contains more than $23 billion.  Thus, there is no dispute that the government could -- as both a legal and practical matter -- pay November SNAP benefits in full by transferring about $4 billion from that fund.  There is also no dispute that if the government were to do so, it would avoid the considerable and

time-consuming technical difficulties that come with making partial payments.

The parties' disagreement centers on the government's decision <u>not</u> to make the transfer from the Section 32 fund. The government argues that the decision is committed to agency discretion by law and that, in any event, the district court erred in concluding that the decision was arbitrary and capricious. <u>See</u> 5 U.S.C. §§ 701(a)(2), 706(2)(A).

But neither of those arguments by the government address the November 6 enforcement order, which directed the government to fully fund November SNAP benefits because of the government's failure to comply with the October 31 TRO. In its stay papers, the government devotes, at most, three sentences to addressing that order.

Specifically, as to the enforcement order, the government states:

> USDA complied with the district court's original injunction by depleting the multi-year contingency fund to make a partial payment of November SNAP benefits but declined to transfer billions of dollars from other food-security programs, like the Child Nutrition Programs. That choice is not reviewable under the APA. Even assuming that USDA has some discretionary authority to transfer funds to support SNAP benefits in the absence of an appropriation for SNAP, the determination of whether to use that authority to deplete funds from one congressionally mandated program to pay for another program with an insufficient appropriation falls

- 19 -

squarely within the APA exception for decisions committed to agency discretion by law. 5 U.S.C. § 701(a)(2).

This limited argument is not persuasive, as the district court's enforcement order was <u>not</u> based on an analysis of the APA. To the contrary, the court made clear that the enforcement order was based on the government's noncompliance with its October 31 TRO. That TRO, it recounted, presented the government with two options: either "use Section 32 funds, contingency funds, or both to make a full payment of SNAP benefits," or "use contingency funds to make a partial payment of SNAP benefits." If the government chose the latter option, the district court explained, it was required to "expeditiously resolve the administrative and clerical burdens" and "under no circumstances shall the partial payments be made later than" November 5. The district court granted the motion to enforce because it determined that the government "did neither."

Of course, the government argued to the district court that it did comply with the October 31 TRO because it exhausted the contingency funds to issue partial payments. But the district court disagreed. And the government's bare assertion in its stay motion, which we quote above, falls far short of a strong showing that it is likely to succeed in demonstrating that the district court erred in finding otherwise.

As the district court properly considered in issuing the enforcement order, USDA knew at the very latest by

October 10 -- the day it sent its first memorandum to the states -- that normal appropriations would be unavailable to cover November benefits. It also knew full well that making partial payments would be technically difficult, as it had never been done before. But it proceeded to do nothing to attempt to solve that problem over the following three weeks. It made no calculations, prepared no tables, and took no other logistical steps to prepare for a shortfall.

Instead, in an unexplained reversal from its 2019 position, the government announced that it would make no November SNAP payments at all because it lacked the authority to use the contingency funds. Once this litigation began, the government then changed its position again -- it agreed that it could access the backup funding sources. But it was, in the government's telling, essentially too late at that point. Making partial payments that would actually reach individuals in any reasonable time period was too difficult, and the government decided that accessing the Section 32 fund to make full payments was imprudent. Yet, even after the October 31 TRO issued, and knowing all this, the government chose the partial funding of November SNAP benefits that the order permitted only if those partial benefits would be available expeditiously and by a certain date.

The district court concluded that the government's actions "undermined both the intent and the effectiveness" of its

October 31 TRO.  As it explained, the government "knew that, at the time [it] chose [to issue partial payments], [it] would be prolonging implementation and frustrating the very purpose of the TRO."  The stay motion at no point addresses this basis for the district court's finding that the government did not comply with the October 31 TRO.

The government does assert at one point that "[t]he district court also erred by concluding it was unreasonable for USDA to 'choose to go down this path [of a partial payment] in light of the difficulties and delays attendant to making a partial payment.'"  And, in support of that argument, the government points out that "in the separate case in Massachusetts, the [s]tates have admitted that some of them are technologically prepared to implement partial benefits immediately."  It then contends that "[a]ny delays on the part of the [s]tates, who are not party to this suit, [and] that are not so prepared are beyond the control of USDA."

