**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| RHODE ISLAND STATE COUNCIL OF CHURCHES, *et al.*,<br><br>    *Plaintiffs,*<br><br>v.<br><br>BROOKE ROLLINS*, et al.*,<br><br>    *Defendants.* | Case No. 25-cv-569-JJM-AEM |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL
SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION .................................................................................................... 1

FACTUAL AND LEGAL BACKGROUND .............................................................. 2

    A.   The SNAP program provides critical support to food-insecure Americans. . 2

    B.   SNAP mandates that recipients meet work requirements unless they are specifically exempted. ..................................................................................... 4

    C.   USDA grants waivers of the ABAWD work requirement in States and areas with limited employment opportunities. .............................................. 6

    D.   USDA prematurely terminates existing waivers of the ABAWD work requirement. ..................................................................................................... 7

    E.   The early termination of ABAWD waivers harms Plaintiffs. ..................... 10

    F.   Procedural History ..................................................................................... 16

LEGAL STANDARD ............................................................................................. 17

ARGUMENT .......................................................................................................... 18

    I.   Plaintiffs have standing ............................................................................... 18

    II.   The early termination of ABAWD waivers exceeds statutory authority and is arbitrary and capricious. ....................................................................... 20

       A.   The early termination is a reviewable final agency action ......................... 20

       B.   The early termination exceeds Defendants' statutory authority. ............... 21

       C.   The early termination is arbitrary and capricious. .................................... 23

CONCLUSION ....................................................................................................... 27

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Abbott Labs v. Gardner*, 387 U.S. 136 (1967) .............................................................. 21

*Bennett v. Spear*, 520 U.S. 154 (1997) ......................................................................... 20

*Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42 (1st Cir. 2016) .............. 17

*City of Arlington v. FCC*, 569 U.S. 290 (2013) ............................................................. 21

*DHS v. Regents of Univ. of Cal.*, 591 U.S. 1 (2020) ............................................... 24, 25

*Drs. for Am. v. OPM*, 793 F. Supp. 3d 112 (D.D.C. 2025) ......................................... 21

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ......................................... 23

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021) ............................................. 23

*Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) ............. 18, 19

*Hall v. Evans*, 165 F. Supp. 2d 114 (D.R.I. 2001) ...................................................... 24

*Harrison v. PPG Indus., Inc.*, 446 U.S. 578 (1980) ..................................................... 21

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ............................................... 18

*Heart 6 Ranch, LLC v. Bernhardt*, 365 F. Supp. 3d 105 (D.D.C. 2019) .................... 17

*La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986) ................................................. 21

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ............................................. 22

*Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277 (D. Mass. 2025) ........................................................................................................................ 26

*McBreairty v. Miller*, 93 F.4th 513 (1st Cir. 2024) ..................................................... 18

*Michigan v. EPA*, 576 U.S. 743 (2015) ........................................................................ 24

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) ..................................... 26

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
 463 U.S. 29 (1983) ..................................................................... 23, 25

*New York v. Kennedy*, 789 F. Supp. 3d 174 (D.R.I. 2015) ......................................... 24

*Ohio v. EPA*, 603 U.S. 279 (2024)..................................................................... 23, 24

*Omnipoint Holdings, Inc. v. City of Cranston*, 586 F.3d 38 (1st Cir. 2009) .............. 21

*Ortiz-Bonilla v. Federacion de Ajedrez de Puerto Rico, Inc.*, 734 F.3d 28
 (1st Cir. 2013) ..................................................................................... 26

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47 (2006) ................... 18

*Scottsdale Ins. Co. v. United Rentals (N. Am.), Inc.*, 977 F.3d 69 (1st Cir.
 2020)..................................................................................................... 17

*Sig Sauer, Inc. v. Brandon*, 826 F.3d 598 (1st Cir. 2016) ......................................... 21

*Trenkler v. United States*, 268 F.3d 16 (1st Cir. 2001)............................................... 22

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S.
 544 (1996)............................................................................................. 19

*Viscito v. Nat'l Plan. Corp.*, 34 F.4th 78 (1st Cir. 2022)............................................. 17

## STATUTES AND REGULATIONS

5 U.S.C. § 704 ......................................................................................................... 20

5 U.S.C. § 705 ................................................................................................... 16, 27

5 U.S.C. § 706 ........................................................................................ 20, 21, 23, 26

7 U.S.C. § 2011 .......................................................................................................... 2

7 U.S.C. § 2013 .......................................................................................................... 4

7 U.S.C. § 2015 ........................................................................................ 4, 5, 6, 7, 22

7 U.S.C. § 2018 .......................................................................................................... 4

7 U.S.C. § 2020 .......................................................................................................... 4

iii

Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, 122
    Stat. 1853 (2008) ................................................................................................... 2

7 C.F.R. § 273.24 ................................................................................................... 5, 6, 22

**OTHER AUTHORITIES**

Cong. Budget Off., *Estimated Effects of Public Law 119-21 on
    Participation and Benefits Under the Supplemental Nutrition
    Assistance Program (2025)* (Aug. 11, 2025), https://perma.cc/LNV8-
    2FVA ......................................................................................................................... 7

Cong. Rsch. Serv., R48531, *Work Requirements: Existing Policies in
    Medicaid, SNAP, Housing Assistance, and TANF* (June 25, 2025),
    https://perma.cc/L94B-B75F ................................................................................ 2

USDA Food & Nutrition Serv., *SNAP Eligibility* (Sept. 30, 2025),
    https://perma.cc/MEY4-SBXJ .............................................................................. 3

Nat'l Assoc. of Counties, *H.R. 1 and the Supplemental Nutrition
    Assistance Program (SNAP): What Counties Should Know* (Aug. 13,
    2025), https://perma.cc/V924-F28L .................................................................... 4

