**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

RHODE ISLAND STATE COUNCIL OF
CHURCHES, *et al.*,

               Plaintiffs,

     v.

BROOKE ROLLINS, in her official
capacity as Secretary of the United States
Department of Agriculture, *et al*.,

               Defendants.

No. 25-cv-00569-JJM-AEM

**<u>DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION
TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT[1]</u>**

---

[1] Under Local Civil Rule 7(a)(2) Defendants have incorporated the grounds for seeking an order, the relief sought, and the legal argument necessary to support the relief into its motion, rather than filing a separate accompanying memorandum of law.

## **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................ 2

    I.     The SNAP Program and Work-Related Eligibility Requirements ........................ 2

    II.    USDA's Provision of and Termination of Waivers ................................................ 5

    III.   This Litigation ........................................................................................................ 6

LEGAL STANDARD ........................................................................................................ 7

ARGUMENT ..................................................................................................................... 8

    I.     Plaintiffs Lack Standing Generally and Especially as to The Remaining
           Waivers After February 28 .................................................................................... 8

           A.    Plaintiffs lack standing generally as to all the terminations that
                 they challenge. ............................................................................................ 8

           B.    After February 28, this Court will lack subject-matter jurisdiction
                 as all relevant waivers will have expired on their own terms. ................. 12

    II.    The Termination of Waivers Was Lawful .......................................................... 15

           A.    The terminations did not exceed the agency's statutory authority. .......... 15

           B.    The terminations of waivers were well-reasoned decisions. .................... 18

    III.   All Parties Agree that the Non-Waiver Claims in the Complaint are no
           Longer Operative so the Court's Waiver Ruling Resolves this Matter ............... 22

CONCLUSION................................................................................................................. 22

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Adria Int'l Grp., Inc. v. Ferré Dev. Inc.*,
    241 F.3d 103 (1st Cir. 2001) ................................................................................. 8

*Albertson v. FCC*,
    182 F.2d 397 (D.C. Cir. 1950) ............................................................................. 16

*Bos. Redevelopment Auth. v. Nat'l Park Serv.*,
    838 F.3d 42 (1st Cir. 2016) ................................................................................... 8

*Brown v. Colegio de Abogados de Puerto Rico*,
    613 F.3d 44 (1st Cir. 2010) ................................................................................. 14

*Burns v. Johnson*,
    829 F.3d 1 (1st Cir. 2016) ..................................................................................... 7

*Califano v. Sanders*,
    430 U.S. 99 (1977) .............................................................................................. 18

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ............................................................................................ 18

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ............................................................................... 9, 12, 13

*DHS v. Regents of Univ. of Cal.*,
    591 U.S. 1 (2020) ................................................................................................ 20

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ............................................................................................ 18

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021) ............................................................................................ 18

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ...................................................................................... 10, 11

*FEC v. Cruz*,
    596 U.S. 289 (2022) .............................................................................................. 9

*Friends of the Earth, Inc. v. Laidlaw Env't Servs.*,
    528 U.S. 167 (2000) ............................................................................................ 13

*Fund for Animals, Inc. v. Bureau of Land Mgmt.*,
   460 F.3d 13 (D.C. Cir. 2006) ................................................................. 14

*Gill v. Whitford*,
   585 U.S. 48 (2018) ......................................................................... 13, 14

*Griffin v. Oceanic Contractors, Inc.*,
   458 U.S. 564 (1982) ............................................................................. 21

*Gun S., Inc. v. Brady*,
   877 F.2d 858 (11th Cir. 1989) ............................................................. 16

*Harris v. Univ. of Massachusetts Lowell*,
   43 F.4th 187 (1st Cir. 2022) ................................................................ 14

*Havens Realty Corporation v. Coleman*,
   455 U.S. 363 (1982) ............................................................................. 10

*Hochendoner v. Genzyme Corp.*,
   823 F.3d 724 (1st Cir. 2016) ................................................................ 13

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ......................................................................... 8, 13

*Macktal v. Chao*,
   286 F.3d 822 (5th Cir. 2002) ............................................................... 16

*March v. Frey*,
   458 F. Supp. 3d 16 (D. Me. 2020) ........................................................ 8

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ............................................................................... 22

*Murphy v. United States*,
   45 F.3d 520 (1st Cir. 1995) ................................................................... 8

*Murthy v. Missouri*,
   603 U.S. 43 (2024) ................................................................................ 8

*Newhouse v. Robert's Ilima Tours, Inc.*,
   708 F.2d 436 (9th Cir. 1983) ............................................................... 16

*Pennsylvania v. New Jersey*,
   426 U.S. 660 (1976) .............................................................................. 9

*Roe v. Healey*,
    78 F.4th 11 (1st Cir. 2023) ................................................................................. 12, 13

*S.W. Bell Tel. Co. v. FCC*,
    168 F.3d 1344 (D.C. Cir. 1999) ................................................................................. 14

*Safe Haven Home Care, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
    130 F.4th 305 (2d Cir. 2025) ..................................................................................... 21

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ..................................................................................................... 8

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ..................................................................................................... 8

*United States v. Am. Trucking Ass'ns*,
    310 U.S. 534 (1940) ................................................................................................... 21

*United States v. Texas*,
    599 U.S. 670 (2023) ................................................................................................... 10

*Weinstein v. Bradford*,
    423 U.S. 147 (1975) ................................................................................................... 14

*Wells Real Est. Inv. Tr. II, Inc. v. Chardon/Hato Rey P'ship, S.E.*,
    615 F.3d 45 (1st Cir. 2010) ......................................................................................... 8

**STATUTES**

7 U.S.C. § 2011 .............................................................................................................. 3