But even if we treat the government's argument on this point as disputing the finding that it did not comply with the October 31 TRO, we do not see how the government has made a strong showing that it is likely to succeed in challenging that finding.  The district court held that the government undermined its October 31 order by proceeding down the partial funding path while knowing that doing so would not result in satisfying the conditions

established in that order.  The government simply does not address that basis for the district court's finding of noncompliance.

"[F]ederal courts are not reduced to issuing injunctions . . . and hoping for compliance.  Once issued, an injunction may be enforced."  Hutto v. Finney, 437 U.S. 678, 690 (1978), abrogation on other grounds recognized by, Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz, 601 U.S. 42, 56 (2024).  "[T]he question whether a party adequately has complied with a court order is a matter peculiarly within the ken of the judge who issued the order."  Faigin v. Kelly, 184 F.3d 67, 84 (1st Cir. 1999).  And a court has "great discretion when deciding how to enforce violations of its own orders."  Eagle Comtronics, Inc. v. Arrow Commc'n Lab'ys, Inc., 305 F.3d 1303, 1314 (Fed. Cir. 2002); see also Kemp v. Peterson, 940 F.2d 110, 113 (4th Cir. 1991) ("[T]he general rule [is] that a court is authorized to issue all orders necessary to enforce orders it has previously issued in the exercise of its jurisdiction.").

Here, the district court fashioned a remedy to ensure that its October 31 TRO was followed, after considering the government's noncompliance and concluding that the obstacles it claimed existed were in fact "the foreseeable result of [the government's] own choices."  That remedy -- requiring the government to "make full SNAP payments . . . by utilizing available Section 32 funds in combination with the contingency

funds" -- directly relates to the court's October 31 TRO.  And the government does not argue in its stay motion that the enforcement order was an improper remedy for its noncompliance with the October 31 TRO to the extent that it failed to comply with that order.

In sum, the government fails to meaningfully challenge the district court's determination that it failed to comply with the October 31 TRO.  Nor does the government advance any argument that the district court lacked authority to order the full funding of November SNAP benefits as a means of addressing any such noncompliance.  The government has thus failed to make a "strong showing" that it is likely to succeed on the merits -- that is, to show that the district court abused its discretion in granting the motion to enforce.

To be sure, the government does argue that the district court lacked authority to issue the October 31 TRO to the extent that order requires the government to fully fund the November SNAP benefits.  It contends that "Congress clearly contemplated that USDA would reduce allotments when faced with a shortfall in annual appropriations."  To support this point, it emphasizes that the governing statute instructs that USDA "shall" make partial payments.  Nevertheless, the government does not contest that it did not even begin to follow the regulatory process for making partial payments until the district court ordered it to do so.

That is apparently why the government had to correct its own mathematical calculations mid-stream, by informing the states on November 4 that contingency funds could cover 65 percent of November payments, as opposed to 50 percent of such payments, as the government had indicated on the previous day.

In any event, the district court has now found that the government failed to comply with that October 31 TRO, from which no stay was sought and no appeal was taken that would have prevented the order from taking effect during the period of alleged noncompliance. Thus, for present purposes, the question that the government's motion to stay the enforcement order presents is this: Has the government made a strong showing that it is likely to succeed in establishing either (a) that the district court erred in finding noncompliance with the October 31 TRO or (b) that, insofar as it did not err in that regard, it could not order full funding in consequence of that noncompliance?

As we have explained, the answer is no. In the single paragraph it devotes in its stay motion to addressing the enforcement order, the government does not make a strong showing of likely success in either respect. And in the only other passage of the stay motion that could be read to address the finding of noncompliance, the government fails to grapple with the actual basis for that finding.

## 2. The Remaining Stay Factors

Having determined that the government has failed to make a strong showing of success on the merits, we turn to the remaining three stay factors. The government's arguments as to these factors fail to establish it is entitled to the "'extraordinary' relief" it seeks. Rhode Island, 155 F.4th at 41 (quoting Somerville Pub. Schs., 139 F.4th at 68).