USDA Food & Nutrition Serv., *Supplemental Nutrition Assistance
    Program - Clarifications on Work Requirements, ABAWDs, and
    E&T - May 2018* (May 25, 2018), https://perma.cc/6J4A-8RHH ...................... 5

USDA Econ. Rsch. Serv., *Supplemental Nutrition Assistance Program
    (SNAP) – Key Statistics and Research* (July 24, 2025),
    https://perma.cc/NST2-C9KL ............................................................................... 3

USDA Food and Nutrition Serv., *A Short History of SNAP* (Aug. 29, 2025),
    https://perma.cc/BU2Q-3MYA .............................................................................. 2

USDA Food and Nutrition Serv., *Characteristics of SNAP Households:
    Fiscal Year 2023* (May 2, 2025), https://perma.cc/X4EY-B8W7 ...................... 3

USDA Food and Nutrition Serv., *ABAWD Waivers* (updated Aug. 29,
    2025), https://perma.cc/88ES-S6D3 .................................................................... 6

USDA Econ. Rsch. Serv., *The Food and Nutrition Assistance Landscape:
    Fiscal Year 2024 Annual Report* at 9 (July 2025),
    https://perma.cc/BV5D-ZM98 ............................................................................... 3

**INTRODUCTION**

The Supplemental Nutrition Assistance Program (SNAP) provides more than forty million U.S. residents with support for their basic nutritional needs. It does so on the condition that recipients meet work requirements unless they qualify for an exemption. The most stringent work requirement applies to "able-bodied adults without dependents" (ABAWDs), who cannot receive SNAP benefits for more than three full months within a three-year period unless they complete a certain number of work, job training, or workfare hours each month.

Historically, the federal government mitigated the harsh effects of these requirements by granting one-year waivers for geographic areas with insufficient jobs. In 2025, Congress amended the law to provide that only areas with an unemployment rate over 10 percent—more than twice the national rate—will be eligible for such waivers going forward. But rather than simply following the new law, the U.S. Department of Agriculture (USDA) took the additional step of cutting off all existing ABAWD waivers granted under the old authority—despite having no basis in statute or otherwise, which is confirmed by an Administrative Record that barely attempts to justify the choice. Defendants' action leaves more than a million individuals in areas with insufficient jobs with a sooner-than-expected requirement to find work or lose their benefits and leaves organizations and municipalities like Plaintiffs to fill significant gaps in the meantime.

There is no genuine dispute as to any material fact, and the undisputed record establishes that Plaintiffs are entitled to judgment on each of their claims challenging the ABAWD waivers' early termination. This Court should therefore grant Plaintiffs'

1

motion for partial summary judgment; declare unlawful, vacate, and set aside the early termination of ABAWD waivers; permanently enjoin Defendants from enforcing, implementing, giving effect to, maintaining, or reinstating under a different name the termination of ABAWD waivers before the waivers' expiration dates; and stay Defendants' early termination, such that all previously approved ABAWD waivers remain in effect until they expire by their own terms.

## FACTUAL AND LEGAL BACKGROUND

### A. The SNAP program provides critical support to food-insecure Americans.

While federally funded food assistance dates back to the Great Depression, Congress created the most recent iteration, known as SNAP, in the Food and Nutrition Act of 2008. Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, §§ 4001–4002, 122 Stat. 1853 (2008); *see also* USDA Food and Nutrition Serv., *A Short History of SNAP* (Aug. 29, 2025), https://perma.cc/BU2Q-3MYA. With the SNAP program, Congress aimed to "alleviate . . . hunger and malnutrition" among low-income households by enabling them to "obtain a more nutritious diet through normal channels of trade." 7 U.S.C. § 2011. It does that by providing eligible individuals an allotment that they can use to buy food at approved retailers. *Id.* § 2013(a)(1). USDA administers the program. *Id.*

Today, SNAP is the nation's largest domestic food assistance program, and it provides critical support to food-insecure individuals and families across the country. Ausenberg, et al., Cong. Rsch. Serv., R48531, *Work Requirements: Existing Policies in Medicaid, SNAP, Housing Assistance, and TANF* 1 (June 25, 2025),

2

https://perma.cc/L94B-B75F. In fiscal year 2024, the program served an average of 41.7 million people per month—about one in eight U.S. residents. Over one-third of SNAP participants are children. USDA Food and Nutrition Serv., *Characteristics of SNAP Households: Fiscal Year 2023* (May 2, 2025), https://perma.cc/X4EY-B8W7. And the vast majority—88 percent in fiscal year 2023—are in households with either a child, an elderly individual, or a person with a disability. *Id.* SNAP provides Americans approximately $8 billion in food assistance monthly. USDA Econ. Rsch. Serv., *The Food and Nutrition Assistance Landscape: Fiscal Year 2024 Annual Report* at 9 (July 2025), https://perma.cc/BV5D-ZM98.

In addition to serving as the first line of defense against hunger, SNAP reduces poverty, improves health and economic outcomes, and supports working people who are paid low wages. It also benefits the economy more broadly, with USDA estimating that, in a slowing economy, $1 billion of SNAP benefits generates more than $1.5 billion in economic activity and creates more than 13,500 new jobs. USDA Econ. Rsch. Serv., *Supplemental Nutrition Assistance Program (SNAP) – Key Statistics and Research* (July 24, 2025), https://perma.cc/NST2-C9KL. SNAP benefits are capped at $298 per month for a single-person household. USDA Food & Nutrition Serv., *SNAP Eligibility* (Sept. 30, 2025), https://perma.cc/MEY4-SBXJ. But most households receive less. On average, participants received $187 per month from SNAP in fiscal year 2024 to help cover food costs. USDA Econ. Rsch. Serv., *Supplemental Nutrition Assistance Program (SNAP) – Key Statistics and Research* (July 24, 2025), https://perma.cc/NST2-C9KL.