7 U.S.C. § 2013 .............................................................................................................. 3

7 U.S.C. § 2015 ..................................................................................................... *passim*

7 U.S.C. § 2020 .............................................................................................................. 3

7 U.S.C. § 2025 .............................................................................................................. 3

Act of Jan. 11,
    Pub. L. No. 91-671, 84 Stat. 2048, 2049 (1971) ........................................................ 3

Food Agriculture Act of 1977,
    Pub. L. No. 95-113, 91 Stat. 913 (1977) ..................................................................... 3

One Big Beautiful Bill Act,
Pub. L. No. 119-21, 139 Stat. 72 (2025)........................................................................... 5

Personal Responsibility and Work Opportunity Reconciliation Act of 1996,
Pub. L. No. 104-193, 110 Stat. 2105 (1996).................................................................. 3

**RULES**

Fed. R. Civ. P. 56(a) ................................................................................................................ 7

**REGULATIONS**

7 C.F.R. § 271.3 ...................................................................................................................... 3

7 C.F.R. § 273.24 .................................................................................................................... 4

7 C.F.R. § 277.4 ...................................................................................................................... 3

## <u>INTRODUCTION</u>

This case arises from Congress's recent action to modify the available bases for the waiver of certain federal work requirements of the Supplemental Nutrition Assistance Program ("SNAP"). For most adults, the SNAP statutory scheme requires evidence of work, or attempts to work, in order to receive benefits. In July 2025, the One Big Beautiful Bill Act of 2025 ("OBBB") repealed the provision of the Food and Nutrition Act of 2008 that gave the Secretary of Agriculture authority to approve waivers from the generally applicable requirement of able bodied adults to work when an area was found to lack sufficient jobs for employment of such individuals. As a result, the U.S. Department of Agriculture ("USDA") terminated waivers that had been based on the statutorily removed ground with a 30-day period to prepare for the change. In short, because Congress determined that, effective immediately, no waivers could be based on that ground, USDA reasonably effectuated that expressed Congressional determination.

Plaintiffs seek an injunction on the grounds that the termination of waivers was unlawful under the Administrative Procedure Act ("APA"). Because this Court previously enjoined USDA from implementing its terminations, nearly all the waivers have expired on their own terms. Plaintiffs do not contest those natural expirations. What is left are a few waivers expiring on February 28 and June 30. Administrative Record ("AR") 468 (Chart of 2025-08-21 Active ABAWD Waivers), Doc No. 50-2; Pls.' Mem. In Supp. MSJ ("Pls.' Mem.") at 8-9 (agreeing that only those waivers remain), Doc No. 50-1. The Court should grant summary judgment for Defendants and enter judgment for Defendants.

First and foremost, Plaintiffs have failed to demonstrate standing generally because their asserted harms are not redressed by maintaining the waivers for a slightly longer period of time. Regardless, even on their own theory, Plaintiffs have not shown standing based on the three

waivers that will still be in effect after February 28.

There are three States with partial waivers that were approved before OBBB and will last past February 28 and through June 30, Montana, Minnesota, and North Dakota. Plaintiffs have not demonstrated any harm—even under their own theory—from the termination of those three waivers. Therefore, after February 28, an injunction as to those terminations could provide no relief to Plaintiffs' asserted injuries. On March 1 then, the Court will lack subject-matter jurisdiction.

Even if the Court turns to the merits, Plaintiffs' claims should be rejected. For their statutory authority claim, Plaintiffs confuse "exemptions" and "waivers," two entirely distinct categories in the SNAP context. So Plaintiffs' invocation of additional guidelines in the OBBB for termination of "exemptions" says nothing about the Secretary's discretion regarding waivers. Indeed, Plaintiffs offer no authority limiting USDA's ability to withdraw waivers. And the effectuation of a Congressional choice is not arbitrary and capricious. Here, Congress weighed the options and chose to eliminate the prior ground for SNAP waivers. Relying on that Congressional determination, USDA's terminations comply with the APA.

All told, after February 28, Plaintiffs' claims cannot be sustained. And even if they could, USDA should prevail. Congress made the choice to eliminate the controverted ground for SNAP waivers. That USDA faithfully effectuated Congress's choice is not unlawful. The Court should grant summary judgment for Defendants.[2]

## **BACKGROUND**

### I.    **The SNAP Program and Work-Related Eligibility Requirements**

SNAP is a federal nutrition assistance program administered by USDA at the federal level

---

[2] Pursuant to Local Civil Rule 7(c) counsel does not believe any oral argument is necessary.

and implemented by state SNAP agencies at the local level. *See* 7 U.S.C. § 2020. Since 1964, SNAP (or its predecessor) has provided monthly benefits to low-income households to purchase nutritious food. *Id.* § 2011. Eligible households receive their SNAP benefits on electronic benefit transfer ("EBT") cards, *id.* § 2020, which may be used to purchase food from authorized retailers, *id.* § 2013(a). States are responsible for determining household eligibility and benefit amount, and loading benefits to EBT cards. *Id.* § 2020. States receive partial reimbursements for the costs of operating their SNAP programs (while the Federal Government pays for the entire cost of the benefits themselves). Part of the cost of the administration of SNAP is borne by States while the federal government covers the other portion. 7 U.S.C. § 2025(a); 7 C.F.R. § 277.4(b).

USDA is authorized to "formulate and administer" SNAP, 7 U.S.C. § 2013(a)(1), and generally delegates administration of the program to the Food and Nutrition Service ("FNS"), a component within USDA, *see* 7 C.F.R. § 271.3(a). Congress has conferred broad rulemaking authority on USDA to implement SNAP. *See* 7 U.S.C. § 2013(c) ("The Secretary shall issue such regulations consistent with this chapter as the Secretary deems necessary or appropriate for the effective and efficient administration of [SNAP.]"). SNAP has several goals, including, specifically, encouraging "obtaining employment." *Id.* § 2011.