We begin by considering the risk of irreparable harm to the government in the absence of a stay. See id. at 47. The government makes one argument: Dipping into the Section 32 fund, it contends, will disrupt other federal nutrition benefits -- the Child Nutrition Programs (CNP) -- that draw primarily from that fund. According to the government, if $4 billion is drawn from the Section 32 fund and Congress does not make any supplemental appropriations for the fund or the CNP in Fiscal Year 2026, those programs will run out of money sometime next calendar year.[4] The loss of federal funds can be irreparable harm.[5] See Dep't of Educ. v. California, 604 U.S. 650, 651-52 (2025) (per curiam). As the

---

[4] The district court credited the plaintiffs' assertion that, if $4 billion were transferred to SNAP, the CNP would still be fully funded at least through May 2026 because CNP benefits amount to about $3 billion per month.

[5] That said, we do not credit the government's argument that "[t]his concern will be paramount particularly if the district court were to conclude that USDA should be required to tap these funds again in December." The orders before us include no such requirement.

plaintiffs point out, however, the government bears the burden of demonstrating that it "<u>will</u> be irreparably injured absent a stay," <u>Rhode Island</u>, 155 F.4th at 41 (emphasis added) (quoting <u>Nken</u>, 556 U.S. at 434), and we cannot see how these speculative predictions amount to making that showing, <u>see</u> <u>New York</u>, 133 F.4th at 72.

The third and fourth stay factors, which the government does not address in any meaningful way, require us to consider any substantial injuries to other parties from a stay and where the public interest lies. The harm from a stay would be immense. The government, understandably, makes no attempt to argue otherwise. As we have already noted, tens of millions of Americans rely on monthly SNAP benefits to pay for food. In support of their motion for a TRO, the plaintiffs provided overwhelming evidence of the harms that even a short suspension of benefits would cause, including numerous declarations from SNAP beneficiaries and those who serve them. Those declarations describe a pregnant mother in Georgia forced to skip meals to feed her son; a working grandfather in Massachusetts who would eat twice instead of three times a day to feed his family; a mother in North Carolina who worries about how feeding her three children less will affect their health; and a nonprofit leader in Rhode Island whose clients will be forced to choose whether to "heat or eat" as the holidays approach and winter bears down on New England. These immediate, predictable, and unchallenged harms facing forty-two million Americans who rely on

SNAP benefits -- including fourteen million children -- weigh heavily against a stay.

In reviewing the district court's balancing of the equities, we also cannot ignore the particular events preceding this litigation. As the district court found, "this is a problem that could have been avoided." The record here shows that the government sat on its hands for nearly a month, unprepared to make partial payments, while people who rely on SNAP received no benefits a week into November and counting. In light of these unique facts, we cannot conclude that the district court abused its discretion in requiring full payment of November SNAP benefits to effectuate the October 31 TRO after the government had failed to comply with it. See Hecht Co. v. Bowles, 321 U.S. 321, 329 (1944) (explaining that courts sitting in equity "mould each decree to the necessities of the particular case").

Taking the four stay factors together, the government has failed to show it is entitled to the extraordinary relief of a stay. It has not made a strong showing that it is likely to succeed on the merits. Nor does it refute the extensive record evidence of the enormous injury to individuals around the country that a stay would cause. We do not take lightly the government's concern that money used to fund November SNAP payments will be unavailable for other important nutrition assistance programs. But we cannot conclude that the district court abused its

discretion in determining that the overwhelming evidence of widespread harm that a stay would cause right now, by leaving tens of millions of Americans without food as winter approaches, outweighed the potential monetary harm to the government and CNP, months into the future. Thus, we reject the government's stay request as to the order granting the motion to enforce based on noncompliance with the October 31 TRO.

### C. Second TRO

That leaves the second TRO, issued on November 6. That order granted the same relief as the enforcement order, and plaintiffs requested the second TRO only in the alternative, if the district court denied the motion to enforce. Thus, we stay the second TRO so long as the enforcement order remains in full force and effect.

### III. Conclusion

For all these reasons, the government's motion for a stay pending appeal is **denied in part**.[6]

---

[6] A number of local governments, states, and former governors have moved for leave to file amicus curiae briefs in support of the plaintiffs-appellees. We grant the motions, and the proposed briefs are accepted as filed. We consider these briefs only insofar as they concern legal issues and positions raised by the parties. See Ryan v. U.S. Immigr. & Customs Enf't, 974 F.3d 9, 33 n.10 (1st Cir. 2020).