USDA and States jointly administer the SNAP program, with States handling most recipient functions, like determining eligibility and issuing benefits, and USDA's Food and Nutrition Service supporting and overseeing State functions and approving retailers to accept SNAP benefits. 7 U.S.C. §§ 2018, 2020. Ten States delegate administrative responsibilities to counties such that SNAP is county-administered in those States. Nat'l Assoc. of Counties, *H.R. 1 and the Supplemental Nutrition Assistance Program (SNAP): What Counties Should Know* (Aug. 13, 2025), https://perma.cc/V924-F28L. The federal government funds all SNAP benefits, 7 U.S.C. § 2013(a), and the federal government and States share administrative costs, *id.* § 2025(a).

### B. SNAP mandates that recipients meet work requirements unless they are specifically exempted.

The Food and Nutrition Act generally requires capable individuals to work in order to be eligible for SNAP benefits. In particular, SNAP imposes two work requirements: a general one and one that applies to people classified as "able-bodied adults without dependents" (ABAWDs). 7 U.S.C. § 2015(d), (o). Under the general work requirement, individuals aged 16 to 59 and "physically and mentally fit" must, with certain exceptions, register for employment, participate in an employment and training program if offered by their State, take a suitable job if offered, and not voluntarily quit (or reduce their hours below 30 per week) without good cause. *Id.* § 2015(d)(1).

The ABAWD-specific rules impose an additional, more stringent requirement on adults aged 18 to 64, unless they are excused from the general work requirement;

4

certified as physically or mentally unfit for employment; a parent or other member of a household that includes a minor under 14; or pregnant. *Id.* § 2015(o)(3).[1] Adults who do not fall into any of those exemptions, classified as ABAWDs, are limited to receiving only three months of SNAP benefits every three years unless they work for at least 80 hours per month, participate in a State employment and training program for the same amount of time, or participate in workfare for a number of hours based on their individual SNAP benefit amount. *Id.* § 2015(o)(2); 7 C.F.R. § 273.24(a). States are not required to offer ABAWDs a slot in an employment and training program or a workfare program. USDA Food & Nutrition Serv., *Supplemental Nutrition Assistance Program - Clarifications on Work Requirements, ABAWDs, and E&T - May 2018* (May 25, 2018), https://perma.cc/6J4A-8RHH.

SNAP recipients who are subject to the ABAWD work requirement but do not comply face a steep penalty. *See* 7 C.F.R. § 273.24(b). A SNAP recipient who does not comply with the requirements for one month while receiving benefits accrues what is referred to as a "countable month." *Id.* A recipient who accrues three countable months (whether consecutive or not) loses eligibility for SNAP benefits for any month in the ensuing three years in which they do not meet the ABAWD work requirement. 7 U.S.C. § 2015(o)(2), (5). Each State determines how to measure and track the three-year period, known as a "clock." 7 C.F.R. § 273.24(b)(3). A SNAP recipient who loses

---

[1] Before the passage of H.R. 1 in July 2025, the SNAP statute exempted additional categories of adults from the ABAWD requirement, including all adults aged 55 to 64, veterans, former foster youths, and those experiencing homelessness. *See* 7 U.S.C. § 2015(o)(3) (2024).

5

eligibility after not meeting the ABAWD work requirement for three months may regain eligibility by complying with the ABAWD work requirement in a subsequent month. 7 U.S.C. § 2015(o)(5). However, if the recipient then does not meet the work requirement for three months again, their benefits will be terminated, and they will be ineligible to receive SNAP benefits for the remainder of the three-year period during any time when they are not meeting the minimum work requirement. *Id.* § 2015(o)(5)(C). Thus, accruing "countable months" has lasting legal and practical consequences for recipients throughout the pending three-year period.

### C. USDA grants waivers of the ABAWD work requirement in States and areas with limited employment opportunities.

To mitigate the harsh effects of these requirements on individuals who live in areas with limited employment opportunities, the SNAP statute permits States to request a waiver of the ABAWD three-month time limit in certain circumstances. Before the passage of H.R. 1 in July 2025, the Food and Nutrition Act allowed States to obtain a waiver of the ABAWD time limit for areas with "an unemployment rate over 10 percent" or that lacked "a sufficient number of jobs to provide employment" for recipients in that area. 7 U.S.C. § 2015(o)(4)(A) (2024). Pursuant to that provision, many States requested, and USDA granted, waivers. Administrative Record (AR) 1-466 (State Waiver Requests and Approval Letters); *see also* USDA Food and Nutrition Serv., *ABAWD Waivers* (updated Aug. 29, 2025), https://perma.cc/88ES-S6D3. Those waivers generally last for one year. 7 C.F.R. § 273.24(f)(5). States planned their operations and budgets around those waivers.

6

In H.R. 1, Congress amended the waiver provision such that, now, States may obtain waivers only for areas with "an unemployment rate of over 10 percent." 7 U.S.C. § 2015(o)(4)(A). USDA can no longer grant waivers for areas that merely lack "a sufficient number of jobs." *See id.* H.R. 1 does not purport to have any retroactive effect, nor does it grant USDA new authority to terminate existing waivers.

At the time H.R. 1 was enacted, more than 25 States had active ABAWD waivers. Those waivers each had different end dates, with the latest ones expiring in June 2026. *See, e.g.*, AR 158-61 (granting Minnesota's waiver request through June 2026). As of August 2025, the Congressional Budget Office estimated that, in an average month, roughly one million people retained SNAP eligibility because they live in areas covered by an ABAWD waiver granted under the pre-H.R. 1 "lack of sufficient jobs" criteria. Cong. Budget Off., *Estimated Effects of Public Law 119-21 on Participation and Benefits Under the Supplemental Nutrition Assistance Program (2025)* (Aug. 11, 2025), https://perma.cc/LNV8-2FVA. Defendants' own estimate is even higher: USDA's Evidence, Analysis and Regulatory Affairs Office estimated that more than 1.8 million individuals otherwise subject to the ABAWD work requirement were covered by waivers as of August 2025. *See* AR 468 (Chart of 2025-08-21 Active ABAWD Waivers).