For decades, Congress has directed that SNAP eligibility be tied to work-related requirements. *See, e.g.*, Act of Jan. 11, 1971, Pub. L. No. 91-671 § 4, 84 Stat. 2048, 2049 (1971); Food Agriculture Act of 1977, Pub. L. No. 95-113 § 6, 91 Stat. 913 (1977). In 1996, Congress strengthened these requirements for SNAP participants through the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"). *See* Pub. L. No. 104-193, 110 Stat. 2105 (1996). These work requirements apply to only a subset of SNAP recipients—able-bodied adults without dependents ("ABAWDs")—who do not fall within certain exceptions. *See* 7 U.S.C.

3

§ 2015(o)(3). By statutory definition, the work requirements apply only to individuals between the ages of 18 and 65 who are not medically certified as physically or mentally unfit for employment, responsible for a dependent child under 14 years old, pregnant, responsible for the care of an incapacitated person, or subject to certain other limited exceptions. 7 U.S.C. §§ 2015(d)(2), (o)(3)(A)-(G). States are required to screen SNAP recipients to determine if they fall within the permissible exceptions. *See* 7 C.F.R. § 273.24(k).

Within a three-year period, anyone who qualifies as an ABAWD may generally receive SNAP benefits for only three months within which he or she did not (1) work at least 20 hours a week (averaged monthly), (2) participate in a work program for at least 20 hours per week, (3) participate in a workfare program, or (4) receive benefits pursuant to a waiver under 7 U.S.C. § 2015(o)(4) or a discretionary exemption under 7 U.S.C. § 2015(o)(6). *Id.* § 2015(o)(2). An ABAWD is not required to find paid employment; "[w]orking" is defined by regulation to include any combination of work in exchange for money, work in exchange for goods or services, or "[u]npaid work." 7 C.F.R. § 273.24(a)(2). If an ABAWD is covered by a waiver for part of a particular month, that month does not count towards the three-month limit. *See id.* § 273.24(f).

An individual who fails to meet these requirements can regain SNAP eligibility by working for 80 or more hours a month or complying with the requirements of a work program. 7 U.S.C. § 2015(o)(5); 7 C.F.R. §§ 273.24(d), (e). If an individual regains eligibility and then again fails to meet the work requirement, they may receive three consecutive months of benefits without meeting the work requirements, but can avail themselves of this grace period only once within a three-year period. 7 C.F.R. § 273.24(e).

Prior to the OBBB, the Secretary of Agriculture, upon the request of a State, could waive the applicability of the work requirement "to any group of individuals in the State" if she

4

determined that "the area in which the individuals reside (i) has an unemployment rate of over 10 percent; or (ii) does not have a sufficient number of jobs to provide employment for the individuals." 7 U.S.C. § 2015(o)(4)(A) (Aug. 22, 1996). With the OBBB, Congress removed clause (ii) as a permissible ground for waiving the work requirement with immediate effect. *See* OBBB Act, Pub. L. No. 119-21, 139 Stat. 72 (2025).

## II.    USDA's Provision of and Termination of Waivers

Before Congress changed the relevant criteria, USDA had approved over a dozen waivers premised on the lack of sufficient jobs covering some or all of a State or territory. AR 3-466; *see* AR 468 (summary chart). With the basis for those approvals eliminated, USDA was forced to consider the effect of that legal change on the then-existing waivers.

On October 3, 2025, USDA made its determination. AR 471-74 (Implementation Memorandum). USDA properly recognized that, for the 48 contiguous States, "[t]he statute, as amended, requires that areas have unemployment rates of over 10 percent to qualify for ABAWD time limit waivers" as no other criteria for approval remained. *Id.* at 471. That accurately describes the statute which, presently states "the Secretary may waive the applicability of [work requirements] to any group of individuals in the State if the Secretary makes a determination that the area in which the individuals reside-"

"(i) has an unemployment rate of over 10 percent; or"

"(ii) is in a noncontiguous State and has an unemployment rate that is at or above 1.5 times the national unemployment rate."

7 U.S.C. § 2015(o)(4) (current). USDA further noted that "[t]he statutory changes to ABAWD waiver criteria . . . were effective upon enactment." AR 471.

Because of the immediate effect of Congress's change, USDA "encourage[d] State

agencies to terminate active ABAWD waivers approved under the outdated 'lack of sufficient jobs' criteria as soon as possible[.]" AR 472. It further determined that it would "terminate any such ABAWD waivers 30 days after issuance of this memorandum." *Id.*

In a letter issued to States that same day, USDA communicated its determination. AR 469-70 (USDA Letter to State Agencies). USDA explained that the OBBB "requires that areas have unemployment rates of over 10 percent to qualify for ABAWD time limit waivers[.]" *Id.* at 469. That is because "[t]he OBBB removed the criterion allowing for approval of waivers for areas that States identified as having 'a lack of sufficient jobs.'" *Id.* "Because there is no longer authority for ABAWD waivers based on a lack of sufficient jobs," USDA explained that it would "terminate all remaining such waivers 30 days from the issuance of this letter." *Id.*

USDA further recognized that, as the statutory language dictates, "ABAWD waivers have always been subject to the Secretary's discretion." *Id.*; *see* 7 U.S.C. § 2015(o)(4) (explaining "the Secretary *may* waive the applicability of [work requirements]" (emphasis added)). In recognition of the States' reliance on the waivers, however, USDA, advised that "[t]he applicable waiver's termination does not affect or attach liability to actions subject to the waiver that State agencies took while the waiver was in effect." AR 469.