### D. USDA prematurely terminates existing waivers of the ABAWD work requirement.

On October 3, 2025, more than two months after H.R. 1's passage, USDA announced for the first time and without warning that it would terminate existing ABAWD waivers early. AR 469-70 (OBBB ABAWD Waiver – Termination Letter). In

an "Implementation Memorandum" entitled "Supplemental Nutrition Assistance Program Provisions of the One Big Beautiful Bill Act of 2025 — ABAWD Waivers," USDA stated not only that it would "review all future waiver requests" under H.R. 1's new standards but that it would go further—beyond what H.R. 1 requires or authorizes—by terminating existing ABAWD waivers that had been approved under the prior "lack of sufficient jobs" criteria. AR 471-74 (OBBB Implementation Memorandum – ABAWD Waivers). The memo provided that the termination would be effective 30 days later, *i.e.*, on November 2, 2025, but USDA also encouraged States to terminate their own waivers even earlier. *Id.* A full list of waivers that, by their own terms, expire after November 2, 2025, is below. *See* AR 468 (Chart of 2025-08-21 Active ABAWD Waivers). By Defendants' own estimate, they cover nearly 1.6 million people across 18 States. *See id.*

| State/Territory | Waiver Expiration Date | Waiver Coverage |
| --- | --- | --- |
| Connecticut | 11/30/2025 | Partial |
| Kentucky | 11/30/2025 | Partial |
| District of Columbia | 12/31/2025 | Statewide |
| New Mexico | 12/31/2025 | Partial |
| Oregon | 12/31/2025 | Partial |
| Virgin Islands | 12/31/2025 | Statewide |
| California | 1/31/2026 | Statewide |
| Illinois | 1/31/2026 | Statewide |
| Nevada | 1/31/2026 | Statewide |
| New Jersey | 1/31/2026 | Partial |
| Washington State | 1/31/2026 | Partial |
| Guam | 2/28/2026 | Statewide |
| Michigan | 2/28/2026 | Partial |

8

| New York | 2/28/2026 | Partial |
|---|---|---|
| Rhode Island | 2/28/2026 | Partial |
| Minnesota | 6/30/2026 | Partial |
| Montana | 6/30/2026 | Partial |
| North Dakota | 6/30/2026 | Partial |

USDA's premature termination of ABAWD waivers imposes a demanding and complex change in SNAP administration on a newly compressed timeframe, which gives States and SNAP recipients less time to prepare for and adjust to H.R. 1's modified ABAWD exemption categories and other rules. The "Implementation Memo" advised States that they "must prepare to enforce the time limit" in areas that will no longer be covered by a waiver, and specified that, "[a]t a minimum," this would "include updating eligibility systems, notifying SNAP households of the time limit, and training eligibility workers." AR 471-74 (OBBB Implementation Memorandum – ABAWD Waivers). The Memo also advised States to screen work registrants to determine whether to refer them to a SNAP employment and training program. *Id*. Thus, USDA directed States to begin enforcing ABAWD time limits and assessing countable months for failure to meet the ABAWD work requirement, while at the same time acknowledging that State agencies are expected to update systems, provide notice to thousands of recipients (some of whom are newly subject to the ABAWD work requirement altogether under H.R. 1's exemption changes), train or retrain their workers, and screen participants for potential referral to an employment and training program.

9

**E. The early termination of ABAWD waivers harms Plaintiffs.**

The early termination of States' previously approved ABAWD waivers harms Plaintiffs—including United Way of Rhode Island (UWRI), New York Legal Assistance Group (NYLAG), Federal Hill House (FHH), National Council of Nonprofits (NCN), City of Central Falls, City of Providence, and City of Pawtucket—their members and constituents, and many others.

SNAP recipients who are subject to the ABAWD requirement in jurisdictions whose waivers are terminated early face a potential loss of benefits earlier than they expected under the original expiration date. And they will immediately have to meet—and figure out how to meet—new work requirements that until now had been waived precisely because of the lack of sufficient jobs in their communities. *See, e.g.*, AR 287-300 (NY Waiver Request and Approval); AR 367-77 (RI Waiver Request and Approval). They will also be doing so in jurisdictions that previously administered SNAP with a waiver in place but now must adapt and create new systems, on a compressed timeframe, to assess SNAP eligibility under new requirements. *See* Decl. of Abby Biberman (Biberman Decl.) ¶ 18, ECF No. 3-15. As a result, Plaintiffs that provide ABAWD SNAP recipients with critical assistance will suffer critical injuries to their resources and missions. *See id.*

For example, **United Way of Rhode Island** operates Rhode Island's only 211 Contact Center and Aging and Disability Resource Center (ADRC), which is a central access point for residents seeking help with benefits, employment, and community resources. Decl. of Cortney M. Nicolato (Nicolato Decl.) ¶ 23, ECF No. 3-13. "UWRI serves a significant population of individuals . . . who will be subject to ABAWD work

requirements when [Rhode Island's] waiver expires," *id.* ¶ 20, and in the organization's experience, "[w]hen individuals lose SNAP benefits, they turn to trusted organizations like United Way for help understanding what happened and what to do next," *id.* ¶ 17. In anticipation of the planned termination of Rhode Island's waiver, starting February 3, 2026, UWRI will be disseminating information, answering questions, and debunking myths about the ABAWD work requirement at weekly office hours coordinated by the Rhode Island Departments of Human Services and Labor & Training. 1/22/26 Decl. of Cortney M. Nicolato (1/26 Nicolato Decl.) ¶¶ 4-6. However, a sudden early termination of the ABAWD waiver would interfere with these public education plans, causing Rhode Islanders instead to experience unnecessary confusion, fear, and frustration that will lead to a significant increase in the number of individuals contacting UWRI for individualized information about their benefits, referrals to appropriate employment opportunities, and direct support, as well as a rise in in-person visits and outreach requests. *Id.* ¶¶ 7-9. UWRI staff would therefore face an influx of calls and cases requiring complex explanations of new rules, employment requirements, and reinstatement procedures, which would not only strain UWRI's contact center capacity, but also extend to UWRI's outreach, community impact, and partnership networks. Nicolato Decl. ¶ 24. As more residents seek urgent help due to the ABAWD waiver's early termination, UWRI anticipates reducing capacity for its programs that focus on long-term stability, such as financial empowerment, education, workforce development, and equity initiatives, as well as slowing partnership development across the broader community impact landscape.