## III.    This Litigation

On October 30, 2025, Plaintiffs, a coalition of organizations and municipalities filed suit. Compl. Plaintiffs bring claims under the APA. They originally sought to challenge both the suspension of SNAP benefits due to the lack of funds as well as the termination of the waivers. *Id.* ¶¶ 105-40. Plaintiffs filed, that afternoon, a motion for temporary restraining order, Doc. No. 3 and memorandum in support, Mem. in Supp. of Pls.' Mot. for TRO, Doc. No. 3-1. All Parties agree that claims related to suspension of benefits during the lapse in appropriations are no longer at

issue in this matter. Pls.' Mot. for Partial Summ. J. at 1 n.1, Doc. No. 50 ("Pls.' MSJ"). So only two claims remain: that the terminations of waivers exceeded statutory authority, Compl. ¶¶ 127-31, and that the terminations were arbitrary and capricious, *id.* ¶¶ 132-40.

On October 31, this Court issued an oral ruling granting Plaintiffs' motion for a temporary restraining order, and the Court later issued a written ruling. Doc. No. 19. For the waivers issue, the Court ruled that "Defendants . . . are enjoined from terminating any able-bodied adults without dependents ("ABAWD") waivers before the waivers' expiration dates on the ground that the waivers were approved due to lack of sufficient jobs in the relevant geographic area." *Id.* ¶ 7.

The Parties subsequently agreed to a summary judgment schedule to resolve the remaining claims on the administrative record. Doc. No. 48. The Court's order remains in effect pending resolution of the motions for summary judgment. *See id.* In accordance with that schedule, Plaintiffs filed their motion asserting that they have standing, the terminations exceeded statutory authority, and that the terminations were arbitrary and capricious. *See generally* Pls.' Mem. To support their motion, Plaintiffs included a single declaration, Decl. Cortney Nicolato, Doc No. 50-3, and the administrative record.

## LEGAL STANDARD

Summary judgment is properly granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, courts must construe the record in the light most favorable to the non-movant and resolve all reasonable inferences in the non-movant's favor. *See Burns v. Johnson*, 829 F.3d 1, 8 (1st Cir. 2016).

"Cross-motions for summary judgment do not alter the summary judgment standard, but instead simply 'require [the Court] to determine whether either of the parties deserves

judgment as a matter of law on the facts that are not disputed.'" *Wells Real Est. Inv. Tr. II, Inc. v. Chardon/Hato Rey P'ship, S.E.*, 615 F.3d 45, 51 (1st Cir. 2010) (quoting *Adria Int'l Grp., Inc. v. Ferré Dev. Inc.*, 241 F.3d 103, 107 (1st Cir. 2001)). However, "each motion should not be considered in a vacuum. Rather, a district court ordinarily should consider the motions 'at the same time, applying the same standards to each motion.'" *March v. Frey*, 458 F. Supp. 3d 16, 30 (D. Me. 2020) (quoting *Wells Real Est.*, 615 F.3d at 51). And for the merits of APA claims, summary judgment simply provides a procedural vehicle to determine whether some set of final agency actions violate the APA. *See Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016).

## ARGUMENT

### I.    PLAINTIFFS LACK STANDING GENERALLY AND ESPECIALLY AS TO THE REMAINING WAIVERS AFTER FEBRUARY 28

"[A] plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). Plaintiffs "must demonstrate standing for each claim that they press" against each defendant, "and for each form of relief that they seek." *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (quoting *TransUnion LLC*, 594 U.S. at 431). And they bear the burden to clearly allege facts for each element. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995) ("The party invoking the jurisdiction of a federal court carries the burden of proving [subject-matter jurisdiction's] existence." (citation omitted)).

### A.    Plaintiffs lack standing generally as to all the terminations that they challenge.

To start, Plaintiffs lack standing as to all their claims because the theories underlying their purported injuries are too speculative. They contend that because they "assist individuals with the benefits process and would face an influx of calls and cases about the premature removal of the ABAWD waiver" and would need to "divert resources" in response to those inquiries, they satisfy the requirement for standing. Pls.' Mem. at 18. Plaintiffs also argue that municipality plaintiffs will have to spend money "on city-funded services" and others will "be inundated with requests to navigate new requirements and provide emergency assistance." *Id.* at 18-19. But none of that can suffice.

Turning first to Plaintiffs' allegations that they will provide their own services or assistance to fill in the gap of newly ineligible SNAP recipients. Plaintiffs—who do not themselves receive SNAP benefits—are threatening to inflict injury on themselves, by providing resources and support to others in the face of the termination of waivers. That is the prototypical example of an action that cannot impart standing. A "self-inflicted injur[y]" is not cognizable. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013)**.** And any choice to provide benefits and support gratuitously would be precisely such a self-inflicted injury.

*Pennsylvania v. New Jersey*, 426 U.S. 660 (1976) (*per curiam*) is closely analogous. There, "the unilateral decisions by a group of States to reimburse their residents for taxes levied by other States was not a basis to attack the legality of those taxes." *FEC v. Cruz*, 596 U.S. 289, 297 (2022) (characterizing *Pennsylvania*). As there, "[n]othing in the challenged [terminations] require[s] the plaintiff [organizations] to offer reimbursements; accordingly, the financial injury those [organizations] suffered [is] due to their own independent response[.]" *See id.* (citing *Pennsylvania* 426 U.S. at 664). Thus, the expenditure of funds to simply fill in the gap cannot grant Plaintiffs standing to then sue.