11

*Id.* ¶ 26; *see also* 1/26 Nicolato Decl. ¶ 10. Moreover, the heightened demand would stretch UWRI's human and financial resources beyond sustainable limits, as overtime costs would rise, staff fatigue and burnout would increase, and its ability to maintain timely responses across all 211 and ADRC call categories would decline. Nicolato Decl. ¶ 25. In effect, dealing with this policy shift—even just a few weeks earlier than expected—could disrupt the entire ecosystem of assistance that UWRI provides to tens of thousands of Rhode Islanders every year. *Id.*

**New York Legal Assistance Group** provides New Yorkers in need with comprehensive, free civil legal services, including through its Public Benefits Unit, which serves clients who are experiencing barriers to accessing and maintaining public benefits like SNAP. Biberman Decl. ¶¶ 4, 5. Like UWRI in Rhode Island, NYLAG is often the first call for clients and partner organizations who are experiencing changes in public benefits administration—especially when, like the early termination of the ABAWD waiver, changes are unplanned. *Id.* ¶¶ 17-20. NYLAG expects to be inundated with requests from clients and community partners if New York's ABAWD waiver is prematurely terminated. *Id.* ¶ 18. In response, NYLAG will have to assess each client's eligibility for an exemption from work requirements, assist clients in gathering and submitting documentation, and advise clients about how to comply with relevant appointments for ABAWD-qualifying work activities. *Id.* NYLAG will also have to develop materials that can be shared with partner organizations. *Id.* ¶ 21. These tasks will place a substantial burden on NYLAG's Public Benefits Unit staff. *Id.* ¶¶ 18, 21. Given that the Public Benefits Unit

12

has limited staff and is already operating at or beyond capacity, directing time and effort to addressing this anticipated surge in clients will divert NYLAG's resources from other clients who need assistance and other areas of essential legal support. *Id.* ¶ 21.

**Federal Hill House** serves more than 7,500 households in Providence and the surrounding communities with emergency food assistance and other support services across an individual's lifespan. Decl. of Kimberly Fernandez (Fernandez Decl.) ¶ 5, ECF No. 3-11. FHH was early in the process of building capacity for benefits assistance when Defendants announced the early termination of the ABAWD waiver, and it will now have to divert resources from its parent education and family support programs to meet the sudden need to educate and assist individuals regarding the new changes. *Id.* ¶ 37. At the same time, FHH will need to expand its food assistance operations to fill some of the gap for individuals losing their benefits earlier than expected. *Id.* ¶ 39. Even though FHH would have had to navigate many of these same challenges when the ABAWD waivers naturally expired, the early termination requires its staff to spend more resources educating themselves and developing new systems on a compressed timeframe, as it diminishes their ability to plan ahead, as well as providing emergency food assistance for additional time. *Id.* ¶¶ 37, 39. As FHH's Executive Director put it, "each additional day that ABAWDs are at risk of losing SNAP eligibility, more families will go hungry, more resources will be diverted from FHH's other critical programs, and more damage will be done to our ability to fulfill our mission of supporting individuals and families across the lifespan." *Id.* ¶ 41.

13

**National Council of Nonprofits** is the largest network of nonprofit organizations in North America, with more than 32,000 organizational members nationwide, including organizations that provide direct emergency food assistance to food-insecure individuals or help them obtain benefits. Decl. of Diane Yentel (Yentel Decl.) ¶¶ 1, 2, 5, ECF No. 3-3; *see also* Nicolato Decl. ¶ 3 (stating that UWRI is a member of NCN). For example, NCN member Brothers Building A Better Nation (BBABN) serves a population that is significantly impacted by the early termination of New Jersey's waiver, as more than 90 percent of its community members are both eligible for SNAP benefits and subject to ABAWD requirements. Declaration of Quadeer Porter (Porter Decl.) ¶¶ 6, 15, ECF No. 3-16. BBABN provides support with SNAP applications and job placement, and it expects to be inundated with requests for help in light of the sudden changes to its constituents' eligibility and work requirements. *Id.* ¶¶ 17, 19. BBABN expects to spend considerable staff time educating itself and its constituents about the new requirements; hire advocates to represent its constituents at their SNAP hearings; and put time into helping its constituents track their work hours. *Id.* ¶ 19. BBABN will have to divert resources from its other critical programs to meet this need, as it is already stretched thin. *Id.* ¶¶ 18, 19.