9

Plaintiffs' additional invocation of alleged operational harms is also insufficient. Of course, "federal policies frequently generate indirect effects" including "on [a plaintiff's] revenues or [plaintiff's] spending." *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023). "[T]hose kinds of indirect effects" are not enough, even if they flow ultimately from the challenged action. *Id.* Indeed, the direct effect of this action is on beneficiaries. The additional indirect effects, requiring Plaintiffs to continue the very advising and support activities they already do, cannot suffice. *See, e.g.*, *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024) ("[A]n organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate."). Plaintiffs' "theory would mean that all the organizations in America would have standing to challenge almost every federal policy that they dislike." *See id.* at 395.

And, while Plaintiffs seek to rely on *Havens Realty Corporation v. Coleman*, 455 U.S. 363, 379 (1982), that "unusual case," *All. for Hippocratic Med.*, 602 U.S. at 396, cannot support Plaintiffs here. In *Havens*, the plaintiff was a housing counseling service named HOME that sued the defendant under the Fair Housing Act alleging that the defendant provided its employees false information about apartment availability. 455 U.S. at 368. As the Supreme Court has emphasized, HOME was only able to establish Article III standing because "when [defendant] gave [its] employees false information about apartment availability," it "perceptibly impaired [the service's] ability to provide counseling and referral services for low- and moderate-income homeseekers." *All. for Hippocratic Medicine*, 602 U.S. at 395 (quoting *Havens*, 455 U.S. at 379). In that way, the case was akin to "a retailer who sues a manufacturer for selling defective goods to the retailer[,]" *id.*

The Supreme Court "has been careful not to extend the *Havens* holding beyond its context."

*Id.* at 396. There, the Court held that medical advocacy organizations lacked standing to challenge a decision of the U.S. Food and Drug Administration ("FDA") to relax regulatory requirements for the prescription of a certain drug. *Id.* The Court rejected the organizations' theory that the FDA's regulatory decision "impaired their ability to provide services and achieve their organizational missions," including by "mak[ing] it more difficult for them to inform the public about safety risks." *Id.* at 394, 395 (citation omitted). The Court held that the "argument does not work to demonstrate standing" because "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's actions." *Id.* at 394. Thus, it is not enough for standing purposes for "an organization [to] divert[] its resources in response to a defendant's actions." *Id.* at 395. That is exactly the operational theory that Plaintiffs here seek to invoke. So their theory must accordingly fail.

Even setting all that aside, Plaintiffs lack standing because they challenge only USDA's terminations but have not shown how USDA's actions harm them in a way separate and apart from the natural expiration of the waivers caused by the OBBB. Plaintiffs must demonstrate that something about the early termination of the waivers harms them in a way that is unique and independent of the inevitable expiration of the waivers under the OBBB. But the logic of their injuries cannot support that speculative theory. Plaintiffs state that the operational and financial difficulties flow from "a significant number of individuals who will be navigating new, stringent work requirements (including individuals who previously qualified for an exemption but will no longer be exempt under [OBBB])." Pls.' Mem. at 18. They are right. But it is the OBBB, not USDA's challenged actions, which could ultimately cause them injury. And Plaintiffs provide no credible explanation why effectuating Congress's action "sooner than expected" will lead them to

an injury separate and apart from the one they are destined to suffer when the waivers naturally expire. *Id.* Regardless of the specific date, all the harms that Plaintiffs allege will come to pass when the waivers eventually expire.

In other words, any harm asserted appears to stem simply from the end of the waiver, and not specifically from any termination, which is all that is challenged here. To establish standing, the purported harm must be fairly traceable to the actions challenged. *Clapper*, 568 U.S. at 410. Plaintiffs have failed to establish sufficient connection between the termination and their purported harm, nor have they shown that any such harm could be redressed by a Court order that the waiver must run through its original date.

### B.  After February 28, this Court will lack subject-matter jurisdiction as all relevant waivers will have expired on their own terms.

Regardless, after February 28, Plaintiffs have, even under their own theories, failed to demonstrate injury stemming from the three remaining waivers. As a result, the Court at that time will not be able to order any effectual relief and will therefore lose jurisdiction over this matter.

"[P]ast harm does not confer standing to seek forward-looking declaratory or injunctive relief unless there is ongoing injury or a sufficient threat that the injury will recur." *Roe v. Healey*, 78 F.4th 11, 21 (1st Cir. 2023). But here, after February 28, there is no ongoing harm linked to Plaintiffs' allegations of injury. At the time they filed their Complaint, Plaintiffs challenged each early termination.[3] However, by operation of time, nearly all the waivers have expired on their own terms. *See* AR 468. After February 28, only three waivers will continue to operate. A partial waiver in Minnesota, a partial waiver in Montana, and a partial waiver in North Dakota. *Id.*

---

[3] Defendants do not contest in this case that each termination is itself a final agency action challengeable under the APA.

Together, an estimated 4,300 people will be affected by the remaining waivers. *Id.*

Plaintiffs have not provided evidence, either at the emergency motions stage nor at the summary judgment stage, that they have been harmed (or are harmed now) by the early termination of *those* three partial waivers. They cite no Plaintiff specifically operating in the areas of those States where the partial waivers operate, and do not credibly assert any harm that would flow to Plaintiffs from the termination affecting the estimated 4,300 individuals covered by the partial waivers. Pls.' Mem. at 10-15, 18-19; *see also* ECF Nos. 3-1 through 3-19 (declarations supporting motion for temporary restraining order). It is their burden to provide sufficient factual material supporting their allegations of standing at the summary judgment stage, and they have failed to meet that threshold showing.