**The Cities of Providence, Central Falls, and Pawtucket** have significant populations of SNAP recipients who are subject to the ABAWD work requirement and who will have difficulty finding work given USDA's own determination that there are insufficient jobs in these areas. AR 367-77 (RI Waiver Request and Approval). In

14

addition, the residents in these cities who are subject to ABAWD requirements already face significant barriers to employment, including limited English proficiency, lack of transportation, criminal records, or health issues that do not meet the threshold for disability. Decl. of Courtney E. Hawkins (Hawkins Decl.) ¶ 27, ECF No. 3-6; Decl. of Maria Rivera (Rivera Decl.) ¶ 28, ECF No. 4; Decl. of Donald R. Grebien (Grebien Decl.) ¶ 27, ECF No. 3-5. If these individuals lose SNAP benefits, they will turn to Plaintiff Cities' services and local food pantries—which are funded in part by these Plaintiff Cities—for emergency assistance. Hawkins Decl. ¶ 29; Rivera Decl. ¶ 30; Grebien Decl. ¶ 29. And if the ABAWD waivers in their jurisdictions expire early, Plaintiff Cities will face additional demand on a range of services to meet the needs of individuals navigating work requirements and potential loss of benefits. *See* Hawkins Decl. ¶¶ 29-31; Rivera Decl. ¶¶ 30-32; Grebien Decl. ¶¶ 29-31. Even though Plaintiff Cities would have had to make adjustments for the eventual termination of their States' waivers in the coming months, the extra emergency support that they will need to provide in the meantime will be a substantial drain on their resources, and their other programs and missions will suffer as a result. *See* Hawkins Decl. ¶ 25; Rivera Decl. ¶ 26; Grebien Decl. ¶ 25.

Pursuant to the Court's temporary restraining order, Defendants have treated the existing ABAWD waivers as remaining in effect. Joint Stip. and Proposal for Br. Sched., ECF No. 48. However, if that order is dissolved, Plaintiffs will require permanent relief to preclude Defendants from prematurely terminating ABAWD waivers before their approved expiration dates.

15

### F.  Procedural History

On October 30, 2025, Plaintiffs filed this lawsuit against USDA, the U.S. Department of the Treasury, the Office of Management and Budget, and each agency's leader, to challenge Defendants' suspension of SNAP benefits during the government shutdown and early termination of ABAWD waivers. Compl., ECF No. 1.[2] As relevant here, Plaintiffs simultaneously moved for a temporary restraining order to stay, under 5 U.S.C. § 705, Defendants' early termination of ABAWD waivers before their expiration date and to enjoin Defendants from enforcing, implementing, giving effect to, maintaining, or reinstating under a different name the termination of ABAWD waivers before the waivers' expiration dates. The Court held a hearing the next day. At the hearing, the government's only argument as to the early termination of ABAWD waivers was that ABAWD SNAP recipients would not "suffer any sort of harm until March of 2026, because they'll still be receiving their benefits regardless of the waiver." 10/31/25 TRO Hrg. Tr. at 34:25-35:5.

The Court orally granted the TRO at the hearing, *id.* at 39:3-40:23, and memorialized it in a written order the next day, Order on Mot. for TRO, ECF No. 19. The Court required "[t]he agencies [to] honor all preexisting waivers and do this during the time frame contained in the waivers themselves." 10/31/25 TRO Hrg. Tr. at 40:21-23. It further enjoined "Defendants, their agents, and all persons acting in concert or participation with Defendants . . . from terminating any able-bodied adults without dependents ('ABAWD') waivers before the waivers' expiration dates on the

---

[2] Defendants' suspension of SNAP benefits during the government shutdown is no longer at issue in this case.

16

ground that the waivers were approved due to lack of sufficient jobs in the relevant geographic area." Order on Mot. for TRO, ECF No. 19.

The parties stipulated that the TRO would remain in effect until further order of the Court and agreed to proceed expeditiously to cross-motions for summary judgment. Joint Stip. and Proposal for Br. Sched., ECF No. 48.

## LEGAL STANDARD

Summary judgment "is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Viscito v. Nat'l Plan. Corp.*, 34 F.4th 78, 83 (1st Cir. 2022) (citation omitted). "On cross-motions for summary judgment, each motion is reviewed separately, drawing facts and inferences in favor of the non-moving party." *Scottsdale Ins. Co. v. United Rentals (N. Am.), Inc.*, 977 F.3d 69, 72 (1st Cir. 2020).

For APA claims, "a motion for summary judgment is simply a vehicle to tee up a case for judicial review and, thus, an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action" violates the APA. *Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016); *see also, e.g.*, *Heart 6 Ranch, LLC v. Bernhardt*, 365 F. Supp. 3d 105, 109 (D.D.C. 2019) ("Summary judgment is the mechanism for deciding whether as a matter of law the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." (alteration omitted)).

17

## ARGUMENT

### I.  Plaintiffs have standing.

Although only one Plaintiff need establish standing for the case to proceed, *see Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n. 2 (2006), multiple Plaintiffs here have standing to challenge the ABAWD waiver terminations because they will suffer an "injury in fact" that is "fairly traceable" to the action and "may be redressed by" a judicial order enjoining its implementation. *McBreairty v. Miller*, 93 F.4th 513, 518 (1st Cir. 2024).

Plaintiffs have suffered direct organizational injuries sufficient for standing because the early termination of ABAWD waivers "directly affect[s] and interfere[s] with [their] core business activities." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). As detailed in Background section E, Plaintiffs UWRI, NYLAG, and FHH assist individuals with the benefits process and would face an influx of calls and cases about the premature removal of the ABAWD waiver. This would require them to divert resources from other critical programs on a compressed timeline. Plaintiff FHH also provides emergency food assistance in communities with a significant number of individuals who will be navigating new, stringent work requirements (including individuals who previously qualified for an exemption but will no longer be exempt under H.R. 1). The premature termination of the ABAWD waiver will require FHH to fill the gap for individuals subject to the ABAWD work requirement sooner than expected and for a longer period, which will put a strain on its other programs and make it harder for FHH to fulfill its mission. The Plaintiff Cities of Central Falls,

18

Providence, and Pawtucket have large populations of individuals subject to the ABAWD work requirement—and insufficient jobs, based on USDA's own findings—who will lean on city-funded services when their access to benefits is cut short. These Cities are already stretched thin and will have to make tradeoffs to provide the necessary support to these residents. Finally, Plaintiff NCN has members, including Plaintiff UWRI and others, like Brothers Building A Better Nation, that would likewise be inundated with requests to navigate new requirements and provide emergency assistance. NCN may sue on behalf of its nonprofit members that provide support to SNAP recipients—which would have standing to sue in their own right given the severe harms to their missions and resources—because ensuring that their members can provide services to their constituents is "germane" to NCN's purpose of supporting nonprofits to ensure that communities thrive. *See* Yentel Decl. ¶ 5; *see also United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553 (1996).