So all waivers even possibly relevant to Plaintiffs will expire naturally on February 28. The effect of that expiration can be understood under either a traditional standing analysis, or under mootness. Standing of course, is an analysis that is based on the outset of the litigation. *Friends of the Earth, Inc. v. Laidlaw Env't Servs.*, 528 U.S. 167, 189 (2000). It requires that "a plaintiff must 'be himself among the injured[.]'" *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 734 (1st Cir. 2016) (quoting *Lujan*, 504 U.S. at 563). And that injury must be fairly traceable to the actions that Plaintiffs challenge. *Clapper*, 568 U.S. at 410. Plaintiffs have always sought the relief that relevant waivers be permitted to run until their original end dates. *See, e.g.*, Compl. Request for Relief D (merely seeking to bar terminations "before the waiver's expiration date"). As all waivers for which Plaintiffs could have a traceable injury will end on their own terms by March 1, Plaintiffs Complaint does not seek further relief after that date. As plaintiff's remedy must "be tailored to redress the plaintiff's particular injur[ies]," and the source of Plaintiffs' alleged injuries will have already expired, there will be nothing more for the Court to do. *See Gill v. Whitford*, 585 U.S. 48,

73 (2018).

The Court could also conceptualize the expiration of the relevant waivers as rendering this case moot. Since, as of March 1, Plaintiffs no longer challenge any termination that could cause them harm, their "claims for injunctive relief are inescapably moot" as the relevant "polic[y] no longer appl[ies]." *Harris v. Univ. of Massachusetts Lowell*, 43 F.4th 187, 192 (1st Cir. 2022); *see also Fund for Animals, Inc. v. Bureau of Land Mgmt.*, 460 F.3d 13, 18 (D.C. Cir. 2006) ("Because the [action] has expired, this claim is moot."). Indeed, since Plaintiffs have proffered no evidence that the three remaining partial waivers cause them any "continuing adverse impact . . . there is no . . . relief that a court may grant, [and] any request for judicial review of the action is moot." *S.W. Bell Tel. Co. v. FCC*, 168 F.3d 1344, 1350 (D.C. Cir. 1999) (citation omitted).

Nor is this an instance where the exceptions to mootness: voluntary cessation and capable of repetition yet evading review—could rescue the case from mootness. First, the voluntary cessation doctrine does not apply when it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Brown v. Colegio de Abogados de Puerto Rico*, 613 F.3d 44, 49 (1st Cir. 2010) (citation omitted). That is definitionally true here. When the waivers here expire, there is no possibility of USDA terminating them again. And the basis for those waivers was eliminated by the OBBB, so the waivers cannot be re-issued. All Plaintiffs ever sought was to continue the waivers through their natural expiration, at which point this controversy cannot arise again.

Similarly, the capable or repetition yet evading review exception cannot rescue the case from mootness. In applying that exceptions, courts require that "there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again." *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975). That cannot be the case here. Once all relevant waivers expire

14

on March 1, there is no possibility that they can be reissued under the now defunct authority, much less terminated again.

Taken together, whether viewed through standing doctrine or mootness doctrine, the Court will lack subject-matter jurisdiction after February 28. When all potentially relevant waivers expire on their own terms, Plaintiffs, even under their own theories, will lack any injury traceable to the remaining terminations. At that point, the Court should dismiss this matter.

## II.   THE TERMINATION OF WAIVERS WAS LAWFUL

### A.  The terminations did not exceed the agency's statutory authority.

Plaintiffs argue that USDA violated its statutory authority by terminating the waivers issued under a terminated statutory authority. In doing so, they argue both that the Secretary may never terminate an existing waiver, Pls.' Mem. at 21-22, and that a provision about "early termination" of exemptions for Alaska and Hawaii renders early termination of waivers improper, *id.* at 22-23. Neither contention works.

First and foremost, the structure of the statutory scheme demonstrates that the Secretary may, after issuing a waiver, terminate that waiver if it is noncompliant with the statutory requirements. Start with the work requirement itself. As established by Congress, "no individual shall be eligible to participate in the supplemental nutrition assistance program as a member of any household if, during the preceding 36-month period, the individual received supplemental nutrition assistance program benefits for not less than 3 months (consecutive or otherwise) during which the individual did not [meet certain work-related requirements]." 7 U.S.C. § 2015(o)(2). Congress also laid out certain exceptions to those rules that always apply. *Id.* § 2015(o)(3).

In addition to those hard and fast rules, Congress provided the Secretary with discretion. "[T]he Secretary may waive the applicability of [the work requirements] to any group of

individuals in the State" when the statutory basis for doing so is satisfied by "a determination" of "the Secretary." *Id.* § 2015(o)(4). Nothing in that language suggests the Secretary is barred from revoking such a waiver when, as here, the original statutory basis is eliminated.

Indeed, courts have often held that the power to grant a waiver or exemption "impliedly authorizes" the suspension or termination of the prior grant. *See Gun S., Inc. v. Brady*, 877 F.2d 858, 862 (11th Cir. 1989); *see also Macktal v. Chao*, 286 F.3d 822, 825–26 (5th Cir. 2002) ("[I]t is generally accepted that in the absence of a specific statutory limitation, an administrative agency has the inherent authority to reconsider its decisions." (citations omitted)); *Albertson v. FCC*, 182 F.2d 397, 400 (D.C. Cir. 1950) ("[T]he Commission has clearly recognized its inherent authority to reconsider previous action taken by it[,]" which is derived from the "implied powers arising out of the Act."). "[T]he Supreme Court and other courts have recognized an implied authority. . . to reconsider and rectify errors even though the applicable statute and regulations do not expressly provide for such reconsideration." *Brady*, 877 F.2d at 862 (collecting cases). "[S]ome courts have specifically relied on this implied authority to allow an agency to revoke a license." *Id.* (collecting cases). That is especially true where "[t]he power to revoke exemptions is inherent in [a] broad congressional mandate." *Newhouse v. Robert's Ilima Tours, Inc.*, 708 F.2d 436, 440 n.7 (9th Cir. 1983).