Each injury flows directly from the early termination of the waivers and the resulting sudden need for increased support with SNAP applications, emergency resources, and food assistance and would thus be redressed by immediate injunctive relief. *See All. for Hippocratic Med.*, 602 U.S. at 383 (confirming that unregulated parties may establish causation where "third parties will likely react in predictable ways, that in turn will likely injure the plaintiffs").

19

## II. The early termination of ABAWD waivers exceeds statutory authority and is arbitrary and capricious.

Under the Administrative Procedure Act (APA), courts can review "final agency action" and must set it aside if it is "in excess of statutory jurisdiction, authority, or limitations," "not in accordance with law," or "arbitrary [and] capricious." 5 U.S.C. §§ 704, 706(2)(A), (C). Defendants' premature termination of ABAWD waivers is final agency action and should be set aside under the APA for two independent reasons: The abrupt and premature waiver termination both exceeds Defendants' statutory authority and is arbitrary and capricious.

### A. The early termination is a reviewable final agency action.

The early termination of ABAWD waivers is a reviewable final agency action. To qualify as final agency action, two conditions must be satisfied: the action (1) "must mark the consummation of the agency's decisionmaking process," and (2) "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotation marks and citation omitted). Both are met here.

First, USDA published an official "Implementation Memorandum" where it definitively stated that the agency "will terminate" any ABAWD waivers that had initially been approved under the pre-H.R. 1 "lack of sufficient jobs" criteria. AR 471-74 (OBBB Implementation Memorandum – ABAWD Waivers). Such a memorandum, which lays out the clear position of the agency and includes tangible action and deadlines, is "a final determination" where the agency is "render[ing] its last word on

20

the matter." *Omnipoint Holdings, Inc. v. City of Cranston,* 586 F.3d 38, 46 (1st Cir. 2009) (quoting *Harrison v. PPG Indus., Inc.,* 446 U.S. 578, 586 (1980)).

Second, obligations and legal consequences flow from USDA's termination. ABAWD SNAP recipients must meet more stringent work requirements that were previously waived sooner than expected, under penalty of no longer receiving benefits; and States must enforce such requirements on a more compressed timeline, requiring significant system updates, screening, and retraining. USDA's memorandum plainly has had a "direct and immediate" effect on the "day-to-day business" of the parties. *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 600 n.1 (1st Cir. 2016) (quoting *Abbott Labs v. Gardner*, 387 U.S. 136, 152 (1967)).

## B. The early termination exceeds Defendants' statutory authority.

The early termination should be set aside because it exceeds Defendants' statutory authority. For agencies charged with administering statutes, "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). An agency "literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). And "if an agency acts without statutory authority, then a court must set that action aside" under the APA. *Drs. for Am. v. OPM*, 793 F. Supp. 3d 112, 143 (D.D.C. 2025). The same is true where an agency action conflicts with a statute. *See* 5 U.S.C. § 706(A). In determining whether an agency has acted within its statutory authority and consistent with the governing statute, "courts must exercise their independent judgment," and "may not defer to an agency interpretation

21

of the law simply because a statute is ambiguous." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 413 (2024).

Here, no provision of the Food and Nutrition Act—nor of H.R. 1's amendments to it—authorizes Defendants to terminate preexisting ABAWD waivers early. H.R. 1 changed the standard for granting *new* waivers: Under the amended law, USDA "may waive" the ABAWD work requirement for people living in areas with an unemployment rate above 10 percent but can no longer grant such waivers for people living in areas with "insufficient jobs." *See* 7 U.S.C. § 2015(o)(4). But, at the time H.R. 1 was enacted, USDA had already granted waivers based on "insufficient jobs," and those waivers were for a set duration (generally one year, *see* 7 C.F.R. § 273.24(f)(5)) that expired in the future. Administrative Record (AR) 1-466 (State Waiver Requests and Approval Letters). Nothing in H.R. 1 authorized USDA to terminate waivers that were approved under the previous standard.

Indeed, in H.R. 1, Congress explicitly authorized the "early termination" of an ABAWD waiver granted to a noncontiguous State (Alaska or Hawaii) under *new* criteria, but only on the basis of failing to comply with reporting requirements or to make good faith compliance efforts, which do not apply here. *See* 7 U.S.C. § 2015(o)(7)(D)(ii). The statute's omission of any reference to early terminations of other ABAWD waivers—like those granted under the pre-H.R. 1 standard—should therefore be understood as deliberate. *See Trenkler v. United States*, 268 F.3d 16, 23 (1st Cir. 2001) ("It has long been settled that where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it

is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."). Accordingly, although USDA has discretion to grant waivers, it does not have discretion to terminate them early after they are granted.

Because the statute does not authorize Defendants to terminate existing waivers due to noncompliance with the standard that applies to new waivers, the early termination must be set aside as exceeding Defendants' statutory authority, 5 U.S.C. § 706(2)(C).

## C. The early termination is arbitrary and capricious.

The early termination decision must also be set aside for the independent reason that it is arbitrary and capricious. Courts must hold unlawful any agency action that is "not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). To pass muster under arbitrary-and-capricious review, an agency must offer "a satisfactory explanation for its action" and can neither "rel[y] on factors which Congress has not intended it to consider" nor ignore "an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). While agencies are free to change their existing policies, they must "display awareness that" they are doing so, provide "good reasons for the new policy," and demonstrate that they have taken account of "reliance interests" engendered by the prior policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). In assessing the reasonableness of an agency's explanation for its action, "the Court must look to 'the grounds that the agency invoked when it took the action.'"