Once Congress eliminated the basis undergirding many then-present waivers, the Secretary was authorized to assert her inherent authority and reconsider whether the stale waivers could remain. After the OBBB went into effect, USDA initiated a review of existing waivers. USDA recognized that "[t]he OBBB removed the criterion allowing for approval of waivers for areas that States identified as having 'a lack of sufficient jobs.'" AR 469. And, utilizing the inherent discretion provided by the ability to grant a waiver, the Secretary eliminated the newly

16

noncompliant waivers.

Plaintiffs counter this commonsense contention by turning to the portion of the statutory scheme dealing with exemptions for Alaska and Hawaii. Pls.' Mem. at 22 (citing 7 U.S.C. § 2015(o)(7)). Plaintiffs state that "Congress explicitly authorized the 'early termination' of an ABAWD waiver granted to a noncontiguous State (Alaska or Hawaii) under *new* criteria, but only on the basis of failing to comply with reporting requirements or to make good faith compliance efforts, which do not apply here." *Id.* (citation omitted). They are wrong.

The provision that they cite does not cover waivers—the subject matter of this case. Instead, that portion of the scheme covers "exemptions" which may be granted to a "noncontiguous State." 7 U.S.C. § 2015(o)(7)(A)(i). An exemption, which covers an entire eligible noncontiguous State, and a waiver, which covers a group of people located within an area of a State, are fundamentally different from each other. To merit an exemption, a noncontiguous State must satisfy a set of conditions entirely separate and apart from those required for a waiver. "[T]he Secretary may exempt individuals in a noncontiguous State from compliance with the [work requirements] if-"

"(i) the State agency submits to the Secretary a request for that exemption, made in such form and at such time as the Secretary may require, and including the information described in subparagraph (C); and"

"(ii) the Secretary determines that based on that request, the State agency is demonstrating a good faith effort to comply with the [work requirements]."

*Id.* § 2015(o)(7)(B). Recall that waivers, located under the entirely separate Section 2015(o)(4), are tied to unemployment rate. Indeed, a group of individuals in a noncontiguous State may be covered by a waiver so long as the State "has an unemployment rate that is at or above 1.5 times

17

the national unemployment rate." *Id.* 2015(o)(4)(A)(ii).

So Plaintiffs wrongly contend that Congress excluded terminations of some waivers by setting forth guidelines to early terminate other waivers. In fact, for an entirely separate category of noncontiguous State exemptions, Congress provided specifics for how early terminations would operate. That says nothing about the default, inherent, authority that the Secretary retains to terminate waivers based on removed statutory criteria for waivers.

In short, the statutory text and structure provide the Secretary with broad authority to grant and administer waivers. The inherent power to terminate stale waivers once Congress modified the appropriate bases existed before and after passage of the OBBB. USDA accordingly did not act beyond the bounds of statutory authority.

**B.  The terminations of waivers were well-reasoned decisions.**

Under the arbitrary and capricious standard, an agency's decision is presumed valid, and a court reviews only whether that decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (citation omitted), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). "Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). A court must "uphold [even] a decision of less than ideal clarity if the agency's path may reasonably be discerned." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (citation omitted).

USDA's decision here was eminently reasonable. Congress revised the statutory scheme to immediately eliminate the basis for the waivers that Plaintiffs seek to maintain. USDA then properly recognized that "[t]he statute, as amended, requires that areas have unemployment rates

of over 10 percent[4] to qualify for ABAWD time limit waivers" as no other criteria for waiver approval remained. AR at 471. Those "statutory changes to ABAWD waiver criteria . . . were effective upon enactment." *Id.*; 7 U.S.C. § 2015(o)(4) (current) (referring only to unemployment rate-based criteria).

With the new statutory criteria in hand, USDA compiled the existing waivers and reviewed their contents. AR 3-466. Plaintiffs do not and cannot contest that those waivers were based on stale criteria. Nor do Plaintiffs challenge that the OBBB properly eliminated that criteria. USDA, accepting Congress's choice to "no longer [provide] authority for ABAWD waivers based on a lack of sufficient jobs," therefore determined it appropriate to "terminate all remaining such waivers 30 days from the issuance of [its] letter." *Id.* at 469. Altogether, USDA observed that Congress had altered the statutory criteria for permissible waivers, reviewed the existing waivers for compliance with Congress's new standard, and terminated all waivers out of compliance with the law as it stood following the OBBB.

Plaintiffs raise several objections to this straightforward story. None are persuasive.

First, Plaintiffs allege that the administrative record fails to explain USDA's actions. *See* Pls.' Mem. at 24. Not so. Plaintiffs concede that USDA plainly relied on the passage of the OBBB and its modification of the law. *See id.* And in its memorandum and letter, USDA forthrightly explained that it was terminating waivers based on the substantial change in criteria caused by the OBBB. *See* AR 469-74. The administrative record itself sets forth the legal materials USDA relied upon: the OBBB and the relevant portion of the Food and Nutrition Act. AR 475-520. Nothing more was required.

Second, Plaintiffs complain that USDA did not sufficiently consider the reliance interests

---

[4] 150 percent above the national unemployment rate for Alaska and Hawaii. A.R. 473.