23

*New York v. Kennedy*, 789 F. Supp. 3d 174, 205 (D.R.I. 2015) (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)). Defendants fail this review for several reasons.

For one, the early termination fails the most basic requirement of the APA because "the administrative record is so devoid of justification for the Secretary's decision that the decision is necessarily arbitrary and capricious." *Hall v. Evans*, 165 F. Supp. 2d 114, 128 (D.R.I. 2001) (citation omitted). Defendants provided no explanation for their actions, much less "a satisfactory explanation for [their] action, including a rational connection between the facts found and the choice made." *Ohio*, 603 U.S. at 292 (citation omitted). Based on the Administrative Record Defendants produced, the only justification offered is the enactment of H.R. 1 itself. *See* AR 467-74 (OBBB ABAWD Documentation); AR 475-520 (Legal Authorities); *see also* Defs.' Notice of Related Proceedings and Related Filings, Ex. 3, ECF No. 14-3 at 408-09. But as explained above, H.R. 1 does not authorize Defendants' action or set forth any rationale for early termination.

Defendants' early termination of waivers is also arbitrary and capricious because Defendants did not consider the "serious reliance interests" of States and counties that administer SNAP, the vulnerable participants who rely on SNAP benefits for food, or the municipalities and nonprofits that rely on SNAP to provide food security in their communities, including Plaintiffs. *See DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020). The Supreme Court has made clear that the failure to "consider[] potential reliance interests," standing alone, renders agency action arbitrary and capricious. *Id.* Specifically, an agency is "required to assess whether

24

there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.* at 33. There is no indication Defendants did that here.

Similarly, Defendants failed to consider an "important aspect of the problem," *State Farm*, 463 U.S. at 43, because they did not account for the effects of USDA's abrupt action on States' and counties' ability to come into compliance with new rules that, under the existing waivers, should not have applied until later. Defendants did not consider how States and counties would be able to update their systems, train staff, revise their policies and procedures, provide sufficient notice to recipients regarding the now un-waived requirements, or provide work activities and referrals to enable ABAWD recipients to comply with the requirements. Nor did they consider how the early waiver termination made existing challenges even worse by accelerating already challenging timelines to implement H.R. 1's other new rules.

Defendants also failed to consider the effects on ABAWD SNAP recipients, who now not only have heightened requirements under H.R. 1's more limited exemptions, but will be expected to find employment or other work activities within a compressed timeframe, or else begin accruing "countable months" toward the three-month SNAP time limit. Nor do Defendants appear to have considered how abruptly compressing the timeframe for States to comply with new rules—and to prepare to help their residents find jobs or alternative placements—would make it more difficult for individuals to find opportunities that would satisfy the work requirement.

25

Finally, Defendants also considered factors Congress did not permit them to consider by apparently terminating existing waivers based on the standard applicable to *new* waivers. For all these reasons, the early termination must be set aside as arbitrary and capricious.

***

For these reasons, the Court should declare unlawful, vacate, and set aside the early termination of ABAWD waivers pursuant to 5 U.S.C. § 706(2). The Court should also permanently enjoin Defendants from enforcing, implementing, giving effect to, maintaining, or reinstating under a different name the termination of ABAWD waivers before the waivers' expiration dates. A permanent injunction is warranted here because merely setting aside the early termination would not necessarily prevent Defendants from again terminating the remaining ABAWD waivers early. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010). Plaintiffs also satisfy the standard for obtaining a permanent injunction, as they prevail on the merits of their challenge, *see supra* Section II; Plaintiffs will suffer "injury for which there is no adequate remedy at law," *see supra* Background section E; and the balance of the equities and the public interest weigh in Plaintiffs' favor given that "the government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277, 326 (D. Mass. 2025) (citation omitted). *See Ortiz-Bonilla v. Federacion de Ajedrez de Puerto Rico, Inc.*, 734 F.3d 28, 40 (1st Cir. 2013) (setting forth permanent injunction standard).

26

Finally, the Court should stay Defendants' early termination of ABAWD waivers pursuant to 5 U.S.C. § 705.

## CONCLUSION

The Court should grant summary judgment to Plaintiffs on their ABAWD waiver claims, such that all previously approved ABAWD waivers remain in effect until they expire by their own terms.

January 23, 2026                              Respectfully submitted,

/s/ Jyoti Jasrasaria
Jyoti Jasrasaria (D.C. Bar No. 1671527)^
Kristin Bateman (D.C. Bar No. 90037068)^
Michael J. Torcello (D.C. Bar No. 90014480)^
Andrew Bookbinder (D.C. Bar No. 90028967)^
Adnan Perwez (D.C. Bar No. 90027532)^
Catherine M.A. Carroll (D.C. Bar No. 497890)^^
Robin F. Thurston (D.C. Bar No. 1531399)^
Skye L. Perryman (D.C. Bar No. 984573)^
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
kbateman@democracyforward.org
jjasrasaria@democracyforward.org
mtorcello@democracyforward.org
abookbinder@democracyforward.org
aperwez@democracyforward.org
ccarroll@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org

/s/ Amy R. Romero
Amy R. Romero (RI Bar # 8262)
Kevin Love Hubbard (MA Bar #704772)^
DeLuca, Weizenbaum, Barry & Revens, Ltd.
199 North Main Street
Providence, RI 02903
(401) 453-1500
Amy@dwbrlaw.com

27

Kevin@dwbrlaw.com
Cooperating counsel, Lawyers' Committee for RI

*Counsel for Plaintiffs*

^ Admitted *pro hac vice*
^^ *Pro hac vice* motion forthcoming

28