"of States and counties that administer SNAP, the vulnerable participants who rely on SNAP benefits for food, or the municipalities and nonprofits that rely on SNAP to provide food security in their communities[.]" Pls.' Mem. at 24 (citing *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020)). But USDA appropriately relied on Congress's own determination as to the timing of statutory criteria—immediately. In *Regents*, the Court faulted the agency for failing to consider reliance interests sufficiently "[w]hen [the] agency change[d] course[.]" 591 U.S. at 32; *see also id.* at 33 ("[The policy] was rescinded because of the [agency's] illegality determination."). To the contrary, here it was Congress that intervened to change the law and eliminate the basis for the waivers. It was Congress that weighed the reliance interests discussed by Plaintiffs and determined that elimination of the prior criteria, effective immediately, was appropriate. The agency did not err by implementing that new Congressional directive.

Third, Plaintiffs contend that USDA violated the APA because it failed to consider various aspects of the terminations that they identify. *See* Pls.' Mem. 25-26. To Plaintiffs, USDA should have considered the effects on States and counties and recipients from implementation of Congress's changed statutory criteria. *Id.* Under Plaintiffs theory, USDA could not rely on the intervening change in the statutory scheme at all to review existing waivers. *Id.* at 26. But that cannot be right.

From the very start, the waiver criteria have been explicitly directed by statute, *see* 7 U.S.C. § 2015(o)(4). The statute sets out precisely what must be satisfied for the Secretary to discretionarily provide a waiver. Nowhere did Congress provide that the Secretary should consider whether Congress made the right policy choice in eliminating prior criteria. And Congress provided no language suggesting that its new criteria should be walled off from previously granted waivers. When the OBBB was passed, individual waivers might have had as many as 12 months

left until their expiration. AR 468.

It would ultimately be rather bizarre if Congress had *sub silentio* provided for continued waivers under stale criteria. Preserving waivers under dead criteria would be based only on the happenstance of whether a waiver was recently granted, or close to expiration. Those States soon seeking new waivers would be subject to Congress's revision, while those States that happened to secure waivers shortly before passage of the OBBB could have as long as a year to operate under the eliminated basis. Reading that intention into Congress's action would credit an unlikely embrace of mere fortune rather than the clear rules set out in the OBBB revision. But the plain "words are sufficient in and of themselves to determine the purpose of the legislation" which was to eliminate the old basis with immediate effect. *See United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 543 (1940). Even if that were insufficient, Plaintiffs' reading would mean Congress meant to freeze in amber waivers conflicting with its newly minted statutory criteria. That construction "would produce absurd results" of the kind "to be avoided if alternative interpretations consistent with the legislative purpose are available." *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982). So no such reading can be sustained.

Instead of engaging in a freeform exploration of whether Congress was wrong to limit the permissible reasons for providing waivers, USDA faithfully executed the new Congressional policy. The agency was not required to consider the additional factors that Plaintiffs claim here were overlooked because Congress nowhere provided for such considerations. *Cf. Safe Haven Home Care, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 130 F.4th 305, 323 (2d Cir. 2025) (holding that where the government was authorized to approve a state Medicaid proposal based on certain enumerated considerations, the APA did not require evaluation of an additional consideration). Indeed, if USDA had relied on these extra-statutory factors, that itself may well have been arbitrary

and capricious. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider.").

At base, USDA properly and appropriately effectuated Congress's choice to eliminate the prior authorization to grant waivers when an area did "not have a sufficient number of jobs to provide employment for the individuals." 7 U.S.C. § 2015(o)(4)(A) (Aug. 22, 1996). It provided up to 30 days for the noncompliant waivers to phase out. AR 469-70. And it made clear that no State would face any penalties for relying on a now defunct waiver. *Id.* That was a reasonable and reasonably explained decision, initiated by Congress, and faithfully executed by USDA. No such action can be arbitrary and capricious.

### III.    ALL PARTIES AGREE THAT THE NON-WAIVER CLAIMS IN THE COMPLAINT ARE NO LONGER OPERATIVE SO THE COURT'S WAIVER RULING RESOLVES THIS MATTER

After this Court rules on the claims related to the waivers, it should issue final judgment resolving all claims in this matter. As Plaintiffs agree, the claims regarding funding during the lapse in appropriations "are no longer at issue in this case." Pls.' MSJ at 1 n.1. They may be dismissed as moot. As a result, when the Court issues summary judgment on the waivers issues, this case will be fully resolved. The Court should consequently issue final judgment with its resolution of the legality of the terminations.

### CONCLUSION

The Court should deny Plaintiffs' motion for summary judgment and grant Defendants' motion for summary judgment on all counts in the Complaint. Counts 1 through 3 of the Complaint are no longer at issue, as all Parties agree, and the Court should accordingly dismiss those counts. Defendants have demonstrated that the Court lacks jurisdiction as to Counts 4 and 5 of the

Complaint or alternatively that Defendants should prevail on the merits of those counts. The Court should issue final judgment in favor of Defendants.

Dated: February 13, 2026                    Respectfully submitted,


                                            BRETT A. SHUMATE
                                            Assistant Attorney General

                                            YAAKOV M. ROTH
                                            Principal Deputy Assistant Attorney General

                                            JOSEPH E. BORSON
                                            Assistant Branch Director
                                            Federal Programs Branch

                                            TYLER J. BECKER (V.A. Bar No. 97636)
                                            Counsel to the Assistant Attorney General
                                            U.S. Department of Justice, Civil Division
                                            Tel.: (202) 514-4052
                                            Email: tyler.becker@usdoj.gov

                                            /s/ *Jason Altabet*
                                            JASON ALTABET
                                            Trial Attorney
                                            Federal Programs Branch

                                            *Attorneys for the United States*